NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| KARUNAMUNIGE CHAMILA KRISHANTHI, *et al*, | **Hon. Dennis M. Cavanaugh** |
| Plaintiffs, | **OPINION** |
| v. | Civil Action No. 09-CV-05395 (DMC-JAD) |
| RAJAKUMARA RAJARATNAM, *et al*. | |
| Defendants. | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion to dismiss by Raj Rajaratnam, Jesuthasan Rajaratnam ("Rajaratnam Defendants") and Tamils Rehabilitation Organization, Inc. ("TRO" or "TRO-USA") in accordance with Federal Rules of Civil Procedure 12(b)(1), 12(b)(3) and 12(b)(6). Pursuant to Federal Rule of Civil Procedure 78, no oral argument was heard. After considering the submissions of all parties, it is the decision of this Court that Defendants' motion to dismiss is **denied in part** and **granted in part**.

## I.   BACKGROUND[1]

A.   LTTE

Founded in 1976 by Vellupillai Prabhakaran, the Liberation Tigers of Tamil Eelam ("LTTE")

---

[1] These facts have been adopted from the parties' respective court submissions.

began engaging in hundreds of terror attacks[2] in 1983. Plaintiffs' Complaint ("Pl. Compl."), ¶¶ 2, 59. The LTTE has killed thousands of civilians in an effort to establish a mono-ethnic Tamil state in northern Sri Lanka. Pl. Compl., ¶ 1. On October 8,1997, the United States Government designated LTTE a Foreign Terrorist Organization ("FTO") pursuant to section 219 of the Immigration and Nationality Act.  On November 2, 2001, the United States Government designated LTTE a Specially Designated Global Terrorist ("SDGT"). Pl. Compl., ¶ 4. Accordingly, FTO and SDGT designations prohibit the provision of financial or other material support to LTTE. Pl. Compl., ¶ 4. Pursuant to a 2008 report released by the U.S. Department of State,

> [t]he LTTE financed itself with contributions from the Tamil Diaspora in North America, Europe, and Australia, by imposing local 'taxes' on businesses operating in the areas of Sri Lanka under its control, and reportedly by extortion in government-controlled areas. The LTTE also used Tamil charitable organizations as fronts for its fundraising [sic].

Pl. Compl., ¶ 68.  In 2002, the Sri Lankan Government and the LTTE agreed to a cease-fire. Pl. Compl., ¶ 64.  Despite that cease-fire, the LTTE continues to engage in further terror attacks in Sri Lanka. Pl. Compl., ¶ 64.

    B.    TRO

In accordance with the Voluntary Social Service Organization (Registration and Supervision) Act No. 31 of 1980, as amended by Act No. 8 of 1988, TRO-Sri Lanka[3] was registered in Sri-Lanka as non-governmental organization ("NGO").  Pl. Compl., ¶ 75.  TRO-USA was incorporated under the laws of the State of Maryland on December 12, 1994.  White Declaration ("Decl."), Exhibit

---

[2]

LTTE suicide bombers are known as the "Black Tigers"; LTTE naval squad are known as "Sea Tigers"; and members of the LTTE air force are known as "Sky Tigers."

[3]

TRO-Sri Lanka is not a named Defendant in the present action.

("Ex.") 1.  In a November 19, 1997 letter from the Department of Treasury, TRO-USA was granted § 501(c)(3) tax exempt status. TRO-Sri Lanka is purported to be a separate entity, at least according to TRO-USA.  TRO Brief ("Br.") at 10. Pursuant to Executive Order 13224, issued on November 15, 2007, the United States Government designated TRO an SDGT and concluded that TRO is a "charitable organization that acts as a front to facilitate fundraising [sic] and procurement for the LTTE."  Pl. Compl., ¶ 70.  As a result of that Executive Order, TRO-USA assets were frozen. Pl. Compl., ¶ 70.   TRO-USA donates funds to charities in Sri Lanka, including, but not limited to, TRO-Sri Lanka.  TRO Br. at 11.

Thereafter, the U. S. Treasury Department found that TRO is "the preferred conduit of funds from the United States to the LTTE in Sri Lanka." Pl. Compl., ¶ 71. In addition to funding assistance, Plaintiffs' Complaint alleges that TRO also "facilitated LTTE procurement of operations in the United States…" that included the "purchase of munitions, communication devices, and other technology for the LTTE." Pl. Compl., ¶ 71.  Pursuant to a federal investigation, the U.S. Treasury Department found that TRO's coordinated network of worldwide branches "allowed LTTE to use humanitarian aid, which TRO collected from the international community after the December 2004 tsunami, to launch new campaigns to strengthen LTTE military capacity." Pl. Compl., ¶ 73. Additionally, the U.S. Treasury Department found that "[d]irectives issued by the LTTE suggest that LTTE-affiliated branch representatives are expected to coordinate their efforts with the respective TRO representatives in their locations and report all activity to the LTTE." Pl. Compl., ¶ 74.

C.      Rajaratnam Defendants

Raj Rajaratnam was born in Sri Lanka, but holds dual citizenship in the United States and Sri Lanka.  Pl. Compl., ¶ 93.  Jesuthasan Rajaratnam, Raj's father, is a United States citizen.  In

3

2000, Raj and Jesuthasan Rajaratnam incorporated the Rajaratnam Family Foundation, Inc., a charitable foundation granted 501(c)(3) tax exempt status by the Internal Revenue Service ("IRS"). Pl. Compl., ¶ 97.  Plaintiffs' Complaint asserts that Raj Rajaratnam personally contributed $1,000,000.00 to TRO-USA in 2000, and further, that the contribution to TRO-USA was ultimately funneled to TRO-Sri Lanka.  Pl. Compl., ¶ 96.  Further, the Complaint alleges that donations to the Rajaratnam Family Foundation individually by named Defendants Raj Rajaratnam and Jesuthasan Rajaratnam and by others were, in turn, transferred to TRO-USA and TRO-Sri Lanka. Pl. Compl., ¶¶ 96-102. Additionally, after the December 26, 2004 tsunami, Defendant Raj Rajaratnam started the charitable organization Tsunami Relief, Inc. Pl. Compl., ¶ 103.  Plaintiffs allege that the donations to Tsunami Relief, Inc. were, in turn, contributed to TRO-Sri Lanka.  Pl. Compl., ¶ 104.

D.    Complaint

Plaintiffs' Complaint alleges that to support its terrorist activities, the LTTE "illegally raises funds and acquires weapons and technology using a network of Tamil-related front charities and organizations."  Pl. Compl., ¶ 7.  The Complaint alleges that the Rajaratnam Defendants "are members of the global Tamil expatriate community who knowingly and purposefully helped fund LTTE's terror campaign and spread LTTE's propaganda."  Pl. Compl., ¶ 59. Further, the Complaint asserts that the Rajaratnams and the TRO "knowingly provided financial and material support to LTTE with the intent to advance the LTTE's terror campaign."  Pl. Compl., ¶ 9.  Additionally, these funds were purportedly used to pay the salary and pension benefits of LTTE members.  Pl. Compl., ¶ 125.  Plaintiffs' Complaint indicates that as late as 2007, the U.S. Department of State identified TRO-USA as the donor of the largest percentage of overseas donations to the LTTE of any TRO

4

office.  Pl. Compl., ¶ 12. Further, "[o]f these remittances from the U.S., the Rajaratnam Family is the largest private donor to the TRO from the United States." Pl. Compl., ¶ 12.  During the period in which tax-exempt status had been conferred upon TRO-USA, the Complaint alleges that the Rajaratnams, as the largest private donor, donated millions of dollars to the TRO directly and indirectly through their charitable foundations.  Pl. Compl., ¶¶ 12, 69 and 146.

The Plaintiffs in this Complaint are victims or the survivors of victims of LTTE bombings in Nugegoda, Sri Lanka on November 28, 2007, Colombo, Sri Lanka on February 3, 2008, Mount Lavinia, Sri Lanka on February 23, 2008, Weliweriya, Sri Lanka on April 6, 2008 and Piliyanda, Sri Lanka on April 25, 2008.  Plaintiffs' Complaint asserts seven counts including: Count I - aiding and abetting, intentionally facilitating and/or recklessly disregarding crimes against humanity in violation of international law; Count II - aiding and abetting acts of terrorism, including specifically suicide bombings and other murderous attacks on innocent civilians intended to intimidate or coerce a civilian population, universally condemned as violations of the law of nations; Count III - reckless disregard; Count IV - negligence; Count V - wrongful death; Count VI - survival action; and Count VII - negligent and/or intentional infliction of emotional distress.  Pl. Compl., ¶¶ 45, 49, 57, 58, 60, 62 and 64.

## II.   LEGAL STANDARD

### A.    Personal Jurisdiction

Pursuant to Fed. R. Civ. P. 4(e), a district court may exercise jurisdiction over a non-resident defendant to the extent permitted by the law of the state where the district court sits.  See Fed. R. Civ. P. 4(e).   "A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law."  Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir.

2004).  "A court may exercise jurisdiction over a defendant if the defendant has specific or general

contacts with the forum." Horton v. Martin, No. 04-4684, 2005 U.S. App. LEXIS 859, at *3-4 (3d

Cir. June 15, 2005).   "New Jersey's long-arm statute provides for jurisdiction coextensive with the

due process requirements of the United States Constitution." Miller, 384 F.3d at 96 (citing N.J. Ct.

R. 4:4-4©).   "The due process clause of the [F]ourteenth [A]mendment of the United States

Constitution limits the reach of long-arm statutes so that a court may not assert personal jurisdiction

over a nonresident defendant who does not have certain minimum contacts with [the forum] such

that the maintenance of the suit does not offend 'traditional notions of fair play and substantial

justice.'" Provident Nat'l Bank v. California Federal Sav. & Loan Asso., 819 F.2d 434, 437 (3d Cir.

1987).   Pursuant to Fed. R. Civ. P. 12(b)(2), a plaintiff must demonstrate by a preponderance of the

evidence facts sufficient to support the assertion of personal jurisdiction over a defendant.

Ameripay, LLC v. Ameripay Payroll, Ltd., 334 F. Supp. 2d 629, 632 (D.N.J. 2004) (citing Carteret

Savings Bank, FA v. Shushan, 954 F.2d 141, 146 (3d Cir. 1992)).   Although "[a] court must accept

as true the allegations in the complaint and resolve disputed issues of fact in favor of the plaintiff[,]"

for purposes of jurisdiction, plaintiff cannot rely on pleadings alone, but instead must provide actual

proofs. Id. (citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d

1984)).   "Once the plaintiff has shown minimum contacts, the burden shifts to the defendant, who

must show that the assertion of jurisdiction would be unreasonable."  Id. (citing Mellon Bank (East)

PFSF, Nat'l Assoc. v. Farino, 960 F.2d 1217, 1221 (3d Cir. 1992)).

      B.     Motion to Dismiss

     "The [d]istrict [c]ourt, in deciding a motion under Fed. R. Civ. P. 12(b)(6), [is] required to

accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in

the light most favorable to the [Plaintiff]." Phillips v. County of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008).   "While a complaint attacked  by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [ ] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly,  550 U.S. 544, 555 (2007).  "[A court is] not bound to accept as true a legal conclusion couched as a factual allegation."  Papasan v. Allain, 478 U.S. 265, 286 (1986).   "Factual allegations must be enough to raise a right to relief above a speculative level, [ ] on the assumption that all factual allegations in the complaint are true (even if doubtful in fact)."  Bell at 555-56.

## III.   DISCUSSION

A.   Subject Matter Jurisdiction - International Law Claims

1.   Diversity Jurisdiction

Arguing that Plaintiffs fail to adequately plead the citizenship of TRO-USA or establish a connection between TRO and Maryland at the time of the filing of the Complaint, the Rajaratnam Defendants dispute the existence of diversity jurisdiction where litigants on each side of the lawsuit are aliens.  Despite this contention, conflating bases for subject matter and personal jurisdiction, Defendant TRO simultaneously disputes this Court's exercise of personal jurisdiction on the ground that TRO is a citizen of Maryland and holds no offices in New Jersey. Nonetheless, the Court accepts the foregoing representation as a concession to the exercise of diversity jurisdiction. (D. TRO Br. 17-18).   Moreover, the articles of incorporation, dated December 12, 1994, memorialize the existence and citizenship of TRO-USA in Maryland.

For purposes of diversity jurisdiction, "a corporation shall be deemed to be a citizen of any

7

State by which it has been incorporated and of the State where it has its principal place of business."
28 U.S.C. § 1332(c)(1). "The district courts shall have original jurisdiction of all civil actions where
the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs, and
is between– . . .citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2).
Therefore, the Court declines to dismiss Plaintiffs' Complaint for lack of diversity jurisdiction.  On
this ground, Defendants' motion to dismiss is **denied.**

2.    Alien Tort Statute ("ATS")/Alien Tort Claims Act ("ATCA")

Defendants move to dismiss Plaintiffs' Complaint pursuant to the ATS for lack of subject
matter jurisdiction. Disputing the legal viability of Plaintiffs' claims pursuant to the ATS,
Defendants contend that aiding and abetting liability does not arise pursuant to the ATS. Moreover,
Defendant TRO-USA disputes the exercise of jurisdiction over a corporation pursuant to the ATS.
To the extent the Court concludes that Plaintiffs have presented a legally viable claim, Defendants
dispute the factual plausibility of Count I of Plaintiffs' Complaint, asserting that donations to a
charitable organization fail to constitute a violation of the law of nations.  Further, in support of that
contention, Defendants argue that the Complaint fails to demonstrate that donations to the TRO
entities had a substantial effect on the alleged acts of the LTTE years later, that specific intent is
absent and that no state action is involved.

Citing Kadic v. Karadzic, 70 F.3d 232, 238 (2d Cir. 1995), Plaintiffs contend subject matter
jurisdiction has been established where the Complaint pleads the following: (1) an alien; (2) suing
for a tort; and (3) committed in violation of the law of nations.   Further, Plaintiffs assert that aiding
and abetting liability is recognized under the ATS and that crimes against humanity constitute a well-
defined international norm. Additionally, Plaintiffs contend that there is no state-action requirement

8

with respect to a claim for aiding and abetting crimes against humanity.  Lastly, Plaintiffs contend that the distribution of money to terrorist organization, LTTE, for the purpose of carrying out suicide bomber attacks on Sri Lankan civilians provides sufficient factual plausibility to overcome a motion to dismiss.

### i.    Primary Liability

With respect to the ATS, the United States Supreme Court has indicated the following:

> [A]lthough the ATS is a jurisdictional statute creating no new causes of action, the reasonable inference from the historical materials is that the statute was intended to have practical effect the moment it became law. The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.

Sosa v. Alvarez-Machain, 542 U.S. 692, 725 (2004).  In determining that the ATS is not exclusively jurisdictional, the United States Supreme Court remarks that it is proper "to assume that the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations, though we have found no basis to suspect Congress had any examples in mind beyond those torts corresponding to Blackstone's three primary offenses: violation of safe conducts, infringement of the rights of ambassadors, and piracy."  Id. at 724.  "We assume, too, that no development in the two centuries from the enactment of § 1350 to the birth of the modern line of cases beginning with Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980) has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law; Congress has not in any relevant way amended § 1350 or limited civil common law power by another statute."  Id.  Narrowing the application of the ATS, the United States Supreme Court asserted the following:

9

> Still, there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind. Accordingly, we think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized. [ ] Federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted.

Id. at 724-25.  "And the determination whether a norm is sufficiently definite to support a cause of action  should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." Id. at 732-33.[4] Accordingly, this Court concludes that the ATS is not exclusively jurisdictional.

### a.      Individual/Corporate Liability

Although previous cases asserting claims under the ATS have primarily involved state actors, more recent cases "impose liability on private individuals and corporations" pursuant to the ATS. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1263 (11th Cir. 2009). In support of this position, the Eleventh Circuit commented:

> In 1995, the Second Circuit held Radovan Karadzic, self-proclaimed leader of an unrecognized Bosnian-Serb entity, could be liable for a violation of the law of nations for ordering a campaign of murder, rape, forced impregnation, and other forms of torture designed to destroy religious and ethnic groups of Bosnian Muslims and Bosnian Croats." Kadic v. Karadzic, 70 F.3d 232, 242 (2d Cir. 1995).  Karadzic argued he was not a state actor because he was not an official of any recognized government. The Second Circuit rejected Karadzic's contention and held acts such as genocide and war crimes 'violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals.' Id. at 239; see also

---

[4]

In a footnote, the Supreme Court remarked, "[a] related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." Id. at 733 n.21.

id. at 244.   Indeed, torture and summary execution perpetrated in the course of
genocide or war crimes have been found actionable absent state action. See id. at 243.

This Court has also acknowledged private individuals may be liable for a violation of
the law of nations. See Romero v. Drummond Co., Inc., 552 F.3d 1303, 1316 (11th
Cir. 2008). . . .In addition to private individual liability, we have also recognized
corporate defendants are subject to liability under the ATS and may be liable for
violations of the law of nations. See id. at 1315.

Id. at 1263; see In re Xe Servs. Alien Tort Litig., 665 F. Supp. 2d 569, 588 (E.D. Va. 2009) ("Nothing

in the ATS or Sosa may plausibly be read to distinguish between private individuals and corporations;

indeed, Sosa simply refers to both individuals and entities as 'private actors.'"); compare Estate of

Manook v. Research Triangle Inst., Int'l, 693 F. Supp. 2d 4 (D.D.C. 2010) ("Further, the ATS may

[only] be used against corporations acting under "color of [state] law," or for a handful of private acts,

such as piracy and slave trading." (internal citations omitted)).   In the absence of Third Circuit

precedent, in accordance with the Second Circuit Court of Appeals and the Eleventh Circuit Court

of Appeals, this Court concludes that to the extent private individuals are subject to liability under

the ATS, corporations are equally subject to liability.

        ii.      Secondary Liability

In the absence of legislation, Defendants assert that aiding and abetting liability pursuant to

the ATS does not exist. Nonetheless, to the extent aiding and abetting liability under the ATS presents

a viable claim, Defendants assert that the appropriate mens rea is purpose rather than knowledge.

Finally, even if Plaintiffs' Complaint asserts a legally viable claim for aiding and abetting liability,

Defendants argue that the Complaint fails to allege that the donations had a substantial effect on the

perpetration of the crimes or torts alleged.   Plaintiffs contend that the Complaint asserts a legally

viable claim for aiding and abetting liability under the ATS; and further, knowledge rather than

purpose supplies the appropriate *mens rea*.

While the Third Circuit Court of Appeals does not appear to have addressed the issue of aiding and abetting liability, in Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254, 260 (2d Cir. 2007), the Second Circuit Court of Appeals explicitly holds that a "plaintiff may plead a theory of aiding and abetting liability under the ATCA." see In re Terrorist Attacks on September 11, 2001, 392 F. Supp. 2d 539 (S.D.N.Y. 2005).   In Presbyterian Church of Sudan v. Talisman Energy, Inc., the Second Circuit reaffirms that holding stating, "a defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." 582 F.3d 244, 259 (2d Cir. 2009). In recognizing secondary or accessorial liability, the Second Circuit determined that the requisite *mens rea* necessary to establish a claim for aiding and abetting liability is purpose rather than knowledge.   Id. at 259 ("Indeed, international law at the time of the Nuremberg trials recognized aiding and abetting liability only for purposeful conduct.").   "Aiding and abetting a violation of international law constitutes an independent cause of action under the ATCA." Ntsebeza v. Daimler AG (In re S. African Apartheid Litig.), 617 F. Supp. 2d 228, 298 (S.D.N.Y. 2009).   In Lizarbe v. Rondon, 642 F. Supp. 2d 473, 491 (D. Md. 2009), the "Court agree[d] that case law recognizes causes of action for aiding and abetting . . . under the ATS."[5] see Mujica v. Occidental Petroleum Corp., 381 F. Supp. 2d 1164, 1173 (C.D. 2005); Burnett v. Al Baraka Inv. & Dev. Corp., 274 F. Supp. 2d 86, 100

---

[5]

Prior to being vacated to be reheard en banc, in accordance with Circuit Rule 35-3,  the Ninth Circuit Court of Appeals acknowledged aiding and abetting liability pursuant to the ATS, however, the requisite *mens rea* established in that Court is knowledge.   John Doe I v. Unocal Corp., 395 F.3d 932, 947 (9th Cir. 2002) (knowing practical assistance or encouragement (*mens rea*) that has a substantial effect on the perpetration of the crime (*actus reus*)); vacated for rhrg en banc, 395 F.3d 978 (9th Cir. 2003).

(D. D.C. 2003); Mehinovic v. Vuckovic, 198 F. Supp. 2d 1322, 1355 (N.D. Ga. 2002). In light of the substantial authority recognizing the existence of aiding and abetting liability pursuant to the ATS, this Court concludes that a party may assert a theory of aiding and abetting in accordance with the ATS.

a.  *Mens Rea*

In support of their contention that the appropriate *mens rea* for addressing aiding and abetting liability is knowledge rather than purpose, Plaintiffs rely a Second Circuit case, Khulmani, 504 F.3d at 275, that is ultimately superseded by the Presbyterian, 582 F.3d at 259.   Plaintiffs also rely on a New York District Court case, Lev v. Arab Bank, PLC; however, that case has no effect on established precedent.  No. 08-cv-3251, 2010 U.S. Dist. LEXIS 16887, at *20 (E.D.N.Y. Jan. 29, 2010) ("knowing and intentional conduct is synonymous with purpose.").  Therefore, in accordance with the Second Circuit's holding in Presbyterian, this Court concludes that the appropriate *mens rea* for aiding and abetting liability is purpose.

b.  *Actus Reus*

The appropriate *actus reus* for the imposition of aiding and abetting liability pursuant to the ATS is "practical assistance to the principal which has a substantial effect on the perpetration of the crime."  Presbyterian, 582 F.3d at 259; see also Liu Bo Shan v. China Constr. Bank Corp., No. 09-8566, 2010 U.S. Dist. LEXIS 63938, at *22 (S.D.N.Y. June 28, 2010).

iii.  Law of Nations

a.  Crimes Against Humanity

"[T]he domestic law of the United States recognizes the law of nations." Sosa, 542 at 729. A "violat[ion] the 'law of nations' [is] commonly referred to as 'international law' or, when limited

to non-treaty law, as 'customary international law.'" <u>Flores v. S. Peru Copper Corp.</u>, 414 F.3d 233,

237 (2d Cir. 2003). "In the context of the ATCA, we have consistently used the term 'customary

international law' as a synonym for the term the "law of nations." <u>Id</u>.  "[W]here there is no treaty, and

no controlling executive or legislative act or judicial decision, resort must be had to the customs and

usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who

by years of labor, research and experience, have made themselves peculiarly well acquainted with the

subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations

of their authors concerning what the law ought to be, but for trustworthy evidence of what the law

really is." <u>Sosa</u>, 542 at 729 (citing <u>The Paquete Habana</u>, 175 U.S. 677, 700 (1900)).  Pursuant to

Article 38 of the International Court of Justice,

> (1) A rule of international law is one that has been accepted as such by the international community of states
>> (a) in the form of customary law;
>> (b) by international agreement; or
>> (c) by derivation from general principles common to the major legal systems of the world.
>
> (2) Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation.
>
> (3) International agreements create law for the states parties thereto and may lead to the creation of customary international law when such agreements are intended for adherence by states generally and are in fact widely accepted.
>
> (4) General principles common to the major legal systems, even if not incorporated or reflected in customary law or international agreement, may be invoked as supplementary rules of international law where appropriate.

In accordance with the guidance in <u>Sosa</u>, this Court looks to existing judicial decisions and sources

of international law to define and establish a standard for assessing the viability of an alleged

violation of a purported international norm, namely crimes against humanity.

The Charter of the International Military Tribunal ("IMT") (Nuremberg Tribunal), signed by

the United States and its allies, describes crimes against humanity as "murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war, or persecutions on political, racial, or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of domestic law of the country where perpetrated." Khulmani, 504 F.3d at 286 n.1 (quoting Article 6, Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 280). Referencing a book called *Crimes of War* by Cherif Bassiouni, the Court commented that "the list of the specific crimes contained within the meaning of crimes against humanity has been expanded since Article 6(c) of the IMT to include, [statutory definitions of] the [International Criminal Tribunal for the Former Yugoslavia ("ICTY")][6]] and the [International Criminal Tribunal for Rwanda

---

[6]

The ICTY Statute, Art. 5, defines crimes against humanity as the following crimes when committed in armed conflict, whether international or internal in character, and directed against any civilian population:

(a) murder;

(b) extermination;

(c) enslavement;

(d deportation;

(e) imprisonment;

(f) torture;

(g) rape;

(h) persecutions on political, racial and religious grounds;

(I) other inhumane acts.

Presbyterian, No. 01-9882, 2005 U.S. Dist. LEXIS 4636, at *83 (S.D.N.Y. Mar. 25, 2005)(citing ICTY, art. 5).

15

("ICTR")],[7] rape and torture. The statute of the International Criminal Court ("ICC")[8] also expands

---

[7]

The ICTR Statute, codified one year later, defines crimes against humanity as the following crimes when committed *as part of a widespread or systematic attack against any civilian population* on national, political, ethnic, racial or religious grounds:

    (a) Murder;

    (b) Extermination;

    (c) Enslavement;

    (d) Deportation;

    (e) Imprisonment;

    (f) Torture;

    (g) Rape;

    (h) Persecutions on political, racial and religious grounds;

    (I) Other inhumane acts.

Presbyterian, No. 01-9882, 2005 U.S. Dist. LEXIS 4636, at *83-84 (S.D.N.Y. Mar. 25, 2005) (citing ICTR, art. 3).

[8]

The Rome Statute, codified in 1998, defines crimes against humanity as any of the following acts when committed *as part of a widespread or systematic attack directed against any civilian population*, with knowledge of the attack:

    (a) Murder;

    (b) Extermination;

    (c) Enslavement;

    (d) Deportation or forcible transfer of population;

    (e) Imprisonment or other severe deprivation of physical liberty in violation of fundamental rules of international law;

    (f) Torture;

    (g) Rape, sexual slavery, enforced prostitution, forced pregnancy, enforced sterilization, or any other form of sexual violence of comparable gravity;

    (h) Persecution against any identifiable group or collectivity on political, racial, national, ethnic, cultural, religious, gender . . ., or other grounds that are universally recognized as impermissible under international law, in connection with any act referred to in this paragraph or any crime within the jurisdiction of the Court;

the list of specific acts. In particular, the ICC statute adds the crimes of enforced disappearance of

persons and apartheid. Further, the ICC statute contains clarifying language with respect to the

specific crimes of extermination, enslavement, deportation or forcible transfer of population, torture,

and forced pregnancy." Nguyen, 373 F. Supp. 2d at 136.

Although the Third Circuit Court of Appeals does not appear to have directly addressed the

issue before this Court, the limited guidance offered in  Hereros v. Deutsche Afrika-Linien Gmblt

& Co., No. 06-1684, 2007 U.S. App. LEXIS 8317, (3d Cir. Apr. 10, 2007), does not foreclose

application of the ATS in the context of crimes against humanity.  In Hereros, the plaintiffs alleged

that defendants engaged in enslavement and crimes against humanity during the German occupation

of South Africa from 1850-1915 pursuant to the ATS. In addressing the issue, the Third Circuit

indicated the following:

> While we are inclined to believe that the conduct alleged by Appellants did violate
> international norms at the time it occurred, a mere inclination does not support a
> cause of action in our reading of Sosa. The arguments on both sides of the issue of
> what constituted international norms from 1899 to 1915 are not frivolous. They are
> substantial and deserve serious consideration. What those arguments illustrate is that
> satisfying the Sosa criteria of specific, universal and obligatory as well as the Sosa
> admonition that '. . . federal courts should not recognize private claims under federal
> common law for violations of any international law norm with less definite content
> and acceptable among civilized nations than the historical paradigms familiar when
> § 1350 was enacted' cannot be achieved in this case.

---

(I) Enforced disappearance of persons;

(j) The crime of apartheid;

(k) Other inhumane acts of a similar character intentionally causing great suffering, or serious injury to body
or to mental or physical health.

Presbyterian, No. 01-9882, 2005 U.S. Dist. LEXIS 4636, at *85 (S.D.N.Y. Mar. 25, 2005) (citing Rome Statute,
art. 7).

Id. at *12-13.  As an aside, the Circuit cautioned that "while we recognize the gravity of the offense described by the appellants, adjudication of such a claim would at least theoretically open the door to claims by countless aggrieved groups for human rights violations occurring anywhere in the world at any point in the vast expanse of recorded human history." Id. at *15.[9]

In the context of the ATS, the Second Circuit Court of Appeals recognizes genocide, war crimes and crimes against humanity as international norms consistent with the application of Sosa. For example, in Presbyterian, 582 F.3d 244, 256 (2d Cir. 2009), the Second Circuit reaffirms that pursuant to the ATS, a court may exercise subject matter jurisdiction over a claim concerning genocide, war crimes and crimes against humanity as customary international law or norms of international law. See Kadic v. Karadzic, 70 F.3d 232, 236 (2d Cir. 1995). "Crimes against humanity violate the law of nations [constituting a] norm[ ] of sufficient specificity and definiteness to be recognized under the ATS." Almog v. Arab Bank, PLC, 471 F. Supp. 2d 257, 274 (E.D.N.Y. 2007).

In Abagninin v. AMVAC Chem. Corp., the Ninth Circuit Court of Appeals determined that "[a] treaty not ratified by the United States at the time of the alleged events cannot form a basis for an ATS claim." 545 F.3d 733, 738 (9th Cir. 2008) (it is undisputed that the United States has not ratified the Rome Statute) (citing Int'l Criminal Court, Assembly of States Parties, The States Parties to the Rome Statute, *available at* http://www.icccpi.int/asp/statesparties.html).  Nonetheless, in assuming, without concluding, that the norm for crimes against humanity is specific, obligatory, and universal, the Court relies on the Rome Statute to ascertain the viability and plausibility of plaintiffs'

---

[9]

In that case, "Judge Chagares agree[d] that th[e] case present[ed] a nonjusticiable political question. He view[ed] the political question doctrine as a threshold, Article III issue that [a] court *must* address before reaching the merits."  Id. at *15 n.6.

claims. The Ninth Circuit articulates two requirements to state a legally viable claim for crimes against humanity pursuant to the ATS, including:

> (1) the commission of any of the enumerated acts when committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack; and

> (2) 'attack directed against any civilian population' is a course of conduct 'pursuant to or in furtherance of a State or organizational policy to commit such attack.'

Expounding upon the second requirement, the Ninth Circuit asserted the following:

> The traditional conception regarding crimes against humanity was that a policy must be present and must be that of a State, as was the case in Nazi Germany. *Prosecutor v. Tadic,* IT-94-1-T, Judgment, P 654 (May 7, 1997). This conception was expanded to include non-State entities which, although not a part of the legitimate government, have *de facto* control over a defined territory. *Id.* The weakening of the "State action" requirement occurred because unofficial militias loosely affiliated with the State and unaffiliated civilians perpetrated the crimes in Bosnia and Rwanda, respectively. A common thread throughout these developments is that crimes against humanity are crimes committed through political organization.

> *De facto* control thus requires control similar to that of a State or government, such as erecting checkpoints on main roads, increasing examples of command and control, developing civilian structures, and holding a substantial percentage of territory. *Prosecutor v. Limaj,* IT-03-66-T, Judgment, PP 213-14 (Nov. 30, 2005). Decisions from the International Criminal Tribunal for Rwanda require that actions by a non-State organization be "instigated or directed by a Government or by any organization or group," as a way to exclude "the situation in which an individual commits an inhumane act . . . in the absence of any encouragement or direction from either a Government or a group or an organisation [sic]." *E.g., Prosecutor v. Kayishema & Ruzindana,* ICTR-95-1-T, Judgment, PP 124-26 (May 21, 1999).

Id. at 741. Dismissal was affirmed because the corporate defendant was neither a state nor a state-like organization and, on a separate ground, dismissal was deemed proper in the absence of allegations in the complaint concerning *de facto* control.

This Court concludes that crimes against humanity constitute a norm of international law that

is sufficiently definite, specific and obligatory in accordance with the requirements of Sosa. Further, this Court adopts the standard established in the Ninth Circuit for purposes of establishing principal liability for crimes against humanity under the ATS. Accordingly, the Complaint must demonstrate with factual plausibility not only that the principal (1) committed an enumerated act as part of a widespread or systematic attack against any civilian population with knowledge of that attack (2) as a course of conduct pursuant to or in furtherance of a State or organizational policy of a non-State entity, with *de facto* control, to commit such attack; but also that the individual or entity charged with accessorial liability (1) provided practical assistance to the principal which had a substantial effect on the perpetration of the crime (2) for the purpose of facilitating the commission of that crime.

Accordingly, pursuant to the ATS, this Court concludes that Plaintiffs' Complaint presents a legally viable claim for aiding and abetting crimes against humanity. Further, the Complaint asserts that the LTTE engaged in terrorism as part of a widespread attack against Sri-Lankan civilians in order to create a mono-ethnic state. The Complaint also supports *de facto* control over rebel territory. Lastly, the Complaint asserts that Defendants provided significant financial support to the LTTE for the purposes of facilitating terrorist attacks. The Court declines to dismiss Count I of Plaintiffs' Complaint, and on this ground, Defendants' motion is **denied.**

        b.      International Convention for the Suppression of the Financing of Terrorism ("Financing Convention")

With respect to the Financing Convention, Defendants argue that the document is not self-executing and fails to create individually enforceable rights. Additionally, to the extent that Congress has incorporated the Financing Convention into domestic law, that statute, 18 U.S.C. §

2339C, does not create a private right of action. Finally, Defendants assert that the Financing Convention does not permit a claim for aiding and abetting liability.

Plaintiffs contend that financing terrorism exists as an independent international norm presenting a viable cause of action pursuant to the ATS. In Count II, Plaintiffs explicitly allege that the Rajaratnam Defendants and TRO-USA "aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of customary international law, to wit, terrorist financing, by directly or indirectly knowingly providing funds to LTTE for the purpose of assisting the LTTE in carrying out offenses as defined by the Financing Convention, the Bombing Convention and customary international law[.]" Pl. Compl., ¶ 167.  Further, Plaintiffs represent that "[t]he International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GAOR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. A/Res/53/108 (1999) (In force Apr. 2002) ('Financing Convention') is declaratory of existing customary international law." Pl. Compl., ¶ 178. Moreover, in support of their opposition to Defendants' motion to dismiss, Plaintiffs' rely primarily on the Financing Convention, arguing that "Plaintiffs plead that financing terror attacks violates well-defined, universally-accepted international law under the International Convention for the Suppression of the Financing of Terrorism[.]" (Pl. Opp. Br. to Raj. MTD, 9).

Pursuant to the International Convention for the Suppression of the Financing of Terrorism, adopted by the General Assembly of the United Nations in resolution 54/109 of December 9, 1999,[10] the States Parties to this Convention agree to the following:

_____

[10] See United Nations Treaty Collection
http://treaties.un.org/Pages/DB.aspx?path=DB/studies/page2_en.xml&menu=MTDSG

Article 2:

Any person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out:

1. (a) An act which constitutes an offence within the scope of and as defined in one of the treaties listed in the annex; or

(b) Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act.

. . . . . .

3. For an act to constitute an offence set forth in paragraph 1, it shall not be necessary that the funds were actually used to carry out an offence referred to in paragraph 1, subparagraphs (a) or (b).

4. Any person also commits an offence if that person attempts to commit an offence as set forth in paragraph 1 of this article.

5. Any person also commits an offence if that person:

(a) Participates as an accomplice in an offence as set forth in paragraph 1 or 4 of this article;

(b) Organizes or directs others to commit an offence as set forth in paragraph 1 or 4 of this article;

(c) Contributes to the commission of one or more offences as set forth in paragraphs 1 or 4 of this article by a group of persons acting with a common purpose. Such contribution shall be intentional and shall either:

(I) Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of an offence as set forth in paragraph 1 of this article; or

(ii) Be made in the knowledge of the intention of the group to commit an offence as set forth in paragraph 1 of this article.

Article 4:

Each State Party shall adopt such measures as may be necessary:

(a) To establish as criminal offences under its domestic law the offences set forth in article 2;

(b) To make those offences punishable by appropriate penalties which take into account the grave nature of the offences.

Article 5:

1. Each State Party, in accordance with its domestic legal principles, shall take the necessary measures to enable a legal entity located in its territory or organized under its laws to be held liable when a person responsible for the management or control of that legal entity has, in that capacity, committed an offence set forth in article 2. Such liability may be criminal, civil or administrative.

2. Such liability is incurred without prejudice to the criminal liability of individuals having committed the offences.

3. Each State Party shall ensure, in particular, that legal entities liable in accordance with paragraph 1 above are subject to effective, proportionate and dissuasive criminal, civil or administrative sanctions. Such sanctions may include monetary sanctions.

Article 6:

Each State Party shall adopt such measures as may be necessary, including, where appropriate, domestic legislation, to ensure that criminal acts within the scope of this Convention are under no circumstances justifiable by considerations of a political, philosophical, ideological, racial, ethnic, religious or other similar nature.

Article 20:

The States Parties shall carry out their obligations under this Convention in a manner consistent with the principles of sovereign equality and territorial integrity of States and that of non-intervention in the domestic affairs of other States.

"With a self-executing treaty, 'no domestic legislation is required to give [it] the force of law in the United States.'" Ogbudimkpa v. Ashcroft, 342 F.3d 207, 218 (3d Cir. 2003) (citing Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 252 (1984))."Conversely, a non-self-executing

treaty is one that 'must be implemented by legislation before it gives rise to a private cause of action.'" Id. (citing Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1298 (3d Cir. 1979)).[11]  However, as indicated by the Third Circuit Court of Appeals in Gross v. German Found. Indus. Initiative, 549 F.3d 605, 616 (3d Cir. 2008), "[b]y itself, the status of 'self-executing' does not answer the question of whether a document creates a private right of enforcement."  See Restatement (Third) of Foreign Relations Law of the United States § 111 cmt. (h) (1986) ("Whether a treaty is self-executing is a question distinct from whether the treaty creates private rights or remedies.").  "The Supreme Court recognized that, '[e]ven when treaties are self-executing in the sense that they create federal law, the background presumption is that [i]nternational agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.'" Id. (quoting Medellin v. Texas, 128 S. Ct. 1346, 1357 (2008)). Accordingly, in addressing a self-executing treaty, "[w]hen no [privately enforceable] right is explicitly stated, courts look to the treaty as a whole to determine whether it evidences an intent to provide a private right of action." Id. The Financing Convention is neither self-executing nor does it create a private right of action.

Moreover, the United States, a signatory to this Convention, has incorporated the agreement into domestic law, 28 U.S.C. § 2339C.  Notably, this is a criminal statute.  There is no corollary creating a private civil remedy.  The Third Circuit has indicated that "[a]fter Sandoval, the relevant inquiry for determining whether a private right of action exists appears to have two steps: (1) Did Congress intend to create a personal right?; and (2) Did Congress intend to create a private remedy? Only if the answer to both of these questions is 'yes' may a court hold that an implied private right of action

---

[11] The law of this Circuit, as already noted, defines a non-self-executing treaty as one that "must be implemented by legislation before it gives rise to a private cause of action.

24

exists under a federal statute." <u>Wisniewski v. Rodale, Inc.</u>, 510 F.3d 294, 301 (3d Cir. 2007) (citing <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001)).

The federal analog implementing this Financing Convention into domestic law clearly foregoes the applicability of a private civil remedy. To hold otherwise constitutes a violation of separation of powers and in effect rewrites legislation where Congress has previously contemplated the purported international norm.  On this ground, Count II of Plaintiffs' Complaint is dismissed and Defendants' motion is **granted.**

B.    Subject Matter Jurisdiction - Common Law Tort Claims

1.    Negligence/Reckless Disregard

Defendants move to dismiss Plaintiffs' remaining common law tort claims for failure to establish proximate causation or a legal duty.  In response, Plaintiffs contend that the Complaint sufficiently pleads the existence of a duty with respect to the common law tort claims and that proximate causation is a matter within the purview of the factfinder.

Count IV of Plaintiffs' Complaint asserts a claim for negligence.  "In order to sustain a common law cause of action in negligence, a plaintiff must prove four core elements: '(1) [a] duty of care, (2) [a] breach of [that] **duty**, (3) proximate cause, and (4) actual damages[.]" <u>Brunson v. Affinity Federal Credit Union</u>, 199 N.J. 381, 400 (2009).

Count III of Plaintiffs' Complaint asserts a claim for reckless disregard.  "The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his **duty** to others to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him." Recklessness requires a substantially higher risk. <u>Schick v. Ferolito</u>, 167 N.J. 7, 26 (2001) (citing

Restatement (Second) of Torts § 500 (1965)); <u>McLaughlin v. Rova Farms, Inc</u>., 56 N.J. 288, 294 (1970). "Recklessness, unlike negligence, requires a conscious choice of a course of action, with knowledge or a reason to know that it will create serious danger to others. Negligence may consist of an intentional act done with knowledge that it creates a risk of danger to others, but recklessness requires a substantially higher risk. The quantum of risk is the important factor." <u>Id</u>. "Reckless conduct is an extreme departure from ordinary care, in a situation in which a high degree of danger is apparent. Reckless behavior must be more than any "mere mistake resulting from inexperience, excitement or confusion, and more than mere thoughtlessness or inadvertence, or simple inattention . . . ." <u>Id</u>.

"The existence of a duty is a question of law to be determined by a judge and, ultimately, is a question of fairness and policy." <u>Arvanitis v. Hios</u>, 307 N.J. Super. 577, 583 (App. Div. 1998) (context of a negligence claim). "Ordinarily, [however], whether there was a breach of the duty, foreseeability, and proximate cause are issues 'peculiarly within the competence of a jury.'" <u>Id</u>.; <u>Reynolds v. Gonzalez</u>, 172 N.J. 266, 284 (2002). "The facts of a case inform the court in determining whether a duty exists. While foreseeability alone does not create a duty, there can be no duty unless harm to another is reasonably foreseeable." <u>Id</u>.

Pursuant to Count IV of the Complaint, alleging a claim for negligence, Plaintiffs assert that "Rajaratnam, J.M. and TRO negligently and recklessly, directly and indirectly, failed to exercise reasonable care in preventing the distribution of personal and charitable funds to designated terrorist organizations." Pl. Compl., ¶ 178. Couched in the foregoing terms, as a matter of law, the Court cannot recognize this purported duty of care as a basis for either a negligence or a reckless disregard claim. To hold otherwise would expose countless innocent donors to liability. Similarly, a claim

negligent infliction of emotional distress premised upon the foregoing duty cannot survive. Accordingly, Counts III and IV of Plaintiffs' Complaint is dismissed, and Defendants' motion is **granted.**

> 2.   Intentional Infliction of Emotional Distress/Negligent Infliction of Emotional Distress

Defendants allege that the purported conduct, namely the provision of financial assistance, is too far removed to support a claim of intentional infliction of emotional distress.  Plaintiffs contend that the Complaint establishes the requisite elements supporting a claim for intentional infliction of emotional distress.

"[I]n order to prevail on[a] common law claim [for intentional infliction of emotional distress], 'the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe.'" Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 587 (2009).  "Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or to any other person who is present at the time, if such distress results in bodily harm." Buckley v. Trenton Sav. Fund Soc., 111 N.J. 355, 366 (1988) (citing Restatement (Second) of Torts § 46 cmt. d). "A plaintiff now can maintain an independent cause of action for negligent infliction of emotional distress where (1) the defendant's negligence caused the death of, or serious physical injury to, another; (2) the plaintiff shared a marital or intimate, familial relationship with the injured person; (3) the plaintiff had a sensory and contemporaneous observation of the death or injury at the scene of the accident; and (4) the plaintiff suffered severe emotional distress." Jablonowska v. Suther, 195 N.J. 91, 104 (2008).

27

On the one hand, a claim for negligent infliction of emotional distress is premised upon a viable claim for negligence.  Given that the Court declines to recognize a duty to "prevent[ ] the distribution of personal and charitable funds to designated terrorist organizations[,]" a claim for negligent infliction of emotional distress premised upon the foregoing duty cannot survive.  For purposes of this motion, Plaintiffs plead sufficient facts to support a viable claim for intentional infliction of emotional distress, including intentional facilitation of terrorist activity, severe, ongoing emotional distress and proximate cause.  As recited above, the presence or absence of proximate cause is within the purview of jury.   Accordingly, Defendants' motion to dismiss Count VII is **granted in part** and **denied in part.**

> 3.      Estate Claims

Pursuant to Counts V and VI of the Complaint, Plaintiffs plead claims for wrongful death and for a survival action, respectively. "Executors and administrators may have an action for any trespass done to the person or property, real or personal, of their testator or intestate against the trespasser, and recover their damages as their testator or intestate would have had if he was living." N.J.S.A. § 2A:15-3.  "In those actions based upon the wrongful act, neglect, or default of another, where death resulted from injuries for which the deceased would have had a cause of action if he had lived, the executor or administrator may recover all reasonable funeral and burial expenses in addition to damages accrued during the lifetime of the deceased." Id.  "When the death of a person is caused by a wrongful act, neglect or default, such as would, if death had not ensued, have entitled the person injured to maintain an action for damages resulting from the injury, the person who would have been liable in damages for the injury if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured and although the death was caused under

circumstances amounting in law to a crime." N.J.S.A. § 2A:31-1.  "An action under the Wrongful

Death Act N.J.S.A. § 2A:31-1 to -6 seeks recompense for the losses suffered by the survivors as a

result of the decedent's death." Johnson v. Dobrosky, 187 N.J. 594, 605 (2006).  "Every action

commenced under this chapter shall be brought in the name of an administrator *ad prosequendum* of

the decedent for whose death damages are sought, except where decedent dies testate and his will is

probated, in which event the executor named in the will and qualifying, or the administrator with the

will annexed, as the case may be, shall bring the action." N.J.S.A. § 2A:31-2.  "The surrogate's court

of the county wherein an intestate resided at his death, or, if the intestate resided outside the State,

the surrogate's court of the county wherein the accident resulting in death occurred, or the Superior

Court, may grant letters of administration *ad prosequendum* to the person entitled by law to general

administration. An administrator *ad prosequendum* shall not be required to give bond." N.J.S.A. §

3B:10-11.  Plaintiffs concede the absence of the letters of administration.  Further, Plaintiffs have not

alleged that they are general administrators or executors of victims' estates. At this time, Plaintiffs

have failed to establish standing.  On this ground, Counts V and VI of Plaintiffs' Complaint are

dismissed, and Defendants' motion is **granted**.

       C.     Personal Jurisdiction/Jurisdictional Discovery

"A court may exercise general jurisdiction over a defendant where he or she has 'continuous and

systematic' contacts with the forum, whether or not those contacts are related to the plaintiff's cause

of action."  Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 334 (3d Cir. 2009) (citing

Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984)). "Specific jurisdiction

exists if the defendant has 'purposefully directed' his activities at residents of the forum and the

litigation results from alleged injuries that 'arise out of or relate to' those activities." Id. (citing Burger

King Corp. v. Rudzewicz, 471 U.S. 462 (1985)).  "If the defendant 'maintain[s] continuous and

substantial forum affiliations,' then general jurisdiction exists. If the defendant's contacts fall short of that standard, then at least one contact must give rise or relate to the plaintiff's claim." Id. (citing O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 321 (3d Cir. 2007)).

"A single contact that creates a substantial connection with the forum can be sufficient to support the exercise of personal jurisdiction over a defendant." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004). "With each purposeful contact by an out-of-state resident, the forum state's laws will extend certain benefits and impose certain obligations." O'Connor, 496 F.3d at 323. "In determining whether there is specific jurisdiction, we undertake a three-part inquiry. First, the defendant must have 'purposefully directed [its] activities' at the forum." D'Jamoos v. Pilatus Aircraft Ltd., 566 F.3d 94, 102 (3d Cir. 2009) (citing Burger King, 471 U.S. at 472). "Second, the litigation must 'arise out of or relate to' at least one of those activities." Id. (citing Helicopteros, 466 U.S. at 414). "The animating principle behind the relatedness requirement is the notion of a tacit quid pro quo that makes litigation in the forum reasonably foreseeable." O'Connor, 496 F.3d at 322. "Out-of-state residents who exercise[] the privilege of conducting activities within a state . . . enjoy[] the benefits and protection of" the state's laws; in exchange, they must submit to jurisdiction over claims that arise from or relate to those activities.'" Id. "The relatedness requirement's function is to maintain balance in this reciprocal exchange. In order to do so, it must keep the jurisdictional exposure that results from a contact closely tailored to that contact's accompanying substantive obligations." O'Connor, 496 F.3d at 323. At the same time, "[i]t is enough that a meaningful link exists between a legal obligation that arose in the forum and the substance of the plaintiffs' claims." Id. at 324. "And third, if the first two requirements have been met, a court may consider whether the exercise of jurisdiction otherwise 'comport[s] with 'fair play and substantial justice.'" D'Jamoos, 566 F.3d at 94 (citing Burger King, 471 U.S. at 476).

Factors appropriate in evaluating whether the exercise of personal jurisdiction, either general or specific, over a defendant comports with notions of fair play and substantial justice include: "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies." Burger King,471 U.S. at 477; see Miller, 384 F.3d at 97.

If "the plaintiff's claim is not clearly frivolous [as to the basis for personal jurisdiction], the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden." Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 336 (3d Cir. 2009) (citing Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. D'Assurances, 723 F.2d 357, 362 (3d Cir. 1983)); see Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 n.13 (1978)). The Third Circuit Court of Appeals has found "jurisdictional discovery particularly appropriate where the defendant is a corporation." Id. Accordingly, Plaintiff is permitted to conduct jurisdictional discovery concerning the issue of whether the Court's exercise of personal jurisdiction over TRO-USA is proper. The Court **reserves** judgment as to the issue of personal jurisdiction over Defendant TRO-USA, pending the conclusion of jurisdictional discovery.[12]

D.      Failure to Exhaust/Forum Non Conveniens

Defendants contend that the District Court may not exercise jurisdiction the Rajaratnams and TRO on the basis that the cause of action arose in Sri Lanka. Furthermore, Defendants assert that the Rajaratnams and TRO are subject to service of process in accordance with the provisions of the Civil

---

[12]

Upon the conclusion of jurisdictional discovery, the parties are directed to submit a joint proposed briefing schedule for the purpose of disposing of this issue.

Procedure Code governing the procedure of the civil courts.  Specifically, Defendants represent that "[a]dequate provisions exist in the laws of Sri Lanka to effect service of process out of jurisdiction." Aziz. Decl., ¶ 14.  By contrast, Plaintiffs assert that "[a]s made clear by the attached Declaration of Sri Lankan lawyer Suneetha Lakshman Gunasekara, Raj and J.M. 'would have every right to ignore' process of a Sri Lankan Court served on them in the United States because Sri Lankan Courts lack extra-territorial jurisdiction over civil causes of action for defendants' conduct that did not occur in Sri Lanka." (Pl. Br. 28).  In the absence of concrete support demonstrating applicable Sri Lankan law, at this time, the Court **reserves** judgment concerning the issues of failure to exhaust local remedies and forum non conveniens.  The parties are directed to brief whether Sri Lanka exercises long-arm jurisdiction and the scope of subject matter jurisdiction conferred upon Sri Lankan courts.[13]

E.      Judicial Notice

Defendants request that the Court take judicial notice of a series of exhibits pursuant to Federal Rule of Evidence 201.  Plaintiffs oppose this request, arguing " the Court should reject judicial notice of 'facts' not identified in Defendants' Request for Judicial Notice but asserted in their Motion to Dismiss and premised on exhibits offered outside the pleadings, especially where those exhibits offered are of questionable support."

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  In considering a Rule 12(b)(6) motion to dismiss, "a court may consider an undisputably authentic document that a defendant attaches as an exhibit to a motion to

---

[13] The parties may submit a proposed joint briefing schedule on this issue.

dismiss if the plaintiff's claims are based on the document." <u>Steinhardt Group v. Citicorp,</u> 126 F.3d 144, 145 (3d Cir. 1997).  However, "[w]hile the rules allow a court to take judicial notice at any stage of the proceedings, Fed. R. Evid. 201(f), we believe that it should be done sparingly at the pleadings stage. Only in the clearest of cases should a district court reach outside the pleadings for facts necessary to resolve a case at that point." <u>Victaulic Co. v. Tieman</u>, 499 F.3d 227, 236 (3d Cir. 2007) (Resolving a thorny issue like reasonableness by resorting to a party's unauthenticated marketing material falls far short of the bar.).

Judicial notice of the requested documents is not necessary for purposes of this motion to dismiss. Accordingly, Defendants request for judicial notice of the exhibits A-K is **denied.**

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **granted** as to Counts II, III, IV, V and VI; **granted in part** as to Count VII; **denied** as to Count I; **denied in part** as to Count VII; and judgment is **reserved** concerning the issues of personal jurisdiction over Defendant TRO-USA, failure to exhaust local remedies and forum non conveniens.  An appropriate Order accompanies this Opinion.

  S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Dated:    August  26  ,  2010
Original:    Clerk
cc:    All Counsel of Record
    Hon. J.A. Dickson, U.S.M.J.
    File