**LITE DEPALMA GREENBERG, LLC**
Joseph J. DePalma (jdepalma@litedepalma.com)
Jeffrey A. Shooman (jshooman@litedepalma.com)
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858

**MOTLEY RICE LLC**
Michael Elsner, Esq.
John M. Eubanks, Esq.
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone: (843) 216-9000

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARUNAMUNIGE CHAMILA KRISHANTHI, Individually, on behalf of the minor children, and on behalf of the Estate of HETTIGE PRIYANTHA PERERA JAYATUNGA, Deceased | ) Civil Action No. 2:09-cv-05395 ) ) ) ) **AMENDED COMPLAINT** |
| PUNYASEELI DHAMMIKA RAJAPAKSE, Individually and on behalf of the Estate of AADAMBARAGE LUXMAN DE ALWIS, Deceased | ) **JURY DEMAND** ) ) ) |
| SADHISA JAYASINGHE GUNASEKARA, Individually, on behalf of the minor child, and on behalf of the Estate of MALINDA ARUMADURA, Deceased | ) ) ) ) ) ) |
| WEERASINGHEGE MURIN SILVA, Individually and on behalf of the Estate of NETTI KUMARAGE DON DILAN CHANDIKA, Deceased | ) ) ) ) ) |
| HETTIYAKANDAGE ANUSHA KUMARI FERNANDO, Individually, and | ) ) |

1

on behalf of the Estate of                                    )
HETTIYAKANDAGE SURANGA                                        )
KUMARA FERNANDO, Deceased                                      )

GANGODAWILLGE KUSUMAWATHI                                     )
DABARE, Individually and on Behalf of                         )
the Estate of UNDAMANDADIGE                                   )
LEELAWATHI FERNANDO, Deceased                                 )

GODIHENA GAMAGE NILUKA                                        )
SUDARSHANI GAMAGE, Individually                               )
and on behalf of the Estate of                                )
GODIHENA GAMAGE NADIKA,                                       )
Deceased                                                      )

DON SARATH CHANDRASOMA                                        )
HALLALA, Individually and on behalf of                        )
the Estate of DON SUPUN HALLALA,                              )
Deceased                                                      )

SENEHIWEERA ARACHCHIGE                                        )
MUNIDESA, Individually and on behalf                          )
of the Estate of ANJANA THANUSKA                              )
HABARADUWA HEWAGE, Deceased                                   )

BUDA GODAGE VONICA                                            )
KEERTHILATHA, KARUNAMUNIGE                                    )

HATHWELLAGE DONA SRIYANI,                                     )
Individually and on behalf of the Estate of                   )
SHANIKA OSHADI PEILLASSAGE,                                   )
Deceased                                                      )

DIYAWADANAGE SUBASHINI                                        )
SAGARIKA PRIYADARSHANI,                                       )
Individually, on behalf of the minor child,                   )
and on behalf of the Estate of KURUPPU                        )
APPUHAMYLAGE KARUNARATNA,                                     )
Deceased                                                      )

KANKANAMAGE WIJERATNA,                                        )
Individually and on behalf of the Estate of                   )
KANKANAMAGE NILANGA NUWAN                                     )
KUMARA, Deceased                                              )

THEYMUNI DEWAGE DAYAWATHI,                                    )
Individually and on behalf of the Estate of                   )
POLWATTA DURAGE NANDANA                                       )

2

KUMARA, Deceased                                )

DONE PATHMINIE                                  )
MAHAMUDALIGE, Individually and on               )
behalf of the Estate of KOLITHA                 )
KUMARA MAHAMUDALIGE,                            )
Deceased                                        )

KASTURI ARACHCHIGE DONE                         )
GUNAWATHI, Individually and on                  )
behalf of DOMBAGAHAGE GINESHA                   )
CHAMALI PERARA, Deceased                        )

JUWANDARA KANKANAMGE                            )
NIRANJALA TRIXEY PERERA,                        )
Individually and on behalf of the Estate of     )
MAAGALAGE RUSHMI LUXIKA                         )
PERERA, Deceased                                )

                                                )
NARANPITAGE ROHANA                              )
PATHMASAY PERERA,                               )

BALAPUWADUGE THUSANI                            )
MANAHARI MENDIS, Individually, on               )
behalf of the minor child, and on behalf of     )
the Estate of KANKANAM                          )
VITHARANAGE PIYARATNA,                         )
Deceased                                        )

UDAHAGE DON ASANKA CHANDRA                      )
KUMARA, Individually and on behalf of           )
the Estate of UDAHAGE DONE                      )
MAHINSA PRADEEPANI, Deceased                    )

WIJAYAN RAJARATNAM, Individually                )
and on behalf of the Estate of                  )
RAJARATNAM RADEESWARAN,                         )
Deceased                                        )

RAJAPAKSE MANIKKUTHAMBI                         )
YAMUNA RANI,                                     )

MALALGODAPITIYA GAMAGE                          )
LAHIRU MADHUSANKA, Individually                 )
and on behalf of the Estate of                  )
MALALGODAPITIYA GAMAGE                          )
VICHITRA SRIMALI, Deceased                      )

CAPTAIN PATHMASIRI                              )

3

THEWARAPPERUMA, Individually and      )
on behalf of the Estate of VIMUKTHI    )
SAJAN THEWARAPPERUMA,                  )
Deceased                               )

PALLIYAGODA                            )
KALUKANKANAMAGE RAMANI                 )
PEIRIS, Individually and on behalf of the  )
Estate of PONSUGE THIWANKA             )
TISSERA, Deceased                      )

LIYANA ARACHCHIGE ASOKA                )
UPALI,                                 )
                                       )

WITHARANAGE CHULARATNE,                )
Individually and on behalf of the Estate of  )
WITHARANAGE DEVIKA HEMALI              )
WITHARANA, Deceased                    )
                                       )
MESTIYAGE RANJANEE                     )
FERNANDO, Individually, on behalf of   )
the minor child, and on behalf of the  )
Estate of SAMARAKOON                   )
MUDIYANSELAGE SAMARKOON                )
BANDA, Deceased                        )
                                       )
          Plaintiffs,                  )
                                       )

              v.                       )

RAJAKUMARA RAJARATNAM,                 )
JESUTHASAN M. RAJARATNAM,              )
TAMIL REHABILITATION                   )
ORGANIZATION, aka TRO, TAMIL           )
RELIEF ORGANIZATION                    )
              Defendants.              )
_____)

## **IDENTIFICATION OF PARTIES (LOCAL CIVIL RULE 10.1)**

The names and addresses of the named parties to this action are as follows: (i) all

Plaintiffs are citizens of and reside in Sri Lanka; (ii) Defendant Rajakumara Rajaratnam is a

4

United States citizen  residing at 60 Sutton Place, New York, New York; (iii) Defendant Jesuthasan M. Rajaratnam is a United States citizen  residing at 18 Lakeview Drive, Old Tappan, New Jersey; (iv) Defendant Tamil Rehabilitation Organization is a Sri Lankan non-governmental organization with a United States branch located at 8 Wheatston Court, Princeton Junction, New Jersey 08550-1935 and 517 Old Town Road, Cumberland, Maryland  21502.

Plaintiffs plead the following facts and legal claims:

## INTRODUCTION

1. The Liberation Tigers of Tamil Elam ("LTTE") is a violent terrorist group based in Sri Lanka that is formally designated by the United States, Canada, United Kingdom, European Union and India as a foreign terrorist organization.  LTTE has waged a campaign of violence and bloodshed in Sri Lanka for over three decades in an effort to establish a mono-ethnic Tamil State in northern Sri Lanka.  In waging that terror campaign, LTTE has killed thousands of innocent Tamil and Sinhalese Sri Lankans.  According to the Federal Bureau of Investigation ("FBI"), LTTE has murdered over 4,000 people since 2006.

2. LTTE was founded in 1976 and began its terror campaign in 1983.  LTTE committed terrorist acts to further its separatist goals.   In carrying out those terrorist acts, LTTE intentionally targeted innocent Sri Lankans as part of its campaign to terrorize Sri Lankans into relenting to its political demands.

3. LTTE is one of the best funded, best trained, and most dangerous terrorist groups in the world.  On October 8, 1997, the United States designated LTTE as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act.  In designating the LTTE as a terrorist organization, then Secretary of State Madeline Albright said, "…[A]s of today, it is a crime to provide funds, weapons or other types of tangible support" to LTTE and

other terrorist organizations. Secretary Albright then continued, "The Anti-Terrorism Act was designed to put a stop to fundraising in the United States by and on behalf of organizations that engage in or sponsor terrorist acts" – expressly including LTTE.

4. On November 2, 2001, the United States designated LTTE as a Specially Designated Global Terrorist ("SDGT") under Executive Order 13224. Both the FTO and SDGT designations prohibit financial and other material support to LTTE.

5. LTTE is particularly known for its ruthless use of suicide bombings. Its suicide bombers, known as "Black Tigers," have launched over 200 suicide attacks since LTTE's first suicide mission in 1987. LTTE improved suicide bombing design and tactics so as to maximize the stealth and lethality of the attacks.

> Prior to the current conflict in Iraq, the LTTE carried out the largest number of suicide operations by any terrorist group. The LTTE transformed suicide operations which terrorists had considered an esteemed tactical approach used exclusively against high-value targets, to a production-line approach. The formation of a standing suicide army known as the Black Tigers is a reflection of the mass-scale production line approach of making the human bomb a common everyday weapon. The LTTE introduced the concept of "soft target suicide operations" that effectively delivered a low-cost high visibility outcome to boost the image of the group. This radically transformed the tactical nature of all future suicide operations globally. Suicide operations were less about the target, and more about building profile and augmenting the image of the group. The LTTE innovated and improved detonation devices and concealment methods contributing significantly to the advancement in the technology used for suicide operations.[1]

6. LTTE's suicide bombings and other bombings have involved the use of explosives, incendiary weapons, and other lethal devices that were designed and built so as to maximize death and serious bodily injury. To this end, LTTE's bombings involved the intentional

---

[1]    Shanaka Jayasekara, "Tamil Tiger Links with Islamist Terrorist Groups," International Institute for Counter-Terrorism located at http://www.ict.org.il/articles/tabid/66/articlsid/277/currentpage/5/Default.aspx.

delivery, placement, discharge, or detonation of explosives, incendiary weapons, and lethal devices in Sri Lankan public places including public transportation, commercial centers and sporting events.

7. To support its terrorist activities, LTTE illegally raises funds and acquires weapons and technology using a network of Tamil-related front charities and organizations.

8. Since the outset of LTTE's terrorist campaign, some wealthy members of the international Tamil community have knowingly provided LTTE with funding and assistance with weapons and munitions procurement with the purpose of assisting the LTTE in carrying out its terrorist campaign.   This international fundraising and weapons support program is carried out through international Tamil-related "charitable" organizations that LTTE controls.

9. The Defendants in this action, Rajakumara Rajaratnam ("Rajaratnam"), J. M. Rajaratnam ("J.M.") and the Tamil Rehabilitation Organization ("TRO"), have knowingly and purposefully provided financial and material support to LTTE with the intent to advance the LTTE's terror campaign.   TRO also facilitated and solicited donations from prominent Tamil expatriates in the U.S., including Defendants Rajakumara "Raj" Rajaratnam ("Rajaratnam") and J.M. Rajaratnam ("J.M."), which were used to finance the terror activities of the LTTE.

10.     Rajaratnam, who lives in New York State, has individually and in his capacity as both a director of the family's New Jersey based charitable foundation and as founder of a New York based tsunami relief charity, knowingly provided substantial money to the LTTE for the purpose of assisting LTTE's terror campaign, including the deliberate murder of civilians.

11.     J.M., who lives in New Jersey, has individually and as a director of the family's New Jersey based charitable foundation knowingly provided substantial funding and logistical

aid to LTTE for the purpose of assisting LTTE's terror campaign, including the deliberate murder of civilians.

12.     Additionally, Defendant Rajaratnam, for the purpose of helping LTTE's terror campaign, made fundraising appeals on behalf of LTTE to the Tamil community in the state of New Jersey and J.M. had direct meetings with LTTE leadership.  TRO, which is headquartered in Sri Lanka and maintains a U.S. branch located in New Jersey and Maryland, knowingly provided substantial funding and logistical aid to LTTE for the purpose of assisting LTTE's terror campaign.  The U.S. Department of State, in an unclassified cable, indicated that as late as 2007, the TRO in the United States ("TRO-USA") was responsible for the largest percentage of overseas donations to the LTTE of any TRO office.  "Of these remittances from the U.S., the Rajaratnam Family is the largest private donor to the TRO from the United States."  Rajaratnam, J.M. and TRO undertook these acts for the purpose of assisting the LTTE's terror campaign.

13.     TRO, which is headquartered in Sri Lanka and maintains a U.S. branch located in New Jersey and Maryland, knowingly provided substantial funding and logistical aid to LTTE for the purpose of assisting LTTE's terror campaign.

14.     TRO Director and Coordinator, Ram Ranjan, maintained TRO-USA's web presence in New Jersey.  TRO-USA's website was registered to his New Jersey address and TRO-USA's email address was directly linked to his New Jersey email address.  Ranjan's home address in Princeton Junction, New Jersey was routinely listed as a point of contact for TRO on fliers, pamphlets, and letters, on which his New Jersey email addresses and telephone numbers were also provided.  Ranjan's New Jersey residence was also listed in soliciting donations from the New Jersey community.  Additionally, the summons and complaint in this case were both served on Ranjan at his New Jersey address.

8

15.     TRO raised money by holding fundraisers and events in New Jersey and surrounding areas.  TRO held more fundraisers and received more contributions from New Jersey than any other location in the United States.

16.     TRO officials were present at all events held in New Jersey.  The officials in attendance at events in New Jersey included TRO-USA President Dr. Arul Ranjithan, TRO-USA Vice President Vimala Ranjithan, TRO-USA Accountant Ranjan Manoranjan, TRO-USA Secretary Muthuthamby Sreetharan, and TRO-USA New Jersey Coordinator Ram Ranjan.

17.     At these events, TRO members and affiliates praised and supported the LTTE, hoisted the Tamil flag, and listened to presentations given by LTTE leaders and operatives.

18.     In addition to regular fundraising events, TRO held annual Maaveerar Naal ("Heroes Day") events in New Jersey and the surrounding areas. Heroes Day was held to commemorate the operatives who had committed suicide attacks or been killed while fighting for the LTTE in Sri Lanka.

19.     At these New Jersey events, TRO members and affiliates praised and supported the LTTE, hoisted the Tamil flag, and listened to presentations given by LTTE leaders and operatives.

20.     TRO also solicited donations from New Jersey residents.  Funds collected by TRO at these events were sent to Sri Lanka with the intention of supporting the LTTE cause.

21.     The U.S. Department of State, in an unclassified cable, indicated that as late as 2007, the TRO in the United States was responsible for the largest percentage of overseas donations to the LTTE of any TRO office.  The cable also stated that TRO in the U.S. received a large proportion of its donations from the New Jersey-based Rajaratnam Family Foundation: "Of

9

these remittances from the U.S., the Rajaratnam Family is the largest private donor to the TRO from the United States."

22.     Rajaratnam, J.M. and TRO undertook these acts for the purpose of assisting the LTTE's terror campaign.  Rajaratnam, J.M. and TRO knowingly and purposefully supported LTTE bombing campaigns in Sri Lanka. Plaintiffs are victims of bombing attacks perpetrated by the LTTE in Sri Lanka.  As such, Rajaratnam, J.M. and TRO caused and contributed to the deaths or injuries suffered by Plaintiffs.   LTTE's systematic and widespread terror campaign of bombings, knowingly and purposefully supported by Rajaratnam, J.M. and TRO, caused Plaintiffs' deaths or injuries.  Those terrorist bombings were authorized, directed and committed by the LTTE.

23.     The claims of the Plaintiffs are brought pursuant the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS") and under common law tort claims.

## PARTIES AND ATTACKS

24.     Plaintiffs, described below, are victims of international terrorism, crimes against humanity, specifically suicide bombings and other murderous attacks on innocent civilians intended to intimidate or coerce a civilian population, reckless disregard, negligence and tort claims committed by the LTTE with financial and material support knowingly and purposefully provided by TRO to the LTTE for the purpose of facilitating the commission of murderous attacks against the Sri Lankan civilian population.  Plaintiffs include persons injured, spouses, siblings, children and/or the legal representatives of persons killed in the following suicide bombings or other terrorist bombing attacks committed by LTTE with the knowing and purposeful support of TRO.  All Plaintiffs are citizens of Sri Lanka.

419848.1

**November 28, 2007 "No Limit" Clothing Store - Parcel Bomb, Nugegoda, Sri Lanka**

25.     On Wednesday, November 28, 2007, during the evening rush-hour, an LTTE operative planted a parcel bomb at the popular clothing store "No-Limit," located in Nugegoda, a suburb of Colombo.  The explosion occurred when a security guard informed a nearby police officer of the suspicious package left with the guard for safekeeping. The officer attempted to open the package, triggering the bomb.  The blast killed at least 17 people and injured more than 30 people. Some of the victims were waiting outside the store at a crowded bus stop.  The No Limit department store and the adjacent building were damaged in the explosion and secondary fire sparked by the bomb.

26.     Plaintiff Karunamunige Chamila Krishanthi is the spouse of Hettige Priyantha Perera Jayatunga and brings this action individually and on behalf of the minor children of Hettige Priyantha Perera Jayatunga.  Mr. Perera was born November 25, 1972, and resided in Nugegoda.  He was killed November 28, 2007 when a LTTE parcel bomb exploded in the crowded "No Limit" clothing store at Nugegoda junction in the suburb of Colombo, Sri Lanka. Mrs. Krishanthi did not learn of her husband's death until after she was released from the hospital over a month after the bombing.  One of the minor children was also injured in the bombing.  She suffered injuries to her eyes and legs, was hospitalized for three weeks, and continues to have pain in her eye.

27.     Plaintiff Karunamunige Chamila Krishanthi was also injured on November 28, 2007 when a LTTE parcel bomb exploded in the crowded "No Limit" clothing store at Nugegoda junction in the suburb of Colombo, Sri Lanka. Mrs. Krishanthi was born April 25, 1975, and resides in Kohuwala Nugegoda.  Mrs. Krishanthi suffered extensive shrapnel injuries;

419848.1

her hand continues to be numb and does not function properly.  She was in the ICU and hospitalized for over a month.

28.   Plaintiff Hathwellage Dona Sriyani is the mother of Shanika Oshadi Peillassage.  Shanika Oshadi Peillassage was born August 22, 1982 and resided in Pannipitiya.  She was killed November 28, 2007 when a LTTE parcel bomb exploded in the crowded "No Limit" clothing store at Nugegoda junction in the suburb of Colombo, Sri Lanka.  Ms. Peillassage was engaged to be married to Anjana Thanuska Habaraduwa Hewage who was also killed in the bombing.

29.   Plaintiff Senehiweera Arachchige Munidesa is the father of Anjana Thanuska Habaraduwa Hewage.   Mr. Hewage was born March 13, 1982, and resided in Pita Kotte.  He was killed November 28, 2007 when a LTTE parcel bomb exploded in the crowded "No Limit" clothing store at Nugegoda junction in the suburb of Colombo, Sri Lanka.  Mr. Hewage was engaged to be married to Shanika Oshadi Peillassage who was also killed in the bombing.

30.   Plaintiff Kankanamage Wijeratna is the father of Kankanamage Nilanga Nuwan Kumara.  Kankanamage Nilanga Nuwan Kumara was born March 21, 1987, and resided in Kurunegala.  He was killed November 28, 2007 when a LTTE parcel bomb exploded in the crowded "No Limit" clothing store at Nugegoda junction in the suburb of Colombo, Sri Lanka.

31.   Plaintiff Godihena Gamage Niluka Sudarshani Gamage is the sister of Godihena Gamage Nadika.  Godihena Gamage Nadika was born March 20, 1982 and resided in Dompe.  She was killed November 28, 2007 when a LTTE parcel bomb exploded in the crowded "No Limit" clothing store at Nugegoda junction in the suburb of Colombo, Sri Lanka.

32.   Plaintiff Udahage Don Asanka Chandra Kumara is the brother of Udahage Done Mahinsa Pradeepani.  Udahage Done Mahinsa Pradeepani was born September 1, 1990 and

12

resided in Piliyandala.  Ms. Pradeepani was killed November 28, 2007 when a LTTE parcel bomb exploded in the crowded "No Limit" clothing store at Nugegoda junction in the suburb of Colombo, Sri Lanka.

33.     Plaintiff Malalgodapitiya Gamage Lahiru Madhusanka is the brother of Malalgodapitiya Gamage Vichitra Srimali.  Malalgodapitiya Gamage Vichitra Srimali was born March 30, 1984, and resided in Homagama.  Ms. Srimali was killed November 28, 2007 when a LTTE parcel bomb exploded in the crowded "No Limit" clothing store at Nugegoda junction in the suburb of Colombo, Sri Lanka.

34.     Plaintiff Witharanage Chularatne is the father of Witharanage Devika Hemali Witharana.  Witharanage Devika Hemali Witharana was born August 10, 1982, and resided in Mahiyanganaya.  Ms. Witharana was killed November 28, 2007 when a LTTE parcel bomb exploded in the crowded "No Limit" clothing store at Nugegoda junction in the suburb of Colombo, Sri Lanka.

**April 6, 2008 Kanthi Stadium Suicide Bombing, Weliweriya**

35.     Early Sunday morning, April 6, 2008, a LTTE suicide bomber attacked the Sri Lankan Minister of Transportation Jeyaraj Fernandopulle as he prepared to give the starting signal for a marathon race at Kanthi Stadium at Weliweriya, Sri Lanka. The explosion occurred at the starting line directly behind the Minister and next to runners and spectators. The attack killed 15 people and injured 80 people. Among those killed were the Minister, several prominent Sri Lankan sports figures, athletes and spectators.

36.     Sri Lankan authorities determined the suicide bomber, who used the name Muththiah Kajendran and had several forged identity cards, was a member of the LTTE.

13

37.     Plaintiff Punyaseeli Dhammika Rajapakse is the spouse of Aadambarage Luxman De Alwis. Aadambarage De Alwis was born March 17, 1940, and resided in Pannipitiya, Maharagama.  Mr. De Alwis was killed April 6, 2008 when a LTTE suicide bomber attacked a sporting event at the Kanthi Stadium at Weliweriya, Sri Lanka.

38.     Plaintiff Diyawadanage Subashini Sagarika Priyadarshani is the spouse of Kuruppu Appuhamylage Karunaratna and brings this action individually and on behalf of the minor child of Kuruppu Appuhamylage Karunaratna.  Kuruppu Karunaratna was born April 29, 1960 and resided in Ragama.  Mr. Karunaratna was killed April 6, 2008 when a LTTE suicide bomber attacked a sporting event at the Kanthi Stadium at Weliweriya, Sri Lanka.

39.     Also injured at the April 6, 2008 Kanthi Stadium at Weliweriya attack is Plaintiff Naranpitage Rohana Pathmasay Perera. Mr. Perera was born September 17, 1968 and resides in Dewlapitiya.  As a result of the bombing, Mr. Perera suffered a head injury and extensive shrapnel injuries.

**February 3, 2008 Fort Railway Station Suicide Bombing Colombo**

40.     On Sunday February 3, 2008, at approximately 2:00 in the afternoon, a LTTE female suicide bomber attacked passengers waiting for trains at the Fort Railway station in Colombo.  The LTTE bomber killed 15 people and seriously injured 20 individuals.  As many as 105 people suffered injuries due to the blast.  A suspicious police officer spotted the movements of a woman as she made her way towards an exit off the train platform.  As he approached her, the woman detonated her bomb near a cafeteria situated between a railway platform and the exits.  In or near the cafeteria, a group of student baseball players and their coach who were waiting for a train were killed.

14

41.     Plaintiff Sadhisa Jayasinghe Gunasekara is the spouse of Malinda Arumadura and brings this action individually and on behalf of the minor child of Malinda Arumadura. Malinda Arumadura was born November 21, 1981, and resided in Gandara.  Mr. Arumadura was killed February 3, 2008 when a LTTE suicide bomber attacked the Fort Railway train station in Colombo, Sri Lanka.

42.     Plaintiff Don Sarath Chandrasoma Hallala is the father of Don Supun Hallala. Don Supun Hallala was born January 19, 1991, and resided in Angoda.  Mr. Hallala was killed February 3, 2008 when a LTTE suicide bomber attacked the Fort Railway train station in Colombo, Sri Lanka.

43.     Plaintiff Dona Pathminie Mahamudalige is the mother of Kolitha Kumara Mahamudalige.  Kolitha Kumara Mahamudalige was born May 30, 1988, and resided in Kaduwela, Mr. Mahamudalige was killed February 3, 2008 when a LTTE suicide bomber attacked the Fort Railway train station in Colombo, Sri Lanka.

44.     Plaintiff Juwandara Kankanamge Niran Jala Trixey Perera is the mother of Maagalage Rushmi Luxika Perera.  Maagalage Rushmi Luxika Perera was born August 8, 1995, and resided in Maharagama.  Ms. Perera was killed February 3, 2008 when a LTTE suicide bomber attacked the Fort Railway train station in Colombo, Sri Lanka.

45.     Plaintiff Wijayan Rajaratnam is the father of Rajaratnam Radeeswaran. Rajaratnam Radeeswaran was born March 20, 1990, and resided in  Dematagoda.   Mr. Radeeswaran was killed February 3, 2008 when a LTTE suicide bomber attacked the Fort Railway train station in Colombo, Sri Lanka.

46.     Captain Pathmasiri Thewarapperuma is the father of Vimukthi Sajan Thewarapperuma. Vimukthi Sajan Thewarapperuma was born June 15, 1989, and resided in

Kaluthara North.   Mr. Thewarapperuma was killed February 3, 2008 when a LTTE suicide bomber attacked the Fort Railway train station in Colombo, Sri Lanka.

47.     Plaintiff Palliyagod Kalukankanamage Ramani Peiris is the mother of Ponsuge Thiwanka Tissera.   Ponsuge Thiwanka Tissera was born February 28, 1990, and resided in Dehiwala.   Mr. Tissera was killed February 3, 2008 when a LTTE suicide bomber attacked the Fort Railway train station in Colombo, Sri Lanka.

### February 23, 2008 Bus Bombing at Mount Lavinia

48.     On Saturday, February 23, 2008, an LTTE operative left a bomb hidden beneath seats in the middle of the #5665 bus.   Passengers and the driver became suspicious about the bag and at approximately 10:30am the bus stopped at the Mount Lavinia junction to unload fearful passengers.   As the driver called the police the bomb exploded, injuring 18 by-standers and damaging several nearby shops including a grocery shop. The bus was completely destroyed.

49.     Plaintiff Rajapakse Manikkuthambi Yamuna Rani was born November 6, 1956, and resides in Ambalangoda Road.  Ms. Rani was injured on February 23, 2008 during the LTTE bombing of a bus stopped in front of a grocery shop in Mount Lavinia, owned by Ms. Rani and her husband.   Ms. Rani suffered injuries to her head and shrapnel wounds in her arm which required surgery. Ms. Rani also suffered permanent hearing loss in her right ear.   Additionally the blast caused major damage to the shop owned by Ms. Rani and her husband. The shop reopened after the bombing however, the damage incurred was extensive and traffic to the area diminished greatly. As a result Ms. Rani and her husband were forced to close their business.

419848.1

### April 25, 2008 Piliyanda Bus Stop Bombing

50.     On Friday, April 25, 2008, an LTTE operative planted a remote controlled bomb aboard a crowed commuter bus carrying passengers from the Piliyanda bus terminal to the suburb destination of Kahapola. At approximately 6:40 p.m., the bomb was detonated remotely, killing 28 people and injuring more than 70 people.  The LTTE operative responsible for the bombing, known by the alias Vasanthan, was arrested by Sri Lankan police.  In his confession, Vasanthan admitted he was directed by LTTE to conduct the bombing.  He was aided in the attack by LTTE operative Devendra Sinnaiah. Vasanthan enlisted in the LTTE in 2000 and received two years of training.

51.     Plaintiff Mestiyage Ranjanee Fernando is the spouse of Samarakoon Mudiyanselage Samarkoon Banda and brings this action individually and on behalf of the minor child of Samarakoon Mudiyanselage Samarkoon Banda.   Samarakoon Mudiyanselage Samarkoon Banda was born January 3, 1974, and resided in Madapatha.  Mr. Banda was killed April 25, 2008 by an LTTE suicide bomber who attacked a crowded bus at the Piliyanda bus stop in the suburbs of Colombo, Sri Lanka.

52.     Plaintiff Weerasinghege Murin Silva is the mother of Netti Kumarage Don Dilan Chandika. Netti Kumarage Don Dilan Chandika was born February 19, 1980, and resided in Madapatha.  Mr. Chandika was killed April 25, 2008 by an LTTE suicide bomber who attacked a crowded bus at the Piliyanda bus stop in the suburbs of Colombo, Sri Lanka.

53.     Plaintiff Hettiyakandage Anusha Kumari Fernando is the sister of Hettiyakandage Suranga Kumara Fernando.  Hettiyakandage Suranga Kumara Fernando was born June 8, 1985, and resided in Madapatha.  Mr. Fernando was killed April 25, 2008 by an LTTE suicide bomber who attacked a crowded bus at the Piliyanda bus stop in the suburbs of Colombo, Sri Lanka.

17

54.     Plaintiff Gangodawillge Kusumawathi Dabare is the daughter of Undamandadige Leelawathi Fernando.  Undamandadige Leelawathi Fernando was born November 5, 1945, and resided in Madapatha.  Ms. Fernando was killed April 25, 2008 by an LTTE suicide bomber who attacked a crowded bus at the Piliyanda bus stop in the suburbs of Colombo, Sri Lanka.

55.     Plaintiff Buda Godage Vonica Keerthilatha was born May 29, 1949, and resides in Madapatha Piliyandala.  Ms. Keerthilatha was injured April 25, 2008 by an LTTE suicide bomber who attacked a crowded bus at the Piliyanda bus stop in the suburbs of Colombo, Sri Lanka.  She saw a ball of fire pass by her head and then lost consciousness.   She suffered injuries to her hand and ear which resulted in loss of hearing.  She was hospitalized for six days.

56.     Plaintiff Theymuni Dewage Dayawathi is the mother of Polwatta Durage Nandana Kumara.  Polwatta Durage Nandana Kumara was born June 26, 1981, and resided in Bombuwala Kalutara.  Mr. Kumara was killed April 25, 2008 by an LTTE suicide bomber who attacked a crowded bus at the Piliyanda bus stop in the suburbs of Colombo, Sri Lanka.

57.     Plaintiff Kasturi Arachchinge Done Gunawathi is the mother of Dombagahage Ginesha Chamali Perara.  Dombagahage Ginesha Chamali Perara was born February 4, 1980, and resided in Madapathe.  Ms. Perara was killed April 25, 2008 by an LTTE suicide bomber who attacked a crowded bus at the Piliyanda bus stop in the suburbs of Colombo, Sri Lanka.

58.     Plaintiff Balapuwaduge Thusani Manahari Mendis is the spouse of Kankanam Vitharanage Piyaratna and brings this action individually and on behalf of the minor child of Kankanam Vitharanage Piyaratna.  Kankanam Vitharanage Piyaratna was born April 9, 1966, and resided in Kahapola Piliyadale.  Mr. Piyaratna was killed April 25, 2008 by an LTTE suicide bomber who attacked a crowded bus at the Piliyanda bus stop in the suburbs of Colombo, Sri Lanka.

18

59.     Plaintiff Liyana Arachchige Asoka Upali was born August 13, 1955, and resides in Madapatha Piliyandala.  Mr. Upali was injured April 25, 2008 by an LTTE suicide bomber who attacked a crowded bus at the Piliyanda bus stop in the suburbs of Colombo, Sri Lanka. Mr. Upali suffered shrapnel injuries to his abdomen and shoulder requiring surgery. He also suffered permanent hearing loss in one ear.

**Defendants**

60.     Rajakumara Rajaratnam is a citizen of the state of New York residing at 60 Sutton Place, New York, New York.  He is the managing member of Galleon Management LLC, Galleon Advisors LLC and the principal partner of Galleon Management LP ("Galleon Group"). He is the treasurer of the Rajaratnam Family Foundation, based in Tenafly, New Jersey.

61.     Jesuthasan M. Rajaratnam ("J.M.") resides at 18 Lakeview Drive, Old Tappan, New Jersey.  He is the father of Raj Rajaratnam and president of the Rajaratnam Family Foundation, which is a family charitable organization located in Tenafly, New Jersey.  J.M. served as president of the Ilanka Tamil Sangam USA ("ITSA"), a non-profit Tamil related-organization.  J. M. Rajaratnam has also hosted meetings with LTTE operatives at his home in New Jersey.

62.     TRO is a Sri Lankan-based non-governmental organization ("NGO") controlled by the LTTE. The organization acts as a charitable front group to collect funds, transfer money to the LTTE, and provide "legitimate" cover for the LTTE to wage its terror campaign abroad.  The TRO maintained and advertised offices at 8 Wheatston Court, Princeton Junction, New Jersey 08550 and at 517 Old Town Road, Cumberland, Maryland 21502.

19

## JURISDICTION AND VENUE

63.     Jurisdiction exists under 28 U.S.C. §1331 for this civil action arising under the laws of the United States.

64.     Jurisdiction also arises and under 28 U.S.C. §1332(a)(2) for this civil action between citizens of a State and citizens or subjects of a foreign state where the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

65.     Jurisdiction also exists under 28 U.S.C. §1350 for this civil action by an alien for torts committed in violation of the law of nations.

66.      This Court has personal jurisdiction over the Defendant TRO, which actively operated and fundraised in the United States and specifically in New Jersey.

67.     This Court has personal jurisdiction over Defendant J.M who is a resident of New Jersey.

68.     This Court has personal jurisdiction over Defendant Rajaratnam who has not previously contested personal jurisdiction in this civil action.

69.     Venue is both proper and convenient in this District under 28 U.S.C. §1391(b).

## FACT ALLEGATIONS

### I. Liberation Tigers of Tamil Elam (LTTE)

#### Historical Background

70.     Founded in the 1970s by Vellupillai Prabhakaran ("Prabhakaran"), LTTE is a designated terrorist organization.  The long running ethnic conflict between minority ethnic Tamils and Sri Lanka's Sinhalese majority resulted in massive bloodshed following the July 1983 riots in which thousands of Tamils were killed in retaliation for the murders of 13 Sinhalese soldiers by the LTTE.  As violence and unrest spread across Tamil areas of the island, tens of

thousands of Tamils fled Sri Lanka.  The Tamil exodus has created a sizable Tamil expatriate community living worldwide, some of whom support LTTE's goals.  LTTE relies on some members of the global Tamil expatriate community to help fund LTTE, procure weapons for LTTE, and to spread LTTE's propaganda.  Specifically, TRO served as the vehicle for prominent expatriates, such as Defendants Rajaratnam and J.M., to knowingly and purposefully fund LTTE's terror campaign and spread LTTE's propaganda.

71.     LTTE's success as a terrorist group is in part due to its substantial funding, which it collects through a well-defined and disciplined organizational structure.  Until his death in 2009, LTTE's leader Prabhakaran closely controlled all elements of LTTE's global activities.  Beneath Prabhakaran, Veerakathi Manivannan, also known as "Castro," was responsible for LTTE's support activities outside of Sri Lanka and lead the LTTE's International Communications Office.[2]  LTTE's intelligence and military operations wing was headed by Sanumganadan Sivashankar, also known as "Pottu Amman."  Selvarasa Pathmanathan, also known as "KP," succeeded Prabhakaran as head of the LTTE.  KP, who ran the LTTE's shipping and logistics operations, was captured and extradited to Sri Lanka in August 2009.

72.     At the height of its powers, LTTE amassed substantial artillery, anti-aircraft weapons and other munitions and gained control of portions of the Northern provinces of Sri Lanka.  In January 2007, Thavajarah Pratheepan ("Pratheepan") was arrested and charged with materially supporting LTTE.  Pratheepan is a senior arms procurement agent for the LTTE who was arrested in Indonesia.  Evidence recovered in a consensual search of Pratheepan's possessions included a laptop computer with spreadsheets, invoices and bills of lading documenting the purchase of millions of dollars worth of military weapons, munitions and other

---

[2]     For a more detailed analysis of Castro's activities, *see*, *U.S. v. Kandasamy*, complaint, Case No. 1:06-cr-00616-RJD (E.D.N.Y. April 23, 2007).

equipment.  A spreadsheet found on his computer dated June 2006 itemized a list of "priority" items, costing a total of $20 million, which included anti-aircraft guns, mounted naval guns and hundreds of tons explosives. The specific explosives needed on the priority list were 50 tons of C4 explosives,  5 tons of "Phlegmatized RDX" explosives, 50 tons of TNT, and 50 tons of Tritonal explosive.

73.      The LTTE had roughly 8,000 to 10,000 armed combatants in Sri Lanka, including 3,000 to 6,000 trained fighters.  These fighters were organized into military-like divisions that included a naval squad, referred to as the "Sea Tigers", a limited air force, known as the "Sky Tigers", and a suicide brigade previously referenced as the "Black Tigers."

74.      LTTE employed suicide terrorism to advance its insurgency.  Since its first suicide attack in 1987, the LTTE has made suicide bombings an enduring feature of its ruthless murderous activities.   At one time, the Black Tigers were estimated to have over 500 cadres involved in the planning and execution of suicide bombings.  The group's expertise grew as it developed special explosive belts, clothing and triggering mechanisms, further perfecting the lethality of the suicide bomb.

75.      LTTE carried out hundreds of attacks against civilian targets, the overwhelming majority of which occurred in Sri Lanka.  These attacks were widely publicized and well known to the Tamil expatriate community, including members and officers of TRO and Defendants Rajaratnam and J.M.  Some of the most notable bombings attacks include:

- In May 1991, an LTTE suicide bomber assassinated former Indian Prime Minister Rajiv Gandhi and killed 14 others;

- In January 1996, LTTE terrorists drove a truck bomb into the Central Bank of Sri Lanka in downtown Colombo.  This brazen attack killed at least 53 people, and injured over 1,000;

- In December 1997, LTTE suicide terrorists detonated a truck bomb parked near the Galadari Hotel in downtown Colombo near the site of the World Trade Center.  At least 10 civilians were killed and over 100 wounded;

- In January 1998, an LTTE suicide squad exploded a truck bomb outside of a sacred Buddhist religious temple, Sir Dalada Maligawa, in Kandy.  Nine civilians were killed and at least 15 were wounded;

- In March 1998, LTTE terrorists exploded a bomb aboard a minibus at the Maradana junction in Colombo.  At least 30 civilians were killed, and over 250 were wounded;

- In December 1999, a female LTTE suicide bomber blew herself up at a presidential campaign event held at the town hall in Colombo.  The intended target was then-president, Mrs. Chandrika Kumaratunga, who suffered injuries in the attack.  At least 16 civilians were killed, and over 100 were wounded in this suicide bombing;

- In March 2000, five LTTE suicide cadres attacked a motorcade outside of the Sri Lankan parliament.  At least 14 civilians were killed and over 40 were injured;

- In September 2000, an LTTE suicide bomber blew himself up outside of the bustling National Hospital of Sri Lanka in Colombo.  At least seven civilians were killed and at least 25 civilians were wounded;

419848.1

- In October 2000, an LTTE suicide bomber killed 23 people in Muttur, including a Muslim political candidate who was contesting parliamentary elections;

- Also in October 2000, a LTTE suicide bomber blew himself up near an election rally in Medawachchiya. At least 10 civilians were killed and at least 40 were wounded. The bomber may have intended to target a government minister in attendance; and

- In October 2001, a LTTE suicide bomber blew himself up in the Narahenpita area of Colombo. The bomber is believed to have targeted then-Prime Minister Wickramanayake, who was expected to have been in the vicinity. At least three civilians were killed and at least 10 were wounded in this attack.

76.    In February 2002, the Sri Lankan government and LTTE agreed to a cease fire after more than 20 years of conflict. Based on determinations given by the Nordic ceasefire monitors the LTTE violated the ceasefire 3,471 times and the Government 162 times between the period February 2002 – December 2005. On November 27, 2005, LTTE leader Prabhakaran publically threatened to intensify LTTE's attacks unless the Tamils were given an independent mono-ethnic state.

77.    With LTTE's imminent return to an all out conflict, Prabhakaran called for an intensified fundraising effort from the international Tamil community beginning in the summer of 2004. The attacks appear to have been delayed because of the tsunami that struck Sri Lanka on December 26, 2004. LTTE funding appeals in the second half of 2004 refer to the "final war" and LTTE collected substantial contributions that were directed to LTTE's military wings.

24

**History of LTTE's Recent Bombings**

78.     Since Prabhakaran's 2004 appeal for renewed funding and his November 2005 speech, LTTE has conducted hundreds of attacks, including several suicide bombings and political assassination attempts.   In addition to the specific attacks referenced herein that give rise to claims, the following list of selected attacks since November 2005 demonstrates LTTE's systematic and wide-spread use of terrorist acts directed at innocent Sri Lankans to achieve its goals, which LTTE carried out with the financial support of Rajaratnam, J.M., and TRO:

- On May 13, 2006, LTTE militants shot and killed 13 civilians in the Kayts Island in the Jaffna district;

- On June 15, 2006, the LTTE detonated a remote-controlled bomb on a crowded civilian bus killing 64 people including 15 children;

- On August 3, 2006, the LTTE fired artillery into a Muslim school in Muttur injuring 30 and killing 15 civilians;

- On August 4, 2006 LTTE slaughtered over 100 civilians in the Tricomalee district attempting to flee fighting in the town of Muttur;

- On October 29, 2006, a suicide bomber attacked the Uduuppidy area of Jaffna district killing five civilians;

- On March 25, 2007, LTTE militants shot three Tamils near the Hatton National Bank in Jaffna town;

- On April 2, 2007, an LTTE bomber exploded a bomb aboard a bus at Konduwatuawana in the northwest of Ampara district killing 15 people and injuring 25 people;

- On April 7, 2007, LTTE bombers triggered a claymore landmine attacking a passenger bus in the Periyamanayankulama area of the Mannar district killing five people and injuring 28;

- On April 12, 2007, LTTE militants dragged seven civilians from their homes and shot them in the Sinhala village of Avaranthalawa in the Vavuniya district killing all seven;

- On April 23, 2007, LTTE bombers detonated a bomb aboard a passenger bus in the Vavuniya-Mannar road between Settikulam and Parayanakulam in the Vavuniya district killing five people and injuring 33 people;

- On September 27, 2007, LTTE bombers detonated a claymore mine in Chunnakam market in Jaffna killing three people;

- On December 5, 2007, LTTE remotely detonnated a claymore mine Padaviya area of Anuradhapura district killing 15 people; and

- On December 27, 2007, a LTTE claymore mine exploded in the Kurumankadu area of Vavuniya district killing four people.

## II. The LTTE Relies on an International Fundraising Network

### The LTTE Relies on an International Network of Charities

79.     In 2010, the U. S. Supreme Court heard arguments in *Humanitarian Law Project v. Holder* (Case No.  08–1498), which, among other issues, considered the material support prohibitions to the LTTE and other designated foreign terrorists organizations under the Antiterrorism and Effective Death Penalty Act of 1996.  The Court relied heavily upon evidence presented by Kenneth R. McKune, Associate Coordinator for Counterterrorism at the

Department of State, about LTTE's activities and the activities of other foreign terrorist organizations.

80.    McKune specifically identified foreign funding as a "significant percentage of [the LTTE's] funds":

> Many of the terrorist organizations designated by the Secretary derive a significant portion of their overall financing from fundraising conducted outside of their area of operations; in the case of the LTTE, for example, the group has historically raised a significant percentage of its funds—millions of dollars annually—in Europe and North America. Organizations such as the PKK [Kurdistan Workers' Party] and LTTE have established political or humanitarian components in addition to those components that carry out acts of terror. When foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put. But at the same time, the funds collected under the guise of political or humanitarian activities ultimately support the terrorist activities of these organizations.[3]

81.    McKune also explains the humanitarian and social benefits provided by LTTE serve the additional purpose of recruitment, such that foreign terrorist organizations "…use social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations."[4]

82.    McKune makes the point that even when funds are entirely devoted to charitable causes, the effect is to free up other LTTE resources to be used for terrorists activities:

> Even if funds or goods raised for charitable purposes are in fact so used in their entirety, the addition of such funds or goods to the coffers of terrorist groups such as PKK and LTTE unencumbers funds raised from other sources for use in facilitating violent, terrorist activities and gaining political support for these activities. Thus, humanitarian support, however well-intentioned, increases the resources that a terrorist organization can dedicate to unlawful, criminal ends. Individuals who wish to assist people in need may provide aid through the many legitimate organizations not affiliated with designated terrorist groups that have embraced terror,

---

[3] McKune Affidavit, App. 134, ¶9.
[4] Opinion at 25, citing McKune Affidavit, App. 135, ¶11.

violence and attacks on innocent civilians Foreign terrorist organizations can and do take advantage of the fact that money is fungible and that there exist myriad ways to disguise its origin and transfer. It is uniquely in the interests of foreign terrorist organizations not to maintain accurate records, not to reveal sources of funding for arms, explosives and logistical infrastructure, not to admit that they derive criminal, terrorist benefit from ostensibly civilian, humanitarian activities, and indeed, not to admit to supporters who believe in the existence of "firewalls" that often these are no more than convenient rationalizations.[5]

83.    The LTTE relies on a network of international front charities and non-governmental organizations controlled by the LTTE for its fundraising and weapons procurement.  To coordinate the activities, the LTTE has established "branches" in as many as 17 countries, including the United States.  Estimates posit that at its height, the LTTE raised as much as $200 million annually to support its military and social infrastructure.

84.    According to a 2008 report released by the U.S. State Department, "The LTTE financed itself with contributions from the Tamil Diaspora in North America, Europe, and Australia, by imposing local 'taxes' on businesses operating in the areas of Sri Lanka under its control, and reportedly by extortion in government-controlled areas. The LTTE also used Tamil charitable organizations as fronts for its fundraising."

**TRO is a Front Organization for the LTTE**

85.    TRO, sometimes referred to as the Tamil Relief Organization, was registered in Sri Lanka as a Non-Governmental Organization in terms of the Certification of Voluntary Social Services/Non-Governmental Organizations under Voluntary Social Service Organizations (Registration and Supervision) Act No. 31 of 1980 as amended by Act No. 8 of 1998, bearing registration number 50706.

86.    TRO headquarters are located in Kilinochchi, Sri Lanka, with branch offices throughout Sri Lanka and seventeen countries worldwide including the U.S., Australia, Belgium,

---

[5] McKune Affidavit, App. 136, ¶14.

Canada, Denmark, Finland, France, Germany, Italy, Malaysia, the Netherlands, New Zealand, Norway, South Africa, Sweden, Switzerland, and the United Kingdom. International TRO officers coordinated and worked together to raise funds.

87.     According to its website, TRO was formed in 1985 as "a self-help organization" for the Tamil Diaspora.

88.     In 1997, the TRO opened a colony for displaced Tamils in Sri Lanka.  The colony was opened in memory of a Black Sea Tiger suicide terrorist by the name of Collins.  A portrait of Collins was ceremoniously unveiled and an eternal flame was lit by the TRO's coordinator in Mannar.

89.     On TRO fundraising forms distributed in Switzerland, TRO called for donations to the "Homeland Funds."  In addition, contributions could be directed to the "Liberation Fund" and the "Elephant Pass Victory Fund."[6]   Donors who contributed to the TRO were given receipts which bore the logo of the LTTE and state that they were received by "V. Prabhakaran, Leader, Liberation Tigers of Tamil Eelam."

90.     TRO also distributed pocket calendars with images of Prabhakaran to its members and supporters.

**TRO-USA Raises Funds for the LTTE**

91.     TRO is the largest fund-generating front organization for the LTTE.  The TRO branch in the United States, sometimes referred to as the TRO-USA, is located in Cumberland, Maryland.  The TRO also maintains a branch office in Princeton Junction, New Jersey from which it raises significant funding for the LTTE and remains politically active.

---

[6] "In April 2000, the LTTE successfully attacked and took control of the Sri Lankan military complex at Elephant Pass….The LTTE claimed to have killed more than 1,000 Sri Lankan soldiers in the attack."  *U.S. v. Kandasamy*, Complaint, Case no. 1:06-cr-00616-RJD, fn 4, p.12(E.N.D.Y. April 23, 2007).

92.     Arrested LTTE operative Vijayshanthar Patpanathan, also known as "Chandru", was a TRO fundraiser and an officer of the World Tamil Coordinating Committee ("WTCC") who worked directly for the WTCC's head Karunakaran Kandasamy (known as "Karuna").  He confirmed to law enforcement sources that "'We have sent millions' [to the LTTE] through the TRO-USA."[7]   Additionally, Chandru confided in a confidential informant for the U.S. government about his involvement in the smuggling and laundering of funds for the LTTE.[8]

93.     According to publically available tax records, TRO-USA reported contributions totaling over $9.4 million between 2001 and 2006.  The charity reported program distributions totaling over $8.3 million between 2002 and 2006.  In 2006, the charity did not indicate that any of its 2006 program distributions, totaling $1,656,000, were to foreign sources.  Throughout its tax filings, TRO-USA describes its primary purpose as "providing grants and help to refugees and children."[9]

94.     In reality, TRO funds have been used to pay the salaries of LTTE members, to pay pension benefits to the families of killed LTTE members, to train LTTE members including suicide bombers, and to purchase arms and explosives for attacks and bombings directed at civilians.[10]

95.     TRO members individually supported the LTTE terror campaign through donations. Notably, TRO-USA Secretary Muthuthamby Sreetharan donated $50,000 in memory of "Martyr Col. Navam for the liberation" on August 18, 2004.[11]  When FBI officials searched Sreetharan's home, they found posters and calendars of LTTE leader Prabhakaran hanging on the

---

[7] Government Sentencing Memorandum, at p. 9.
[8] Government Sentencing Memorandum, at p. 9.
[9] TRO-USA 990 Tax Forms for the years 2002-2006.
[10] Sri Lankan Government Report entitled, "Collection of Money From Foreign Countries in the Name of Tamil Rehabilitation Organization and Provision of Financial Assistance to a Terrorist Organization Operating Against a Lawful Government."
[11] Sreetharan donation: USAO.100214.

walls, along with a Prabhakaran mouse pad, a photo album containing pictures of LTTE officials in uniform, TRO donation jars bearing the LTTE seal and flag, and a photo collection from Sri Lanka with Prabhakaran's photo displayed prominently in the center.

96.     TRO, including TRO-USA, and its members knowingly gave that money to LTTE for the purpose of carrying out targeted attacks against civilians.  TRO-USA and its members knew when they gave that money to the TRO that those funds would be funneled to the LTTE and used to carry out bombing attacks that killed or injured Plaintiffs and other innocent civilians.

**TRO-USA Transfers Funds to the LTTE through TRO-SL**

97.     Funds raised by TRO-USA were sent to the TRO-USA office in Maryland.  From there, donations were sent directly to TRO in Sri Lanka or one of the other TRO international offices abroad. As stated in TRO's Objectives, their aims include "channel[ing] donations from overseas countries for TRO's operations in Sri Lanka."[12]

98.     The TRO in Sri Lanka operated in LTTE-controlled areas and "made a base for itself in the Vanni" area in particular.[13]

99.     The U.S. Department of State stated in an unclassified cable:

 The TRO Sri Lanka has received almost 10 million U.S. dollars in foreign currency remittances from the USA during the period January 2003 to March 2006 through the commercial banks in Sri Lanka.  This represents the largest component of foreign currency remittances received by the TRO accounting for 41 percent.  The TRO-USA is the largest contributor to the TRO Sri Lanka.  In August alone of this year, a total of U.S. 556,000 or LKR 60 million, was remitted by the TRO USA to the TRO and various affiliated organizations in North and East.  These funds have been received from TRO office registered in Cumberland in State of Maryland in the U.S.A. which is the entity that is presently being

---

[12] TRO Objectives: USAO.1 01999, USAO.101996, USAO.101988, USAO.101991; TRO Letter from February 1997 USAO.233676; and TRO Letter from January 1997: USAO.233678.
[13] TRO Website announcing Oct. 6, 2002 JCC Edison TRO event.

investigated by the U.S. authorities with regard to arms purchases for LTTE.[14]

100.    On November 30, 2005, TRO-USA transferred approximately $100,000 to TRO's Seylon Bank account 012001726548022 at the Vavuniya branch. On September 5, 2005, TRO-affiliated organization, Ilanka Tamil Sangam America ("ITSA"), based in Chester, New Jersey, transferred approximately $190,000 to TRO's Seylon Bank account 072001726548005 at the Vavuniya branch.  On February 15, 2006, TRO-USA transferred approximately $150,000 to TRO's Seylon Bank account 072001726548003 at the Vavuniya branch.  On March 7, 2006, TRO-USA transferred approximately $250,000 to TRO's Seylon Bank account 072001726548005 at the Vavuniya branch.  On April 1, 2006, ITSA of Chester, New Jersey transferred approximately $250,000 to TRO's Seylon Bank account 072001726548005 at the Vavuniya branch.[15]

101.    In 2006 and 2007, U.S. authorities arrested LTTE operatives in the U.S. for materially supporting the LTTE. Included in the charges of material support were the specific attempts to procure anti-aircraft weapons and bribe U.S. Government officials in the hopes of having LTTE delisted as a SDGT.  One of the LTTE operatives arrested was Karunakaran Kandasamy ("Karuna").  In June 2009, Karuna pled guilty to all charges of materially supporting LTTE which were filed against him.  Karuna has admitted he oversaw and directed all of LTTE's activities in the U.S. as an officer of the WTCC.  Karuna further admitted reporting directly to Castro who oversaw all of LTTE's international operations.   Karuna confirmed that TRO-USA and WTCC and its senior leaders are controlled by LTTE and are used to channel funding and other forms of material support to LTTE through TRO in Sri Lanka.

**TRO is Recognized Internationally as a Front for the LTTE**

---

[14] U.S. State Department, *Sri Lanka:  Text on GSL Reports on LTTE Financing,* p. 3-4 (October, 2006).
[15] TRO Account Information at Seylan Bank, obtained from Sri Lankan Financial Intelligence Unit.

102.    As a result of its illegal activities, TRO and its officials have been investigated and prosecuted around the world.

**Sri Lanka**

103.    By September 2006, the government of Sri Lanka froze nearly Rs.78 million of TRO funds in Sri Lanka.  The Sri Lankan government took action after the Financial Intelligence Unit of the Central Bank investigated TRO under Sri Lanka's Financing of Terrorism Law.[16]

104.    Among the accounts under investigation was account number 1498811003 held by TRO at Seylan Bank, Vavuniya Branch.[17]   Balasubramaniam Shriskandaraj was one individual who transferred funds from TRO account 1498811003 at Seylan Bank.  Shriskandaraj was later indicted for aiding and abetting the LTTE.[18] Additionally, the account number 0720-01726548-003 held by TRO at Seylon Bank, Vavuniya Branch transferred a total of Rs. 38,300,000 to Mr. Arumugam Senthilnathan, a member of the Tamil National Alliance (TNA). Sinnathurai Subramaniam, an employee of Ceylon Cold Stores, gave a statement as part of the CID's investigation regarding the TRO and described Mr. Senthilnathan as "a money launderer." He also stated that Mr. Senthilnathan confided in him and stated that a "major portion of this fund [was] given to Udayan of the LTTE…I [Subramaniam] have given encashed money to Senthilnathan six times a month. Udayan collected cash from year 2002 until Senthilinathan died…no books were maintained for these cash transactions. Apart from this another LTTE member meets Senthilinathan. I do not know his name."[19]

105.    Following the freeze of TRO bank accounts on August 28, 2006 and the granting of the CBSL petition six month extension of the freeze on September 4, 2006, the Criminal

---

[16] Ministry of External Affairs Sri Lanka http://www.mea.gov.lk/index.php/component/content/article/1055-us-freezestro-assets-and-designates-it-a-front-organization-of-the-ltte.
[17] Statements of Rajaratnam Raviraj, Executive officer, Seylan Bank, Vavuniya Branch, 2007.
[18] Id. at p. 75, 82.
[19] Id. at p. 88, 114-155.

Investigation Division (C.I.D.) of the Sri Lankan police raided and searched the Trincomalee and Vavuniya TRO Offices on January 5, 2007 and the Colombo Office on February 21, 2007. The CID seized all documents, project files, account details, computers, check books, vouchers, and computer disks. All personnel at both offices were photographed and videotaped. The CID searched the offices and interrogated the staff.[20]

106.    On November 21, 2007, the Sri Lankan Government banned the TRO and urged the international community to take action against the TRO and LTTE. This action came after the freezing of the TRO accounts in 2006. The recommendation for the proscription was made to the cabinet by Foreign Minister Rohitha Bogollagama, who addressed the Sri Lankan Parliament stating, "the LTTE's ability to continue to raise funds from the Tamil diaspora, mostly through extortion, has been possible due to the presence of numerous front organizations, mainly the TRO, which operates under the control of the LTTE."[21]

107.    The Colombo High Court issued open warrants against five Sri Lankans who were accused of funding the LTTE through the TRO. The accused were indicted under the Convention on the suppression of Terrorist Financing Act and the Prevention of Money Laundering Act by the Director of the Criminal Investigations Department (CID) of Sri Lankan Police, as ordered by High Court Judge Deepali Wijesundara. In total, nine Sri Lankans were indicted for aiding and abetting the appropriation of a sum of Rs. 35 million of TRO funds and

---

[20] "Sri Lanka: TRO Comobo Office Raided by C.I.D. – Update on Vavuniya & Tinco TRO office raids" TRO Report http://reliefweb.int/report/sri-lanka/sri-lanka-tro-colombo-office-raided-cid-update-vavuniya-trinco-tro-office-raids.

[21] "Sri Lanka proscribes TRO and urges global action against all LTTE Front Organizations" Ministry of External Affairs in Sri Lanka http://www.mea.gov.lk/index.php/component/content/article/1059-sri-lanka-proscribes-tro-and-urges-global-action-against-all-ltte-front-organizations.

giving it to LTTE member Chrisnakutti Shivakumaran from the period October 10, 2005 to March 24, 2006 in Colombo and Vavuniya.[22]

### The United States

108.    On November 15, 2007, the U. S. Treasury Department designated TRO as a "charitable organization that acts as a front to facilitate fundraising and procurement for the LTTE."  The designation, pursuant to Executive Order 13244, froze TRO's assets under U. S. jurisdiction and prohibited U. S. persons from engaging in activities with TRO.

109.    The U. S. Treasury Department found that TRO is "the preferred conduit of funds from the United States to the LTTE in Sri Lanka."  In addition to funding assistance, TRO also "facilitated LTTE procurement of operations in the United States…" that included the "purchase of munitions, communication devices, and other technology for the LTTE."

110.    The TRO branch and other affiliated sites were raided by Federal government officials in conjunction with an investigation of TRO's illegal activities.

111.    The U.S. Treasury further found that "[d]irectives issued by the LTTE suggest that LTTE-affiliated branch representatives are expected to coordinate their efforts with the respective TRO representatives in their locations and report all activity to the LTTE."

112.    The U.S. Treasury found that TRO's coordinated network of worldwide branches "allowed LTTE to use humanitarian aid, which TRO collected from the international community after the December 2004 tsunami, to launch new campaigns to strengthen LTTE military capacity."

---

[22] Fernando, Santhush. "Sri Lanka High Courts Orders Arrest of TRO Officials" *Asian Tribune.* December 21, 2010. http://www.asiantribune.com/news/2010/12/21/sri-lanka-high-courts-orders-arrest-tro-officials; *Democratic Socialist Republic of Sri Lanka, v. Slvanadiyar, et al.,* Indictment, CR1/163/2008, High Court of Colombo, Sri Lanka (June 16, 2009) (re: Vellupillai Sivanadiar, Murugesu Shanmugaraga, Kanthilingam Ganeshalingam, Sinnaiah Shanthilingam, Eliyathambi Nadaraja, Krishnakutti Sukumaran (aka "Udayan"), Balasubramaniam Shriskandaraj, and Komilius Prabhakaran).

419848.1

**The United Kingdom**

113.    TRO-UK's connection with TRO in Sri Lanka can be seen in fundraising solicitations found on its web site, calling for direct donations to be made to TRO's Sri Lankan bank account at Standard Charter Bank, Wellewatta Branch, Colombo, account number 01607837001.   Donations could also be made to the United Kingdom based charity White Pigeon, which is another known LTTE front charity.

114.    As early as 2000, the U.K. Charity Commission initiated a public investigation into the UK office of the TRO.   As a result of this investigation, the Charity Commission de-listed the TRO from its list of charitable organizations finding that the TRO liaised with the LTTE in determining where funds could be applied.

115.    The British Charity Commission froze TRO-UK accounts on October 26, 2000. Among the funds frozen at this time was Rajaratnam's $1 million donation through TRO-USA following the LTTE's Elephant Pass attack.

**III. Rajaratnam and J.M. are a Major Source of Funding and Support for TRO-USA**

**Rajaratnam and J.M. Personally Support TRO**

116.    Defendant Rajaratnam is a U.S. Citizen.  He was born in Sri Lanka in 1957 and, in the early 1980s, came to the U.S. as a graduate student.  After obtaining a master's degree in business from the Wharton School of Business at the University of Pennsylvania in Philadelphia, Pennsylvania, Rajaratnam began a financial career and eventually joined the investment bank Needham & Company.  On or about 1997, Rajaratnam co-founded the Galleon Group of companies comprising a hedge fund and financial advisory service companies.  Rajaratnam is currently the managing member of Galleon Management LLC and Galleon Advisors LLC and

the principal partner of Galleon Management LP.  These three companies form the Galleon Group.

117.    Defendant Rajaratnam was indicted for securities fraud on October 15, 2009.  He was subsequently indicted on these and other charges and is currently in prison based on this conviction.

118.    Rajaratnam is a prominent donor to the LTTE through TRO-USA.  He has made donations to TRO-USA through his personal accounts as well as through the Galleon Group. Due to his substantial and numerous donations over the years, he is a well known figure among TRO members and senior LTTE leaders.

119.    Before succeeding Prabhakaran as head of the LTTE, Selvarasa Pathmanathan ("KP") was in charge of arms procurement for the LTTE.  Captured and extradited to Sri Lanka in August 2009, he recently admitted that Rajaratnam knowingly provided financial support to the LTTE.

120.    In 2000, Rajaratnam donated $1 million to the LTTE through TRO after LTTE's successful "Elephant Pass" attack.   The 2000 attack was a significant LTTE victory allowing the LTTE to control the northern province of the island.  Rajaratnam's substantial donation was confirmed by arrested LTTE operative Vijayshanthar Patpanathan, also known as "Chandru." Chandru was a TRO-US fundraiser and WTCC officer working directly for Karuna.

121.    Banking records obtained from TRO-USA also confirm Rajaratnam's $1 million donation in 2000, which Rajaratnam contributed in the form of three checks written between July and September 2000.  TRO-USA funneled the donations through its account to TRO's branch in the United Kingdom ("TRO-UK").   TRO-UK then withdrew the donation in a series of cash withdrawals.

122.     Rajaratnam and J.M. knowingly gave money to LTTE for the purpose of carrying out terror attacks intended to cause death or serious bodily injury to civilians including Plaintiffs.

123.     Rajaratnam and J.M provided money for the LTTE through Tamil charitable organizations with the knowledge that it would be transmitted to the LTTE for the commission of terrorist acts including suicide bombings and other bombing attacks against civilians or civilian targets including Plaintiffs.

124.     Rajaratnam knowingly gave substantial sums of money he generated at the Galleon Group to LTTE for the purpose of carrying out terror attacks that killed or injured Plaintiffs.

125.     Rajaratnam and J.M personally and on behalf of their family provided material financial support for the LTTE and its terrorist acts for the purpose of facilitating suicide bombings and other terrorist acts associated with what LTTE Leader Prabhakaran called the "final war" during which Plaintiffs were killed or injured.

126.     Rajaratnam and J.M.'s intentional provision of financial and other material support to LTTE for the purpose of assisting the LTTE in carrying out its terror attacks in fact contributed to LTTE's commission of those attacks in a way that had a substantial effect on the perpetration of those attacks that killed or injured Plaintiffs.

127.     Rajaratnam and J.M. knowingly gave money to the LTTE for the purpose of carrying out terror attacks that killed or injured Plaintiffs and other victims of the LTTE's terror campaign.  The LTTE used funds contributed by the TRO, Rajaratnam and J.M. to carry out attacks that caused Plaintiffs' deaths or injuries.

**J.M.'s Support for LTTE**

128.    According to ITSA biographical information, J. M. Rajaratnam has lobbied "governments and international bodies for the Eelam Tamil causes" and written "Tamils of Sri Lanka – The quest for human dignity," which was published by the Tamil Information Center in the United Kingdom.  LTTE operatives have identified J. M. Rajaratnam as a source for money used to bribe U.S. officials in connection with LTTE's attempts to remove LTTE from the U.S.'s list of Foreign Terrorist Organizations.  J. M. Rajaratnam has also hosted meetings with LTTE operatives at his home in New Jersey.

129.    Defendant J. M. Rajaratnam, is the co-author of a "Frequently Ask[sic] Questions & Statements" section of Ilankai Tamil Sangam Association of Tamils of Sri Lankan USA's ("ITSA") website.  According to its literature, the organization is the oldest Tamil association in the United States.  The organization is based in New Jersey with the knowledge and purpose to help advance LTTE's terror campaign.

130.    In response to the statement "The LTTE is a terrorist organization" posted on the organizations' Frequently Asked Questions & Statements section, J. M. Rajaratnam wrote:

> The LTTE is a freedom movement.
>
> Historically, freedom movements have been labeled as terrorist organizations by the oppressors
>
> From George Washington to Mahatma Gandhi to Nelson Mandela, all freedom fighters have been called terrorists.
>
> "Terrorists" have in their lifetime become "His excellencies."

131.    Responding to the statement "The LTTE has killed civilians," J. M. Rajaratnam wrote on the website:

> Any killing is wrong and immoral, but is an integral part of war.

LTTE has not engaged in any killing that is not justifiable in the context of war.

The LTTE do attack security forces and government installations. The LTTE has killed the "home guards", who are a civilian force armed by the government, who terrorize and kill innocent unarmed Tamil civilians. They have also killed armed Sinhala settlers brought in by the government under the colonization schemes, to occupy Tamil villages and homes forcibly evacuated by the government forces.

The number of civilians killed by the LTTE in this war is less than 5% of the total, whereas the government forces are responsible for over 95% of the civilian deaths.

132.    According to the non-profit internet archiving service Archive.org, ITSA's website section titled "Frequently Ask[sic] Questions & Statements" has existed in the form described above since February 6, 2001 and as recently July 18, 2009.

133.    J.M. frequently attended fundraisers sponsored by LTTE charitable trust groups. In most, if not all, of these fundraisers the flag of the Tamil Tigers was prominently displayed.  During these fundraisers, he solicited donations and encouraged attendees to support the cause of the LTTE.  J.M. raised that money with the knowledge and purpose that it be funneled to LTTE to help LTTE carry out terror attacks.

134.    In addition, J.M. hosted LTTE supporters and various speakers for fundraisers at his home in New Jersey.

**Defendant Rajaratnam's Tsunami Relief Inc. Funded the LTTE through TRO**

135.    Almost three years after a tsunami struck Sri Lanka in December 26, 2004, the U.S. State Department released a cable to all countries in which TRO operated.  This cable warned that "TRO is suspected of enabling the LTTE to use humanitarian aid TRO collected from the international community after the December 2004 tsunami to launch new campaigns to strengthen LTTE military capacity."   The cable also stated that "The LTTE oversees the

activities of TRO and other LTTE-linked non-governmental organizations (NGOs) in Sri Lanka and abroad.  Directives issued by the LTTE suggest that LTTE-affiliated branch representatives are expected to coordinate their efforts with the respective TRO representatives in their locations and report all activity to the LTTE."

136.    Following the December 26, 2004 tsunami, Defendant Rajaratnam founded the charitable relief organization Tsunami Relief Inc. ("Tsunami Relief") and served as its chairman. Two Galleon Group employees, Jogalingam Yogakumar and Tom Fernandez, served as treasurer and director, respectively.  Tsunami Relief used Galleon Group's Madison Avenue address and telephone number.  Tax records indicate the organization contributed to both the TRO-SL and TRO-US.

137.    In 2005, Tsunami Relief took in $ 7,085,115.00 in direct public contributions.  In that year, the organization donated $2,000,000.00 to the TRO in Sri Lanka.

138.    On March 21, 2005, Rajaratnam informed donors that Tsunami Relief would coordinate relief efforts with the Tamil Rehabilitation Organization in the "rebel-controlled" area of northern Sri Lanka:

> **In the North:** In the rebel-controlled North, we are working primarily through the Tamil Rehabilitation Organization (TRO), a US and Sri Lankan registered charity. Formed in 1985 as a self-help organization, the TRO has a proven track record of operating as an effective humanitarian agency with 14 overseas offices, providing relief, rehabilitation and development to the people of the North and East of Sri Lanka. It is currently reaching over 400,000 displaced people in its project area. The TRO have been successful in providing temporary shelter. We are working with them to provide permanent housing.

139.    In July 2005, U.S. Embassy officials in Sri Lanka announced that the U.S. would not support regional relief efforts that would give LTTE control or management of relief funds.

140.    In 2006, Tsunami Relief took in $152,853.00 in direct public contributions.  In 2006, Tsunami Relief donated $500,000.00 to the TRO in Sri Lanka, and $1,000,000.00 to the TRO in the U.S.   Rajaratnam directed Tsunami Relief to donate that money with the knowledge and purpose that it be funneled by TRO to LTTE to help LTTE carry out its campaign of bombings which resulted in the deaths or injuries of Plaintiffs.

## IV. TRO-USA is Part of a Vast Network of Front Organizations Supporting the LTTE

141.    The TRO is closely affiliated with numerous organizations operating in the United States, including the World Tamil Coordinating Committee ("WTCC"), the South Asian Community Association ("SACA"), and ITSA.  Members of TRO, WTCC, ITSA, and SACA worked together to raise money and garner support for the LTTE in the U.S. since at least 1994.

142.    The relationship between TRO and the WTCC is particularly strong and significant in their support for the LTTE.  When LTTE operative Karuna was arrested in the United States in 2007, he pled guilty to providing material support to the LTTE.  Karuna was the director of WTCC and a TRO fundraiser.  He admitted in an interview with the FBI that the LTTE operates in the U. S. through its control of TRO and the WTCC.[23]  Karuna also admitted during his plea allocution that the LTTE had access to TRO accounts."[24]

143.    Additionally, evidence recovered by the FBI from the WTCC and TRO-USA offices "confirmed beyond dispute that WTCC was in fact the American branch of the LTTE, TRO-USA was the American fundraising arm of the LTTE/WTCC, WTCC and TRO-USA were directly controlled by LTTE leadership in Sri Lanka."[25]

---

[23] *U.S. v. Kandasamy,* Complaint, p. 9, part 13, 1:06-CR-00616-RJD (E.D.N.Y. April 23, 2007).
[24] Government Sentencing Memo, p. 8.
[25] *U.S. v. Kandasamy,* Complaint 1:06-cr-00616-RJD –JO, DE 108-2, July 25, 2005 Government Sentencing Memorandum , p. 7.

144.    The U.S. government found that "Bank records show that funds raised for the LTTE – at WTCC fundraising events and elsewhere – are often funneled through TRO-USA accounts.  In addition, the search of the WTCC [office in Queens, NY] revealed numerous TRO-USA donation receipts and checks made payable to TRO-USA.[26]

145.    Photos of LTTE Flags and posters of Prabhakaran were prominently displayed in the WTCC office in New York.  Additionally, an LTTE flag was taped to one of the four TRO donation boxes found during an FBI investigation of the WTCC office.[27]

146.    In his capacity as director of WTCC and TRO fundraiser, Karuna personally knew and worked with prominent TRO-USA officers located in Maryland and New Jersey. When Karuna sought to be released on bail in July 2007, TRO director Ram Ranjan's home at 8 Wheatston Court in Princeton Junction, New Jersey 08550 was among the few properties Karuna listed to secure his personal recognizance bond.[28]

147.    In 1994, New Jersey contributions to the LTTE's National Defense Fund totaled approximately 16.5% of total donations.[29]  Of the total amount of $18,720 collected from New Jersey, Defendant J.M. contributed the largest sum of $13,500.  Among those donating to the National Defense Fund from other states were TRO President Dr. Arul Ranjithan ($10,000) and TRO Secretary Muthuthamby Sreetharan ($2,000).

148.    Karuna was also responsible for arranging meetings in LTTE controlled areas in Sri Lanka between TRO-USA officers and senior LTTE leaders.

149.    Among the TRO-USA officers Karuna arranged trips to Sri Lanka for were TRO President Dr. Arul Ranjithan and TRO Vice President Dr. Vimala Ranjithan between January

---

[26] Government Sentencing Memo, p. 8.
[27] Photos from the WTCC office: USAO.1 4321-32 and USAO.1 04104.
[28] Karuna bond application at p. 2.
[29] List of donations by state: USAO.206251-USAO.206283.

and February of 2003 and September of 2004[30]; TRO accountant Ranjan Manoranjan from December 2002 to January 2003[31]; and TRO Secretary Muthuthamby Sreetharan and his family.[32]  In these letters, which were addressed to senior LTTE operatives such as Castro, Chief Ideologue and Spokesperson Anton Balasingham, and Political Wing Head S.P. Thamilselvan, Karuna explicitly states that these TRO officials should meet with LTTE Leader Prabhakaran.

150.    Between December 2002 and June 2003, Karuna sought to arrange meetings between Defendant Rajaratnam and LTTE leader Prabhakaran.  In letters to senior LTTE leaders in Sri Lanka, Karuna referenced Rajaratnam's donations to the LTTE, which were made through TRO.  Specifically, he described Rajaratnam as a wealthy Tamil supporter in the United States who was "among the people who provide financial support for our struggle for freedom" and as someone who "has been working actively on the forefront."   Karuna further explained Rajaratnam's "long lasting desire to meet and discuss with the National Leader [Prabhakaran] is the prime reason for approaching you," requesting arrangements be made for Rajaratnam to meet Prabhakaran and "other important Generals."   Karuna concluded his letter by indicating the significance of Rajaratnam's support by stating "[a]mong all the people who has visited from here [United States], make special arrangements for [Rajaratnam] and render expert assistance" and "extreme care in this matter."[33]  Karuna and Rajaratnam remained in direct communication following this arrangement, corresponding about funding for Heroes Day events, which were

---

[30] Letter from Karuna to senior LTTE leaders introducing Arul and Vimala Ranjathan: USAO.225994-USAO.225995; and Letter from Karuna to senior LTTE leaders introducing the Ranjithans: USAO.209361.
[31] Letters from Karuna to senior LTTE leaders introducing Manoranjan: USAO.225995; and USAO.226001.
[32] Handwritten details regarding "Sree Family": USAO.100507; Letters with details regarding the Sreetharan Family: USAO.226020; USAO.22598; and USAO.226024.
[33] Letters from Karuna to senior LTTE leaders introducing Rajaratnam: USAO.225995; and USAO.225959-960.

held by the WTCC and jointly organized by TRO.  These Heroes Day donations financed the terror attacks carried out by the LTTE in Sri Lanka.[34]

151.    In December 2002, Karuna wrote to Anton Balasingham (addressed as "Bala Brother") to set up a meeting between LTTE leader Prabhakaran and Defendant J.M. and his wife in Jaffna and Vanni the following month.[35]  In this letter, which is marked "New Jersey, USA," J.M. is described as an activist for the "freedom struggle" from the "beginning," and is credited with actively linking Tamils living in the United States into the WTCC.  Karuna also states that Defendants J.M. and Rajaratnam are at the forefront in providing financial support to the LTTE, and that J.M.'s wife keeps a photo of Prabhakaran in the prayer room of their New Jersey residence in order to worship him.[36]

## V. The New Jersey Branch of TRO is Critical to the Organization's Support of the LTTE

### TRO Conducts Political Activities to Promote the LTTE in New Jersey

152.    Karuna's letter introducing J.M. to Anton Balasingam was accompanied by an English language copy of the personal profile of J.M., listing his achievements, work and business experience, and "activities connected with Tamil affairs."  These activities, all conducted from his residence in New Jersey, included senior positions within Tamil organizations in the United States, "lobbying government and international bodies for the Eelam Tamil cause," and the financing and directing of operations and publications affiliated with the Eelam Tamil cause.[37]  J.M. has hosted meetings with LTTE leaders at his New Jersey residence. As founder and Vice President of the World Tamil Organization for eight years, J.M.

---

[34] Check from Rajaratnam to WTCC: USAO.217135; Rajratnam Galleon Group business card found in the WTCC office: USAO.235261-USAO.235262; and Letter from the Galleon Group to WTCC: USAO.235422.
[35] Letter from Karuna to senior LTTE leaders introducing J.M.: USAO.225986.
[36] Personal profile of J.M.: USAO.225987-USAO.225993.
[37] Personal profile of J.M.: USAO.225987-USAO.225993.

communicated information to LTTE Leader Prabhakaran through WTCC President and TRO Fundraiser Karuna.[38]

153.    J.M. was also in direct communication with Nachimuthu Socrates ("Socrates") regarding lobbying efforts aimed at U.S. government officials as early as July 1995.[39]  Socrates later attempted to bribe U.S. officials in support of the LTTE cause.  In December 2005, FBI undercover agents and confidential informants, posing as U.S. government officials, sold LTTE supporters access to classified information discussing a joint investigation by the U.S. and a foreign government into the TRO.  Socrates gave $1,000 to confidential informants to view and take notes of the alleged investigation's findings.   After informing LTTE senior leadership of the classified information, Socrates discussed with other senior LTTE operatives offering the confidential informant an annual salary of $50,000 to provide additional information.   The FBI found that the LTTE supporters in the U.S. obtained permission from senior LTTE leadership in Sri Lanka to retain the confidential informant.    Additionally, in January 2006, Socrates purchased   other   purported   classified   information   about   Namasivaya   Viswanathan ("Viswanathan), another LTTE supporter.  Based on evidence collected from these undercover investigations eight LTTE supporters were indicted and later plead guilty to charges of materially supporting LTTE.[40]

154.    After the LTTE's designation as a foreign terrorist organization by the United States in 1997, the TRO worked to remove the LTTE from this list.[41] Specifically, TRO Director Ram Ranjan worked in New Jersey to file a petition to remove the LTTE from the list. [42] He also made a request to Congressman Rush Holt of New Jersey to recommend to the Review

---

[38] Note from J.M. to Karuna: USAO.210060.
[39] Letter from J.M. and his wife to Socrates: USAO.233966.
[40] *United States v. Fnu Lnu et al.*, Civ. A. No., 1:06-mj-00887-KAM, *16-19 (E.D.N.Y. 2006).
[41] Ram Ranjan email regarding lobbying efforts: INV 06539.
[42] October 2007 Ram Ranjan email regarding lobbying efforts: INV 06545.

Committee that the LTTE be removed from its FTO designation.  Among the reasons provided

for this request, Ranjan stating that if the LTTE were classified as "freedom fighters," the TRO

could carry out more work in Sri Lanka.[43]

### TRO Raises Substantial Funds for the LTTE in New Jersey

155.    TRO-USA raised a substantial amount of funding for the LTTE by organizing and

holding events in venues in and around New Jersey throughout the 1990s and 2000s.  Donations

and contributions collected by TRO-USA from prominent LTTE supporters in New Jersey, as

well as at public events held by TRO and its affiliate organizations, constituted a large

percentage of the funding TRO-USA knowingly provided to the LTTE to carry out its attacks.

156.    Between 1993 and 1994, WTCC President and TRO Fundraiser Karuna collected

donations to the LTTE's National Defense Fund.  New Jersey contributions to the LTTE's

National Defense Fund totaled approximately 16.5% of total donations in 1994.[44]  Of the total

amount of $18,720 collected from New Jersey, Defendant J.M. contributed the largest sum of

$13,500.  Among those donating to the National Defense Fund from other states were TRO

President Dr. Arul Ranjithan ($10,000) and TRO Secretary Muthuthamby Sreetharan ($2,000).

157.    TRO Coordinator and fundraiser Ram Ranjan has lived in Princeton Junction,

New Jersey since at least December 1997.  From this residence, he has contributed funding and

services to TRO-USA.[45]  Specifically, Ranjan's New Jersey address was listed as the contact

information on TRO-USA's informational pamphlets and fundraising fliers for events held in

---

[43] October 2007 Ram Ranjan email regarding lobbying efforts: INV 06498.
[44] Handwritten list of donations by state: USAO.206251-USAO.206283.
[45] *Krishanthi, et al., v. Rajaratnam, et al.,* Civil Action No. 2:09-CV-05395 DMC-MF, D.E. 141 "Plaintiffs Supplemental Brief in Opposition to the Motion to Dismiss of Defendants Based Upon Kiobel v. Royal Dutch Petroleum Co., Forum Non Conveniens, Exhaustion of Local Remedies, and Solely as to Defendant Tamil Rehabilitation Organization for Lack of Personal Jurisdiction," at p. 38, citing to State of New Jersey Property Records for 8 Wheatson Court, Princeton Junction, New Jersey 08550 ("Ex. 2").

New Jersey and the surrounding areas. Ranjan also received the summons and complaint in this case at his New Jersey address.[46]

158.    In his deposition in this case, Ranjan testified that he approached TRO President Dr. Arul Ranjithan in 1999 or 2000 about becoming a representative of TRO in New Jersey, and he was made a Director of TRO thereafter.  As Director, he was publicly known to be the TRO representative in New Jersey, and he testified that he is the person most knowledgeable about YRO activities within New Jersey.[47]  Ranjan was routinely listed as a contact person for TRO, and his New Jersey address, New Jersey telephone numbers, and New Jersey-operated email addresses were provided for the purpose of soliciting donations for the TRO and promoting events organized by the TRO in New Jersey.[48]  The email addresses listed by TRO-USA included Ranjan's business email addresses from Princeton, New Jersey-based contract research organization, Covance Inc., and Princeton, New Jersey-based clinical research organization, PharmaNet/i3 (now inVentiv Health, Inc.).

---

[46] Id. at p. 38-39, citing to TRO-USA Website, Home Page (June 22, 2003) ("Ex. 5"); Advertisement for Fourth Annual Fund Raising Event on Sunday, June 8, 2003, Sangam.org (May 14, 2003) ("Ex. 6"); Advertisement for TRO's Fifth Annual Event on Saturday October 23, 2004, New Jersey, Sangam.org ("Ex. 7"); Email from Janarthanan Pillai to tamil@tamil.net listserv (June 4, 2000) ("Ex. 8"); Puthukkudiyiruppu Bomb Victims Fund Appeal, Sangam.org (Oct. 15, 1999) [USAO.1 02802-02808] ("Ex. 9"); TRO appeals for urgent assistance, TamilNet (Dec. 24, 2004) ("Ex. 10"); TRO USA Home Page, Local Contacts ("Ex. 11"); and Advertisement for an event on Oct. 6, 2002 in Edison, NJ, TRO USA Website ("Ex. 12"); and Proof of Service [D.E. 13].

[47] Id. at p. 40, citing to Ex. 1 45:20-46:19; see specifically 45:24-46:1 (used title in letters written on behalf of TRO), 46:2-4 (used title in emails written on behalf of TRO), 46:5-9 (used title the entire time he worked for TRO in New Jersey from 2000-2005), and 46:13-19 (Coordinator of Relief Efforts for TRO), 46:20-51:4 (admitting that he coordinated a TRO Bomb Victims Fund; requesting funds be directed to TRO at the Princeton Junction address), 50:13-24, 51:12-23 (listed TRO on his N400 application), and 62:18-24; and Ex. 7 (Ram Ranjan held out as coordinator in 1999).

[48] Id. at p. 39-40, citing to Deposition of Ramanathan Ranjan taken May 8, 2013 ("Ex. 1") at 18:15-19 (name and address used on fliers), 18:20-23 (contact for all TRO events and activities in New Jersey); and 20:1-19 (Ram Ranjan listed on TRO website as local TRO contact in New Jersey), 29:21-30:5, 42:14-44:2, 44:13-25, 45:1-19, and 68:2-8; Ex. 5 (requests checks payable to TRO at Princeton Junction address); Ex. 6 (same); Ex. 7 (same); Ex. 8 (same); Ex. 9 (same); Ex. 10 (same); Ex. 11 (address and phone numbers; "organization engagement contact"); Ex. 12 (organized by Ram Ranjan); 2008 State of Maryland Personal Property Return filed by TRO-USA ("Ex. 13") (listing Ram Ranjan as a Director); South Brunswick Board of Education, Application for the Use of School Facilities (Sept. 23, 2004) ("Ex. 14") (using Princeton Junction address and paying for fee with TRO funds).

419848.1

159.    In addition to outreach using his personal email addresses, Ranjan was responsible for creating and maintaining the TRO's entire internet presence from his home in New Jersey.  It was from his Princeton Junction address that Ranjan paid for TRO's website registration, and served as the registrar and administrator of www.trousa.org.[49]  The TRO email address on the organization's website was directly connected to Ranjan's New Jersey email address, and he was responsible for responding to and/or forwarding all emails to other TRO-USA members.  Another New Jersey resident, Thaya Nagarajah, maintained the website on a daily basis.[50]

160.    In addition to various WTCC, ITSA, SACA, and TRO events held across the United States, TRO held fundraisers annually in New Jersey and the surrounding areas since 1996.[51]  Each year from 2000 to 2005, approximately 100 to 150 people attended these New Jersey events, and at least $25,000 was raised at these events.[52]  TRO's involvement in these events including registering venues, securing insurance for the venues, advertising, calling within the New Jersey community to spread awareness of events, arranging food, organizing volunteers, booking entertainment such as live music and films, and collecting donations to be sent to TRO in Maryland.[53]

---

[49] *Id.* at p. 40-41, citing to Ex. 1 (Deposition of Ramanathan Ranjan taken May 8, 2013) at 51:24-52:5; Final Notice regarding Domain Extension [INV 0025-26] ("Ex. 15") (addressed to Ram Ranjan using info@trousa.org and Princeton Junction address) and Email from Thaya Nagarajah to Ram Ranjan (May 18, 2005) [INV 00228] ("Ex. 16").

[50] *Id.* at p. 41, citing to Ex. 1 (Deposition of Ramanathan Ranjan taken May 8, 2013) at 52:13-54:14, 55:16-56:5, 56:16-57:25 (email to info@trousa.org regarding fund collection directed to Mr. Ranjan's Pharmanet email in New Jersey, and 58:7-16; Ex. 16: Email from Thaya Nagarajah to Ram Ranjan (May 18, 2005) [INV 00228]; and Email from Shawn Srishan to Ram Ranjan (Mar. 21, 2005) [INV 00170] ("Ex. 17").

[51] *Id.* at 39:11-16 (admitting to organizing at least one event annually), and 138:15-139:10 (admitting that Newark Star Ledger reported that Heroes Day events were held for 13 years); *Group Denies Link to Terrorism*, Newark Star Ledger (Dec. 21, 2006) ("Ex. 18"); and Email from K. Thirukumaran to Ram Ranjan *et al.* (Dec. 27, 2006) [INV-1610-1612] ("Ex. 19") (discussing "mistakes" of admitting 13 years of Heroes Day events and anticipating questions about who organized them).

[52] Deposition of Ramanathan Ranjan taken May 8, 2013 at p. 38:17-25, 39:1-16, and 44:1-5.

[53] *Krishanthi, et al., v. Rajaratnam, et al.,* Civil Action No. 2:09-CV-05395 DMC-MF, D.E. 141 "Plaintiffs Supplemental Brief in Opposition to the Motion to Dismiss of Defendants Based Upon Kiobel v. Royal Dutch

161.    In addition to fundraisers, TRO directly participated in the organizing and execution of annual Heroes Day memorial ceremonies honoring the martyrs of the LTTE. Heroes Day meetings were "held to remember the freedom fighters who have sacrificed their lives to liberate the homeland."   These events were held in the New York area, and many of them in New Jersey.  In addition, New Jersey residents were solicited for donations.

162.    At TRO, WTCC, SACA, and ITSA events in New Jersey and the surrounding areas, photos of the LTTE Flag, American flag, and WTCC Banner were displayed.[54]

163.    At a Heroes Day Event on November 30, 1996 in Flushing, NY, events honoring the LTTE included an "homage to the heroes dance and lamp lighting," reading of Prabhakaran's Heroes Day Speech by Mr. Karunakaran of the WTCC, and the distribution of flags and "Mr. Balasingam Sea Tigers." Moreover, Dr. Jeyalingam, head of the WTCC hoisted the national flag and Dr. Siva of the TRO released a Heroes Remembrance Book.[55]

164.    TRO held an event on July 23, 2000 at the Edison Jewish Community Center Hall in Edison, New Jersey, where $19,000 was raised and matched by an anonymous donor, totaling at least $38,000 to be sent from TRO in New Jersey to Sri Lanka.   At this event, TRO Coordinator Ranjan introduced TRO-USA President Arul Ranjithan.[56]   During his speech,

---

Petroleum Co., Forum Non Conveniens, Exhaustion of Local Remedies, and Solely as to Defendant Tamil Rehabilitation Organization for Lack of Personal Jurisdiction," at p. 41.

[54] Photo of the Tamil flag at a WTCC event: USAO.2 01638; Photo of a woman in uniform with a Tamil flag at a WTCC event: USAO.2 13379; and photo of several mini-Tamil flags at a WTCC event: USAO.2 13381.

[55] Letter from WTCC and list of donations from 1996 Heroes Day: USAO.2 25860-USAO.225873.

[56] *Krishanthi, et al., v. Rajaratnam, et al.*, Civil Action No. 2:09-CV-05395 DMC-MF, D.E. 141 "Plaintiffs Supplemental Brief in Opposition to the Motion to Dismiss of Defendants Based Upon Kiobel v. Royal Dutch Petroleum Co., Forum Non Conveniens, Exhaustion of Local Remedies, and Solely as to Defendant Tamil Rehabilitation Organization for Lack of Personal Jurisdiction," at p. 42, citing to Ex. 1 (Deposition of Ramanathan Ranjan taken May 8, 2013) at 79:20-25, 80:1-2 ( "probably" attended this event; contact information on fliers; and requested checks made out to TRO to be Princeton Junction address), 83:7:20 ("it sounds like my voice"), and 84:1-19 (admitting attendance, contact person, and approximately $19,000 was collected); *see also* Ex. 8 (advertising July 23, 2000 "Fund Raising Dinner Dance being organized by TRO in New Jersey"); Translated Transcript of Audio File USAO.2 25959 (Jan. 29 2013) ("Ex. 20").

Ranjithan stated that TRO USA works with TRO Sri Lanka in the Eelam.[57]  He emphasized that

New Jersey was the most important fundraising location for TRO-USA.[58]

165.    TRO held a fundraiser at Adams High School in Jamaica Queens, New York in

March 2002. The event was managed and coordinated by the WTCC, but the fundraising

activities were identified as benefitting the TRO. Gaspar Raj Maria Paulian ("Father Gasper

Raj"), an intermediary between LTTE and Diaspora Tamils, was in attendance and spoke at this

event.

166.    ITSA held a Silver Jubilee Event in North Brunswick, New Jersey, in November

2002 where Defendant Rajaratnam was a guest speaker.  An LTTE flag and informational

brochures concerning the LTTE were placed on a table in the conference hall.  In his speech to

the organization, Rajaratnam referred to the struggle in Sri Lanka and asked those in attendance

to support the struggle, emphasizing the role of "freedom fighters" in the liberation battle.  As if

to clarify, Rajaratnam described those in attendance who support the struggle in Sri Lanka as

terrorists, noting that he was married to a terrorist because his wife is an Indian Punjabi.  Some

Indian Punjabis support a Khalistan separatist movement in India.  He further described those

supporters in attendance as not just terrorists but as freedom fighters. At this event, a song was

sung stating "Long Live the Tamil Eelam." Donations at the North Brunswick, New Jersey

fundraiser were collected by the New Jersey branch of the TRO.

167.    TRO held a fundraising event in New Jersey on June 8, 2003.  At the event, TRO

received $29,250 in public donations, $15,000 of which was made by three anonymous donors.

Additionally, ITSA donated $16,000.  TRO received a total of $45,250 in public donations at this

event.

---

[57] Fundraising Dinner Dance at the Edison Jewish Community Center  in Edison, New Jersey – July 2000 and Ram
Ranjan Speech USAO 0000016072300.002_part 1 between 1:36:00 to 1:29:29.wav.
[58] *Id*.

168.    WTCC held a Heroes Day event on December 6, 2003 at Crossroads Middle School in South Brunswick, New Jersey. At this event, the Tamil Eelam flag was hoisted, dances such as "Need Need Need New Tamil Eelam Needed" and "In Memory of Black Tigers" were performed, and Mr. Nehru Gunaratnam, an Expatriate member of the LTTE's Political Affairs Committee, gave the keynote address.[59]  This event also served as a book release for Chief LTTE Strategist and Negotiator Anton Balasingham.  His book, "Viduthalai," or "Liberation," is a collection of essays on the history of the Tamil struggle and the LTTE.[60]

169.    The funds raised at these New Jersey-based events were sent to TRO in Sri Lanka.[61]   In 2004, K.P. Reggi, the Executive Director of TRO internationally, expressed the importance of New Jersey fundraising to TRO in a letter addressed to Tamils living in America. He thanked the New Jersey community for raising a sum of $45,000 through the TRO at a fundraising event, and solicited donations specifically from New Jersey residents at an event to be held in New Jersey in January 2004.  The contributions from TRO events in New Jersey comprised a significant source of TRO's total funding so as to warrant correspondence and specific letters of solicitation to New Jersey residents and event organizers.

170.    LTTE Senior Leadership in Sri Lanka was directly involved in the planning of TRO events and Heroes Day celebrations in particular.  In a letter dated October 11, 2004, the LTTE in Sri Lanka requested details of the U.S. celebrations and fundraising activities for the

---

[59] WTCC Heroes Day Celebration Brochure.
[60] See a reference to this book in TRO Secretary Muthuthamby Sreetharan's "Reminiscing and a Tribute to Sornalingam," 2006,
http://www.hartleycollege.com/hweb/ppa/nsw/publication/miscellany2006/miscellany_2006_2of2.pdf
[61] *Krishanthi, et al., v. Rajaratnam, et al.,* Civil Action No. 2:09-CV-05395 DMC-MF, D.E. 141 "Plaintiffs Supplemental Brief in Opposition to the Motion to Dismiss of Defendants Based Upon Kiobel v. Royal Dutch Petroleum Co., Forum Non Conveniens, Exhaustion of Local Remedies, and Solely as to Defendant Tamil Rehabilitation Organization for Lack of Personal Jurisdiction," at p. 39:20-41:5, 24:2-5 ("I have always been receiving contributions. . . they mail it to my address, yes."), 24:20-25:13 (collecting checks from 2000- 2005), 65:17-68:19 (admitting that if anyone wanted to make a contributions they would mail checks to TRO to Prince Junction address); and TRO-Tsunami Relief Contributions (Jan. 7, 2005), D.E. 128-1 ("Ex. 26") (attaching 65 pages of copies of checks).

National Leader's fiftieth birthday and Heroes Day celebrations.  The letter also requests an update on the "various activities undertaken for the collection of the Emergency fund requested by us."  The letter bears the logo of the LTTE and the header "International Communication Center Liberation of Tamil Tiger's Eelam" and bears the LTTE motto, "Tiger's Thirst is Tamil Homeland."  The letter is addressed to "Mr. Karunakaran, Director, American Branch."

171.    TRO collected funds at WTCC, SACA, and ITSA events. TRO advertised on ITSA's website stating that TRO USA's New Jersey Chapter would be collecting funds at the Fifth Annual Fundraising Event on Saturday October 23, 2004. The facilities were rented by SACA in TRO coordinator Ram Ranjan's name.  Public contributions made via cash and check to TRO at this event in New Jersey totaled approximately $12,800.[62]  In a note to TRO Secretary Muthuthamby Sreetharan, Ranjan requested that TRO pay the rental fee for the 2004 SACA event.[63]

172.    TRO held an event at the Royal Albert Hotel in North Brunswick New Jersey on or around November 6, 2004.  Among those in attendance were TRO President Dr. Arul Ranjithan, WTCC President and TRO Fundraiser Karuna, and LTTE legal advisor Visvanathan Rudrakumaran.[64]

---

[62] Handwritten notes regarding donations collected at New Jersey event: USAO.101628; USAO.101631; USAO.101634; USAO.101640; USAO.101643.

[63] *Krishanthi, et al., v. Rajaratnam, et al.,* Civil Action No. 2:09-CV-05395 DMC-MF, D.E. 141 "Plaintiffs Supplemental Brief in Opposition to the Motion to Dismiss of Defendants Based Upon Kiobel v. Royal Dutch Petroleum Co., Forum Non Conveniens, Exhaustion of Local Remedies, and Solely as to Defendant Tamil Rehabilitation Organization for Lack of Personal Jurisdiction," at p. 42, citing to Ex. 1 (Deposition of Ramanathan Ranjan taken May 8, 2013) at 63:12-65:16 (Mr. Ranjan attended, filled out registration form with Crossroads Middle School, and requested checks to be made payable to TRO and addressed to Princeton Junction address), 118:7-121:10 (event paid for by TRO; funds collected at event made out to TRO); and Invoice, South Brunswick Board of Education (Nov. 3, 2004) ("Ex. 24") (handwritten notes requesting payment from TRO Treasurer and listing TRO contributions received) USAO.101628.

[64] *Id.* at p. 42, citing to Ex. 1 (Deposition of Ramanathan Ranjan taken May 8, 2013) at 142:11-143:11 and 143:11-144:23 (discussing Prabhakaran's book launch and praising a picture of Prabhakaran); Summary of FBI Informant Conversations from Nov. 6, 2004 TRO Event [USAO 004186-4199] ("Ex. 23").

173.    TRO held a Heroes Day Event on December 3, 2005 in Piscataway, NJ, where the TRO praised the LTTE's fallen heroes and LTTE leader Prabhakaran.[65] TRO Director and New Jersey Coordinator Ram Ranjan attended this event. Notably, Padmini Sithambaranatham, who represented the LTTE in the Sri Lankan Parliament between April 2004 and February 2010, was honored as a special guest.[66] In addition to hoisting the Eelam Flag, TRO-USA sold CDs and tapes supporting the LTTE, and put out fliers and collection boxes for donations.[67]

174.    New Jersey-based SACA held a Heroes Day event in South Brunswick, New Jersey in December 2006.  TRO Director and New Jersey Coordinator Ram Ranjan was listed as the contact person for this event on the venue rental application.  Following this event, members of the South Brunswick community filed a complaint with police regarding SACA's ties to the LTTE.[68]

175.    TRO and WTCC board members, including TRO New Jersey Director Ram Ranjan and WTCC President Nalingam Jeyalingam, coordinated to invite the families of fallen LTTE operatives to attend a Heroes Day Event on December 9, 2007 in New Jersey. TRO members discussed "contribution collection" via email in preparation for the event. [69] As part of the Tamil Memorial Day, TRO arranged a screening of "My Daughter the Terrorist."[70]  This documentary follows two female members of the Black Tigers, an elite wing of the LTTE charged with carrying out suicide attacks.

---

[65] *Id*. at p. 148:4-149:12; and United States Attorney's Office Summary of Event [USAO 002725] ("Ex. 25").
[66] Transcript of 2005 Heroes Day event in Piscataway, New Jersey: USAO.002725.
[67] October 2005 email regarding Heroes Day: INV 00458.
[68] *Krishanthi, et al., v. Rajaratnam, et al.*, Civil Action No. 2:09-CV-05395 DMC-MF, D.E. 141 "Plaintiffs Supplemental Brief in Opposition to the Motion to Dismiss of Defendants Based Upon Kiobel v. Royal Dutch Petroleum Co., Forum Non Conveniens, Exhaustion of Local Remedies, and Solely as to Defendant Tamil Rehabilitation Organization for Lack of Personal Jurisdiction," at p. 42, citing to Ex. 1 (Deposition of Ramanathan Ranjan taken May 8, 2013) at 129:19-25, 137:14-139:10; Ex. 17 and 18 at 2.
[69] November 2007 email regarding Heroes Day 2007: INV 07489-91.
[70] November 2007 email regarding Edison, New Jersey event: INV 07276.

**A Large Percentage of TRO's Funding Comes from the New Jersey-Based Rajaratnam Family Foundation**

176.     According to an unclassified cable from the U.S. Department of State:

TRO-USA is the largest contributor to the TROSL, remitting USD 5.01 Mn or 55.15 percent of total remittances from the USA to Sri Lanka.  Of these remittances from the US, the [Rajaratnam] Family represent 3.3 Mn or 36.31 percent.  These two remitting parties together have remitted USD 8.31 Mn. [t]o the TROSL, representing 91.5 percent of total remittances from the USA.[71]

177.     Responding to LTTE's calls for renewed funding in anticipation of the "final war," Rajaratnam personally gave $1,000,000.00 to the TRO branch in the United States ("TRO-US") in June 2004.  The contribution was funneled from TRO-US accounts to the TRO headquarters in Sri Lanka ("TRO-SL").  This personal contribution is consistent with an earlier $1,000,000.00 contribution Rajaratnam made in 2000 following the LTTE's successful Elephant Pass attack.  Both donations demonstrate that Rajaratnam's contributions were given with the knowledge and purpose of supporting LTTE attacks and operations.  The 2000 Elephant Pass campaign required significant logistical and material support to implement.

178.     Rajaratnam's contributions were also made through a New Jersey-based and registered family charitable foundation.  The Rajaratnam family formed the Rajaratnam Family Foundation ("the Foundation") sometime in 2000 or 2001.  According to tax records, directors of the New Jersey based Foundation included New Jersey resident J. M. and Rajaratnam, among others.  Rajaratnam has acted as treasurer of the Foundation since at least 2000.  J. M. has acted as president of the Foundation since at least 2000.

179.     Beginning in 2001, the New Jersey Foundation made regular, and in some instances large, contributions to the TRO through its U. S. and Sri Lankan branches.  In 2001, the

---

[71] U.S. State Department, *Sri Lanka:  Text on GSL Reports on LTTE Financing, pp. 3-4* (October, 2006).

Foundation provided $12,500.00 to TRO-US.  The TRO contribution was the only reported distribution from the Rajaratnam Family Foundation for that year.

180.    In 2002, the Foundation contributed $16,000.00 to TRO-US.  Again, the TRO contribution was the only reported distribution from the Foundation for that year.  This single donation constituted approximately 7% of all donations TRO-USA reported on its tax forms that year.

181.    In 2003, Rajaratnam contributed $5,050,000.00 to the Foundation, which in turn donated $5,000,000.00 to the TRO in Sri Lanka.

182.    In 2004, Rajaratnam personally contributed $500,000.00, and J. M. persoanlly contributed $462.00, to the Foundation.  The Foundation, in turn, contributed $650,000.00 to "Tamil Rehab. Org."  This single donation constituted approximately 18.7% of all donations TRO-USA reported on its tax forms that year.  Other donations made by the Foundation to support the Tamil cause include $43,500.00 to the "IMHO 1027 Saddleback Way Bel Air MD 21024," $2,000.00 to "Tamil Tech. Prof. Orgn.," and $5,882.00 to "various" other organizations.

183.    In 2005, J.M. personally contributed $250,000.00 to the Foundation, which in turn donated $400,000.00 to the TRO-US.   This single donation constituted approximately 25% of all donations TRO-USA reported on its tax forms that year.

**New Jersey is Indispensible to TRO-USA in its Support for the LTTE**

184.    TRO is recognized as a front for the LTTE by the governments of Sri Lanka, the United States, and the United Kingdom.  Senior operatives of the LTTE have acknowledged that the LTTE controls the TRO and has access to its bank accounts.  Additionally, officers of TRO-USA communicated with known LTTE members, and even traveled to Sri Lanka to meet with senior LTTE leadership.

185.    Although TRO-USA was technically headquartered in Maryland, New Jersey served as its main operational base.  From New Jersey, TRO-USA maintained its web presence, held events in support of fallen LTTE "heroes," hosted LTTE operatives and leaders, raised support and funds for the LTTE, and dispensed information regarding the activities and purpose of TRO to the Tamil communities living in New Jersey and throughout the United States.

186.    TRO-USA financed the LTTE by transferring funds solicited in the United States through TRO in Sri Lanka.  TRO-USA is the largest contributor to the TRO in Sri Lanka. Between 2001 and 2006, TRO-USA reported contributions totaling over $9.4 million.  These funds, often collected under the guise of humanitarian aid, greatly enhanced the military capability of the LTTE.  Funds raised by TRO-USA were used to pay the training costs and salaries of LTTE members, pension benefits to the families of killed LTTE members, and to purchase arms and explosives for attacks and bombings directed at civilians.

187.    New Jersey is the most important fundraising area for TRO-USA.  Donations are solicited by TRO from the New Jersey public, and funds are collected from New Jersey-based organizations, such as the Rajaratnam Family Foundation, which was the largest contributor to TRO-USA in the country.  Remittances from TRO-USA and the Rajaratnam Family Foundation together comprised 91.5% of all remittances from the United States to Sri Lanka.

188.    The importance of New Jersey to TRO-USA's fundraising efforts has been acknowledged by senior TRO leadership, including TRO International Head, K.P. Reggi, and TRO-USA President, Dr. Arul Ranjithan.

189.   Funds raised in New Jersey were sent to the TRO in Sri Lanka, and were used to support the LTTE in carrying out terror attacks that killed or injured Plaintiffs and other innocent civilians.[72]

## CONDEMNATION

### Universal Condemnation of Crimes Against Humanity

190.   The international community has universally condemned crimes against humanity.  Consequently, crimes against humanity are offenses under the law of nations and are actionable under the ATS.

191.   The following international conventions and/or United Nations Security Council Resolutions support the recognition that crimes against humanity are incorporated into the law of nations:

i. *The Charter of the International Military Tribunal*, Aug. 8, 1945, Art. 6I, 59 Stat. 1546, 1547, E.A.S. NO. 472, 82 U.N.T.S. 284;

ii. *The Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991*, Art. 5, U.N. Doc. S/25704, adopted by the United Nations Security Council on 25 May 1993, U.N. Doc. S/RES/827 (1993);

iii. *Statute of the International Criminal Tribunal for Rwanda*, Article 3, annexed to Resolution 955, SC Res 955, UN SCOR, 49th Sess, 3453rd Mtg, UN Doc S/RES/955 (1994);

---

[72] While this Court previously granted Plaintiffs jurisdictional discovery with regard to TRO-USA, Plaintiffs note that TRO-USA's production of documents was limited solely to and limited number of copies of checks submitted by Mr. Ranjan to the TRO-USA officers in Maryland and submitting Mr. Ranjan to deposition.  Though it had obtained a license from the Office of Foreign Assets Control of the U.S. Department of the Treasury to access its documents in the hands of law enforcement, it failed to obtain such access and failed to produce relevant documents in response to Plaintiffs' jurisdictional discovery requests.

iv. The Rome Statute of the International Criminal Court, Art. 7., 37 I.L.M. 999, 1004-05, 2187 U.N.T.S. 90 (July 17, 1998)(Entered in Force July 1, 2002).

**Universal Condemnation of Terrorism Bombing**

192.    The international community has universally condemned terrorist bombings, including specifically suicide bombings and other murderous attacks on innocent civilians intended to intimidate or coerce a civilian population.   Consequently, terrorist bombings, including suicide bombings and other murderous attacks on civilians are offenses under the law of nations pursuant to the ATS.

193.    The following international conventions and/or United Nations Security Council Resolutions support the premise that the condemnation of terrorist bombings is incorporated into the law of nations:

i.      International Convention for the Suppression of Terrorist Bombings ("Bombing Convention"). G.A. Res. 52/164, ¶ 1, U.N. Doc A/RES/52/164 (Dec. 15, 1997);

ii.     The International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GA OR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. A/Res/53/108 (1999) (In force Apr. 2002);

iii.    United Nations Security Council Resolution 1566, S/RES/1566 (2004), condemning attacks against civilians intended to intimidate a civilian population;

iv.     United Nations Security Council Resolution 1267, S/RES/1267 (Oct. 15, 1999), on the freezing of the funds and other financial resources of the Taliban;

v.      United Nations Security Council Resolution 1269, S/RES/1269 (Oct. 19, 1999), calling upon states to take steps to deny those who finance terrorist acts safe haven;

vi.     United Nations Security Council Resolution 1333, S/RES/1333 (Dec. 19, 2000), on the freezing of the funds and other resources of Usama bin Laden and the Al-Qaida organization;

vii.     United Nations Security Council Resolution 1363, S/RES/1363 (July 30, 2001), on the establishment of a mechanism to monitor the implementation of measures imposed by Resolutions 1267 (1999) and 1333 (2000);

viii.     United Nations Security Council Resolution 1373, S/RES/1373 (Sept. 28, 2001), on threats to international peace and security caused by terrorist acts, and mandating the formation of the Counter-Terrorism Committee;

ix.     United Nations Security Council Resolution 1377, S/RES/1377 (Nov. 12, 2001), calling upon states to implement fully Resolution 1373 (2001);

x.     United Nations Security Council Resolution 1390, S/RES/1390 (Jan. 16, 2002), effectively merging the freezing measures of Resolutions 1267 (1999) and 1333 (2000);

xi.     United Nations Security Council Resolution 1455, S/RES/1455 (Jan. 17, 2003), on measures to improve the implementation of the freezing measures of Resolutions 1267 (1999), 1333 (2000), and 1390 (2002);

xii.     United Nations Security Council Resolution 1456, S/RES/1456 (Jan. 29, 2003), reaffirming that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened"; stating that states must "bring to justice those who finance…terrorist acts"; and urging states to become parties to the 1999 Terrorism Financing Convention; calling on Counter-Terrorism Committee to intensify efforts to implement Resolution 1373 (2001);

xiii.     United Nations Security Council Resolution 1526, S/RES/1526 (Jan. 30, 2004), calling upon states to implement fully Resolution 1373 (2001), and measures to improve the freezing measures of Resolutions 1267 (1999) and 1333 (2000);

xiv.     United Nations Security Council Resolution 1535, S/RES/1535 (Mar. 26, 2004), calling upon states to implement fully Resolution 1373 (2001).

xv.     United Nations Security Council Resolution 1566, S/RES/1566 (Oct. 8, 2004), condemning "in the strongest terms all acts of terrorism irrespective of their motivation, whenever and by whomever committed, as one of the most serious threats to peace and security.";

xvi.     United Nations Security Council Resolution 1611, S/RES/1611 (July 7, 2005), reaffirming the purposes and principles of resolutions 1373 and 1566 in the aftermath of the terrorist attacks in London on July 7, 2005;

xvii.     United Nations Security Council Resolution 1735 (Dec. 22, 2006), reaffirming that terrorism in all its forms and manifestations constitutes one of the most serious threats to peace and security and that any acts of terrorism are criminal and unjustifiable regardless of their motivations, whenever and by whomever committed;…";

xviii.     United Nations Security Council Resolution 1787 (Dec. 10, 2007), reminding states that they must ensure that any measures taken to combat terrorism comply with all their obligations under international law, and should adopt…measures in accordance with international law, in particular…humanitarian law."; and

xix.     United Nations Security Council Resolution 1822 (June 30, 2008), pursuant to the string of resolutions on the threat to international peace and security caused by terrorist threats, including resolutions 1373 and 1566, encourages all Member States to list all groups,

individuals, undertakings and entities that finance or support Al-Qaida, Usama bin Laden, and the Taliban;

### Universal Condemnation of Financing of Terrorism

194.    The international community has universally condemned the financing of terrorism thus incorporating this offense into the law of nations pursuant to the ATCA.

195.    The following international conventions and/or United Nations Security Council Resolutions support the premise that the financing of terrorism is incorporated into the law of nations:

i.       The International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GA OR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. A/Res/53/108 (1999) (In force Apr. 2002);

ii.      United Nations Security Council Resolution 1267, S/RES/1267 (Oct. 15, 1999), on the freezing of the funds and other financial resources of the Taliban;

iii.     United Nations Security Council Resolution 1269, S/RES/1269 (Oct. 19, 1999), calling upon states to take steps to deny those who finance terrorist acts safe haven;

iv.      United Nations Security Council Resolution 1333, S/RES/1333 (Dec. 19, 2000), on the freezing of the funds and other resources of Usama bin Laden and the Al-Qaida organization;

v.       United Nations Security Council Resolution 1363, S/RES/1363 (July 20, 2001), on the establishment of a mechanism to monitor the implementation of measures imposed by Resolutions 1267 (1999) and 1333 (2000);

vi.     United Nations Security Council Resolution 1373, S/RES/1373 (Sept. 28, 2001), on threats to international peace and security caused by terrorist acts, and mandating the formation of the Counter-Terrorism Committee;

vii.    United Nations Security Council Resolution 1377 (2001) of November 12, 2001 calling upon states to implement fully Resolution 1373 (2001);

viii.   United Nations Security Council Resolution 1390, S/RES/1390 (Jan. 16, 2002), effectively merging the freezing measures of Resolutions 1267 (1999) and 1333 (2000);

ix.     United Nations Security Council Resolution 1455, S/RES/1455 (Jan. 17, 2003), on measures to improve the implementation of the freezing measures of Resolutions 1267 (1999), 1333 (2000), and 1390 (2002);

x.      United Nations Security Council Resolution 1456, S/RES/1456 (Jan. 29, 2003), reaffirming that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened"; stating that states must "bring to justice those who finance…terrorist acts"; and urging states to become parties to the 1999 Terrorism Financing Convention; calling on Counter-Terrorism Committee to intensify efforts to implement Resolution 1373 (2001);

xi.     United Nations Security Council Resolution 1526, S/RES/1526 (Jan. 30, 2004), calling upon states to implement fully Resolution 1373 (2001), and measures to improve the freezing measures of Resolutions 1267 (1999) and 1333 (2000);

xii.    United Nations Security Council Resolution 1535, S/RES/1535 (Mar. 26, 2004), calling upon states to implement fully Resolution 1373 (2001).

xiii.   United Nations Security Council Resolution 1535, S/RES/1535 (Mar. 26, 2004), calling upon states to implement fully Resolution 1373 (2001).

xiv.   United Nations Security Council Resolution 1566, S/RES/1566 (Oct. 8, 2004), condemning "in the strongest terms all acts of terrorism irrespective of their motivation, whenever and by whomever committed, as one of the most serious threats to peace and security."

xv.   United Nations Security Council Resolution 1611, S/RES/1611 (July 7, 2005), reaffirming the purposes and principles of resolutions 1373 and 1566 in the aftermath of the terrorist attacks in London on July 7, 2005.

xvi.   United Nations Security Council Resolution 1735 (Dec. 22, 2006), reaffirming that terrorism in all its forms and manifestations constitutes one of the most serious threats to peace and security and that any acts of terrorism are criminal and unjustifiable regardless of their motivations, whenever and by whomever committed;…".

xvii.   United Nations Security Council Resolution 1787 (Dec. 10, 2007), reminding states that they must ensure that any measures taken to combat terrorism comply with all their obligations under international law, and should adopt…measures in accordance with international law, in particular…humanitarian law."; and

xviii.   United Nations Security Council Resolution 1822 (June 30, 2008), pursuant to the string of resolutions on the threat to international peace and security caused by terrorist threats, including resolutions 1373 and 1566, encourages all Member States to list all groups, individuals, undertakings and entities that finance or support Al-Qaida, Usama bin Laden, and the Taliban.

## COUNT ONE

### AIDING AND ABETTING, INTENTIONALLY FACILITATING, AND/OR RECKLESSLY DISREGARDING CRIMES AGAINST HUMANITY IN VIOLATION OF INTERNATIONAL LAW

196.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

197.    The suicide bombings and other murderous attacks committed by LTTE against Plaintiffs and the civilian Sri Lankan population constitute crimes against humanity in violation of the law of nations.

198.    Condemnation of crimes against humanity rests on a clear and definite norm of international law which is universally accepted by the civilized world.  See, e.g., Charter of the International Military Tribunal, Aug. 8, 1945, art. 6I, 59 Stat. 1546, 1547, E.A.S. NO. 472, 82 U.N.T.S. 284; Statute of the ICTY, Art. 5; Statute of the ICTR, Art. 3; and The Rome Statute of the ICC, Art. 7.

199.    Crimes against humanity are likewise defined with a specificity sufficiently comparable to international law violations that were familiar when the ATS, 28 U.S.C. § 1350, was enacted.

200.    The core elements of a crime against humanity in violation of international law, as codified in the above sources and recognized in international law generally, are murder and other heinous acts against human life, physical welfare, and dignity that are undertaken as part of a widespread or systematic attack against a civilian population.

201.    Crimes against humanity are punishable whether committed in time of peace or war.

202.    Aiding and abetting and/or joint venture and/or reckless disregard of crimes against humanity are actionable claims under the law of nations and this court has jurisdiction pursuant to the ATS.

203.    Beginning on or about 1986, LTTE engaged in numerous suicide bombings and other murderous attacks that were part of systematic and widespread attacks on a civilian population.  LTTE murdered and seriously injured several thousand innocent Sri Lankans civilians, including Plaintiffs, in furtherance of the overarching goal of creating a mono-ethnic Tamil state.

204.    LTTE's suicide bombings and other murderous attacks were systematically committed.  Their suicide bombings and other murderous attacks required a high degree of careful planning, coordination, funding, and orchestration by and between LTTE and others, including Rajaratnam, J.M. and TRO.  Suicide bombings and other murderous attacks also involve recruitment, the provision of explosives, and the targeting of Plaintiffs and other members of the Sri Lankan civilian population.

205.    LTTE's suicide bombings and other murderous attacks were widespread in nature.  Plaintiffs and the entire Sri Lankan civilian population were targeted and thousands of unarmed innocents were injured or killed.  Suicide bombings and other murderous attacks have taken place in public and private locations, during the day and night, and have involved attacks against men and women, both young and old, and children.  In addition to the suicide bombings that were carried out, scores of similar suicide bombings have been thwarted prior to implementation.

206.    LTTE's suicide bombings and other murderous attacks therefore constitute a violation of the law of nations as they are crimes against humanity.

66

207.    Rajaratnam, J.M. and TRO knowingly, intentionally, and purposefully, directly and indirectly, aided and abetted, intentionally facilitated, and/or recklessly disregarded crimes against humanity in violation of the law of nations.  Rajaratnam, J.M. and TRO aided and abetted crimes against humanity by knowingly giving money to LTTE for purposes of assisting the LTTE in carrying out terror attacks, including suicide bombings and other murderous acts of violence in widespread and systematic attacks on innocent civilians that killed or injured Plaintiffs.

208.    Rajaratnam, J.M. and TRO knowingly provided millions of dollars to the LTTE through private and charitable contributions with the purpose of supporting LTTE's terror activities, including widespread and systematic attacks of murder, and other heinous acts against human life, physical welfare, and dignity against civilian populations, including the attacks that killed or injured Plaintiffs.

209.    At all times, Rajaratnam, J.M. and TRO knew that the receipt, transfer, and disbursement of charitable funds were being paid to members of LTTE who carried out suicide bombings and other murderous attacks against Plaintiffs and other Sri Lankan civilians

210.    Rajaratnam, J.M. and TRO aided and abetted, intentionally facilitated and/or recklessly disregarded the planning, preparation or execution of these crimes against humanity by providing organized and systematic financial support and other practical assistance, encouragement or moral support which had a substantial effect on the perpetration of crimes against humanity, with the knowledge and purpose that such actions would assist LTTE in the commission of crimes against humanity.

211.    Plaintiffs and their family members suffered death, serious physical injuries,  and serious mental injuries as a direct and proximate result of conduct by Rajaratnam, J.M. and TRO.

212.    WHEREFORE, Plaintiffs demand judgment in their favor against Rajaratnam, J.M. and TRO and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Court deems appropriate to compensate the Plaintiffs and prevent Rajaratnam, J.M. and TRO from ever again supporting crimes against humanity against the Sri Lankan people in violation of the law of nations.

## COUNT TWO

### AIDING AND ABETTING ACTS OF TERRORISM, INCLUDING SPECIFICALLY SUICIDE BOMBINGS AND OTHER MURDEROUS ATTACKS ON INNOCENT CIVILIANS INTENDED TO INTIMIDATE OR COERCE A CIVILIAN POPULATION, UNIVERSALLY CONDEMNED AS VIOLATIONS OF THE LAW OF NATIONS

213.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

214.    The financing of suicide bombings and other murderous attacks committed by LTTE against Plaintiffs and the unarmed members of the civilian Sri Lankan population, Tamil and Sinhala alike, constitutes a crime in violation of the law of nations.

215.    The prohibition against financing suicide bombings and other murderous attacks on innocent civilians intended to intimidate or coerce a civilian population rests on a clear and definite norm of customary international law that is universally accepted by the civilized world.

216.    The International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GAOR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. A/Res/53/108 (1999) (In force Apr. 2002) ("Financing Convention") is declaratory of existing customary international law.  It has been signed by 132 states, and, as of July 11, 2009, was in force among

169 states.  *See* http://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=XVIII-11&chapter=18&lang=en.  The Convention condemns the funding of terrorism and requires that the provision or collection of funds for terrorist offenses be criminalized. The United States ratified this Convention on June 26, 2002.  Sri Lanka ratified this Convention September 8, 2000.

217.    The Financing Convention follows the precedents set by numerous other sources of international law that reflect the universal condemnation of terrorist financing.

218.    First, the Financing Convention defines offenses by incorporating eleven existing antiterrorism conventions.  This includes providing or collecting funds for any act falling within the International Convention for the Suppression of Terrorist Bombings, adopted by the General Assembly of the United Nations Jan. 12, 1998, G.A. Res. 164, U.N. GAOR 52nd Sess., U.N. Doc. A/RES/52/164 (1998), 37 I.L.M. 249 (1998) (In force May 23, 2001) ("Bombing Convention"), which itself has been ratified by 162 nations. The United States ratified the Bombing Convention on June 26, 2002.  Sri Lanka ratified the Bombing Convention on March 23, 1999.

219.    Financing Convention offenses also encompass providing or collecting funds for "any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in hostilities in a situation of armed conflict, when the purpose of the act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

220.    Second, the Financing Convention supplements and gives effect to existing international authority, e.g., including United Nations Security Council Resolutions that reflect the international community's collective denouncement of terrorist financing:

- United Nations Securities Council Resolution 1267 (1999) of October 15, 1999 on the freezing of the funds and other financial resources of the Taliban.

- United Nations Securities Council Resolution 1269 (1999) of October 19, 1999 calling upon states to take steps to deny those who finance terrorist acts safe haven.

- United Nations Securities Council Resolution 1333 (2000) of December 19, 2000 on the freezing of the funds and other resources of Usama bin Laden and the Al-Qaida organization.

- United Nations Securities Council Resolution 1363 (2001) of July 30, 2001 on the establishment of a mechanism to monitor the implementation of measures imposed by Resolutions 1267 (1999) and 1333 (2000).

- United Nations Securities Council Resolution 1373 (2001) of September 28, 2001 on threats to international peace and security caused by terrorist acts, and mandating the formation of the Counter-Terrorism Committee.

- United Nations Securities Council Resolution 1377 (2001) of November 12, 2001 calling upon states to implement fully Resolution 1373 (2001).

- United Nations Securities Council Resolution 1390 (2002) of January 16, 2002 effectively merging the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

- United Nations Securities Council Resolution 1455 (2003) of January 17, 2003 on measures to improve the implementation of the freezing measures of Resolutions 1267 (1999), 1333 (2000), and 1390 (2002).

- United Nations Securities Council Resolution 1456 (2003) of January 29, 2003 reaffirming that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened"; stating that states must "bring to justice those who

70

finance…terrorist acts"; and urging states to become parties to the 1999 Terrorism Financing Convention; calling on Counter-Terrorism Committee to intensify efforts to implement Resolution 1373 (2001).

- United Nations Securities Council Resolution 1526 (2004) of January 30, 2004 calling upon states to implement fully Resolution 1373 (2001), and measures to improve the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

- United Nations Securities Council Resolution 1535 (2004) of March 26, 2004 calling upon states to implement fully Resolution 1373 (2001).

- United Nations Securities Council Resolution 1566 (2004) of October 8, 2004 condemning "in the strongest terms all acts of terrorism irrespective of their motivation, whenever and by whomever committed, as one of the most serious threats to peace and security."

- United Nations Securities Council Resolution 1611 (2005) reaffirming the purposes and principles of resolutions 1373 and 1566 in the aftermath of the terrorist attacks in London on July 7, 2005;

- United Nations Securities Council Resolution 1735 (2006) reaffirming that terrorism in all its forms and manifestations constitutes one of the most serious threats to peace and security and that any acts of terrorism are criminal and unjustifiable regardless of their motivations, whenever and by whomever committed;…"

- United Nations Securities Council Resolution 1787 (2007) remind states that they must ensure that any measures taken to combat terrorism comply with all their obligations under international law, and should adopt…measures in accordance with international law, in particular…humanitarian law."; and

- United Nations Securities Council 1822 (2008) pursuant to the string of resolutions on the threat to international peace and security caused by terrorist threats, including resolutions 1373 and 1566, encourages all Member States to list all groups, individuals, undertakings and entities that finance or support Al-Qaida, Usama bin Laden, and the Taliban;

221. United Nations Securities Council Resolution 1373 was unanimously adopted under Chapter VII of the U.N. Charter. Under Article 25, decisions taken by the Security Council under Chapter VII of the Charter are legally binding on all members.

222. United Nations Securities Council Resolution 1373 is unequivocally directed at the prevention, prosecution, and punishment of the financing of terrorism, and characterizes acts of terrorism as threats to international peace and security. By characterizing acts of terrorism as threats to international peace and security, the Security Council is entitled to take the collective measures (or "sanctions") envisioned by Chapter VII of the United Nations Charter. The measures that the Council decides to take in these circumstances are mandatory for all the members of the United Nations by virtue of Articles 25 and 48 of the Charter.

223. Under United Nations Securities Council Resolution 1373, "all States shall...prevent and suppress the financing of terrorist acts" and "criminalize the willful provision or collection, by any means, directly or indirectly, of funds by their nationals or in their territories with the intention that the funds should be used, or in the knowledge that they are to be used, in order to carry out terrorist attacks." States are equally bound to "[e]sure that any person who participates in the financing" of terrorism "is brought to justice." Resolution 1373's prohibition against "acts, methods, and practices of terrorism" which are "contrary to the purposes and principles of the United Nations" – including knowingly financing, planning and inciting terrorist acts – is declaratory of the fact that terrorist financing is contrary to existing

72

Treaty obligations of member states as expressed in the purposes and principles of the U.N. Charter, which all member states are obliged to honor.

224.   More recently, United Nations Securities Council Resolution 1566 reiterates the requirements elucidated in Resolution 1373 and condemns "in the strongest terms all acts of terrorism irrespective of their motivation, whenever and by whomever committed, as one of the most serious threats to peace and security."

225.   World condemnation of terrorist financing is equally reflected in various regional conventions, which prohibit the financing of terrorist acts. *See* Annex to Resolution No.: 59//26P; 1999 Convention of the Organization of the Islamic Conference on Combating

International Terrorism, Art. 3; 1999 OAU Convention on the Prevention and Combating of Terrorism (Algiers, July 14, 1999), Art. 3; and 1998 Arab Convention for the Suppression of Terrorism (Cairo, April 1998), Art. 3.

226.   As such, the prohibition against financing suicide bombings and other murderous attacks on innocent civilians intended to intimidate or coerce a civilian population is defined with a specificity sufficiently comparable to international law violations that were familiar when the ATS, 28 U.S.C. § 1350, was enacted.

227.   Consistent with its condemnation of terrorism financing, the world community has also joined in defining who can be held liable. The Convention explicitly provides that liability for terrorist financing reaches those that directly or indirectly provide or collect funds with the knowledge and purpose that the funds will be used to carry out a defined terrorist offense, regardless of whether the funds were actually used. Specifically, the Financing Convention reaches every accomplice and every person who organizes or directs others in the terrorist financing effort.

228.     Furthermore, legal entities may be held civilly liable for the offenses set out in the Financing Convention. This comports with the general international consensus embodied in the Bombing Convention, which also reaches all persons who "participate[] as an accomplice" in a terrorist bombing or "organizes others to commit them or in any other way contributes to their commission."

229.     Rajaratnam, J.M. and TRO aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of customary international law, to wit, terrorist financing, by directly or indirectly knowingly providing funds to LTTE for the purpose of assisting the LTTE in carrying out offenses as defined by the Financing Convention, the Bombing Convention and customary international law:

i. Starting on or about 1986, LTTE engaged in numerous terrorist bombings that were part of a systematic and widespread attack on a civilian population, in which they murdered and seriously injured Plaintiffs and several thousand innocent Sri Lankan civilians, in furtherance of the overarching goal of creating a mono-ethnic Tamil state.

ii. LTTE's suicide bombings and other murderous attacks were intended to cause death or serious bodily injury to Plaintiffs and other Sri Lankan civilians. By its nature and context, expressed through the professed goals of LTTE, suicide bombings and other murderous attacks are designed to destroy and intimidate the Sri Lankan population.

iii. Rajaratnam, J.M. and TRO regularly provided substantial funding, totaling millions of dollars, individually and through private and charitable contributions, with actual knowledge and awareness that some of these same funds were raised and provided for the purpose of supporting LTTE's suicide bombings and other murderous attacks on civilians.

iv. At all times, Rajaratnam, J.M. and TRO knew that their receipt, transfer, and disbursement of charitable funds were being paid to LTTE with the purpose of assisting the LTTE in carrying out suicide bombings and other attacks that killed or injured Plaintiffs and other Sri Lankan civilians.

230.    Rajaratnam, J.M. and TRO aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law by knowingly giving money to LTTE for the purpose of assisting the LTTE in carrying out terror attacks that killed or injured Plaintiffs

231.    In the alternative, Rajaratnam, J.M. and TRO aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law, by directly or indirectly providing funds to LTTE with the knowledge and purpose that those funds would be used to carry out an offense as defined by the Financing Convention, the Bombing Convention and customary international law, as follows:

i. Starting on or about 1986, LTTE engaged in suicide bombings and other murderous attacks involving the use of explosives, incendiary weapons, and other lethal devices which were designed to cause death and serious bodily injury.

ii LTTE's suicide bombings and other murderous attacks also involved the intentional delivery, placement, discharge, and/or detonation of explosives, incendiary weapons, and lethal devices in public places, government offices, public facilities, and in public transportation system(s), including buses and train stations.

iii. LTTE's suicide bombings and other murderous attacks constitute a violation of international law as they constitute an offense under the Bombing Convention.

iv. Rajaratnam, J.M. and TRO regularly provided substantial funding, totaling millions of dollars in private contributions and charitable donations, with actual knowledge and awareness

that these same funds were raised and deposited for the purpose of supporting LTTE's terrorist activities against Plaintiffs and other innocent Sri Lankan citizens.

v. At all times, Rajaratnam, J.M. and TRO knew that their receipt, transfer, and disbursement of charitable funds were being paid to LTTE for the purpose of assisting the LTTE in carrying out suicide bombings and other attacks that killed or injured Plaintiffs and other Sri Lankan civilians.

232.   Plaintiffs and their family members suffered death, serious physical injuries, serious mental injuries as a proximate result of the conduct of Rajaratnam, J.M. and TRO.

233.   WHEREFORE, Plaintiffs demand judgment in their favor against Rajaratnam, J.M. and TRO and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Court deems appropriate to compensate the Plaintiffs and prevent Rajaratnam, J.M. and TRO from ever again engaging in the financing of terrorism in violation of the law of nations.

## COUNT THREE

### RECKLESS DISREGARD

234.   Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

235.   Rajaratnam, J.M. and TRO recklessly disregarded a known threat when they gave individual, private, or charitable funds to designated terrorist groups.  Rajaratnam, J.M. and TRO knew, or should have known, that the private contributions and charitable funds, as discussed herein throughout, were used to support, encourage, entice and make possible the suicide bombings and other murderous attacks described herein. In spite of this knowledge, or in spite of

76

the fact that they did not take reasonable steps to know what a reasonable person should have known, Rajaratnam, J.M. and TRO made individual, private, and charitable money transfers to the LTTE.  As a result, Rajaratnam, J.M. and TRO were aware or should have been aware of a risk so great that it was highly probable, and thus foreseeable, that serious harm and/or death could result to Plaintiffs from their acts in collecting and distributing such funds.

236.    Rajaratnam, J.M. and TRO recklessly disregarded this known and substantial risk thereby facilitating, assisting, aiding, abetting and incentivizing the suicide bombings and other murderous attacks that were foreseeable to Rajaratnam, J.M. and TRO and which were the direct and proximate cause of the injury or death of Plaintiffs or their decedents.

237.    As a result of the foregoing Plaintiffs have been damaged in an amount not less than the statutory amount of $75,000.

238.    WHEREFORE, Plaintiffs demand judgment in their favor against Rajaratnam, J.M. and TRO and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Court deems appropriate to compensate the Plaintiffs and prevent Rajaratnam, J.M. and TRO from ever again engaging in the financing of terrorism in violation of the law of nations.

## COUNT FOUR

### NEGLIGENCE

239.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

240.     Rajaratnam, J.M. and TRO negligently and recklessly, directly and indirectly, failed to exercise reasonable care in preventing the distribution of personal and charitable funds to designated terrorist organizations.  In doing so, Rajaratnam, J.M. and TRO disregarded the intentional commission of suicide bombings and other murderous attacks on civilians by the LTTE that resulted in the death, serious physical injuries, serious mental injuries, and heinous affronts to dignity for thousands of Sri Lankan civilians, including Plaintiffs.

241.     Rajaratnam, J.M. and TRO knew or should have known that they were distributing money to LTTE, a designated terrorist organization.  Rajaratnam, J.M. and TRO owed a duty of care to potential victims of attacks by the LTTE in Sri Lanka including Plaintiffs. Rajaratnam, J.M. and TRO breached that duty of care by giving money to a designated terrorist organization.  Rajaratnam, J.M. and TRO knew or should have known that the conveyance of such money to LTTE would facilitate and assist the execution of suicide bombings and other murderous attacks by the LTTE.  And Rajaratnam, J.M. and TRO knew or should have known that the suicide bombings and other murderous attacks committed by LTTE would kill, maim, and/or permanently injure innocent civilians in Sri Lanka.

242.     The actions taken by Rajaratnam, J.M. and TRO were unconscionable and done with reckless disregard or negligence for the rights and lives of those murdered, those injured, and their surviving family members.

243.     As a direct and proximate cause of the acts and omissions of Rajaratnam, J.M. and TRO, foreseeable physical and emotional injuries were inflicted upon innocent Sri Lankan civilians, including Plaintiffs.

244.     Plaintiffs either died or have suffered and will continue to suffer severe, debilitating, and permanent emotional, physical, and psychiatric disorders, ongoing emotional

distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, counseling, and long-term care.

245.    Rajaratnam, J.M. and TRO, by engaging in this negligent or reckless conduct, caused significant foreseeable injuries to Plaintiffs.

246.    WHEREFORE, Plaintiffs demand judgment in their favor against Rajaratnam, J.M. and TRO and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Court deems appropriate to compensate the Plaintiffs and prevent Rajaratnam, J.M. and TRO from ever again engaging in the financing of terrorism in violation of the law of nations.

## COUNT FIVE

### WRONGFUL DEATH

247.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

248.    Plaintiffs bring this claim for wrongful death against the Defendants, because Rajaratnam, J.M. and TRO caused the Decedents' deaths through such wrongful acts and/or omissions as knowingly, purposefully, directly and indirectly, assisting, aiding, abetting, facilitating, materially supporting, incentivizing and/or recklessly disregarding the intentional commission of suicide bombings, and other murderous attacks and shockingly egregious acts of international terrorism by LTTE against Plaintiffs and their Decedents, and such other wrongful actions and omissions as set forth herein.

79

249. As a direct and proximate result of the wrongful actions and/or omissions of Rajaratnam, J.M. and TRO, as set forth herein, Decedents suffered serious emotional and bodily injuries resulting in their deaths on the dates as referenced herein.

250. As a direct and proximate result of the wrongful actions and/or omissions of Rajaratnam, J.M. and TRO, and the Decedents' resulting wrongful deaths, the Decedents' relatives, representatives, and other survivors, have suffered pecuniary and other losses including but not limited to loss of earnings and services of pecuniary value, as well as hospital, medical and funeral expenses.

251. Plaintiffs, as Decedents' surviving relatives and/or representatives, are entitled to recover damages as a result of the wrongful acts and/or omissions of Rajaratnam, J.M. and TRO, and the Decedents' resulting wrongful deaths, as plead herein pursuant to pertinent Wrongful Death statutes.

252. As a direct and proximate result of the wrongful actions and/or omissions of Rajaratnam, J.M. and TRO, and the Decedents' resulting wrongful deaths, the Decedents' surviving relatives have suffered and will continue to suffer permanent, physical and emotional distress, severe trauma, and lasting physical, emotional, and psychological injuries, for which they have and will continue to incur actual damages including but not limited to ongoing medical and other expenses.

253. WHEREFORE, Plaintiffs demand judgment in their favor against Rajaratnam, J.M. and TRO, and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate the Plaintiffs and

prevent Rajaratnam, J.M. and TRO from ever again engaging in the financing of terrorism in violation of the law of nations.

## COUNT SIX

### SURVIVAL ACTION

254.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

255.    Plaintiffs bring this survival action against Rajaratnam, J.M. and TRO, because Rajaratnam, J.M. and TRO caused the Decedents' pain, suffering, and eventual deaths through such wrongful acts and/or omissions as knowingly, purposefully, directly and indirectly, assisting, aiding, abetting, facilitating, materially supporting, incentivizing and/or recklessly disregarding the intentional commission of suicide bombings, and other murderous attacks and shockingly egregious acts of international terrorism by LTTE against Plaintiffs and their Decedents, and such other wrongful actions and omissions as set forth herein.

256.    As a direct and proximate result of the wrongful, intentional, malicious, reckless, criminal, grossly negligent and negligent acts of Rajaratnam, J.M. and TRO, as described herein, those killed in the murderous attacks described herein were placed in a severe, often prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted bodily contact, injury, and assault.   Those murdered suffered intensely severe and offensive harmful bodily contact, personal injury, and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, knowledge of pending death, physical and emotional trauma, and intentionally inflicted physical pain.

257.    Decedents were mentally, physically and emotionally damaged, harmed, trapped, and falsely imprisoned prior to their personal physical injury and deaths because of LTTE's

terror attacks for which the Defendant knowingly and intentionally provided financial and other material support.

258.    As a direct and proximate result of the wrongful, intentional, malicious, reckless, criminal, grossly negligent and negligent acts of Rajaratnam, J.M. and TRO, as described herein, Decedents suffered damages including conscious pain and suffering, severe trauma, fear, anxiety, permanent physical and emotional distress, ultimate loss of life and life's pleasures, companionship and consortium, loss of family, career, earnings and earning capacity, loss of accretion to their estates, medical expenses and other immeasurable items of damages to be shown at trial. Plaintiffs herein seek and are entitled to survival damages for those tortured and killed in these suicide bombings and other murderous attacks.

259.    Plaintiffs are entitled to all compensatory, punitive, and other damages permitted under the pertinent survival statutes against the Defendant.

260.    WHEREFORE, Plaintiffs demand judgment in their favor against Rajaratnam, J.M. and TRO and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate the Plaintiffs and prevent Rajaratnam, J.M. and TRO from ever again engaging in the financing of terrorism in violation of the law of nations.

## COUNT SEVEN

### NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

261.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

82

262.    Plaintiffs bring this claim for negligent and/or intentional infliction of emotional distress against Rajaratnam, J.M. and TRO, because Rajaratnam, J.M. and TRO facilitated, assisted, aided, abetted, materially supported, and incentivized acts of murder and wrongful death, specifically, the suicide bombings and other shockingly egregious acts of international terrorism discussed herein.

263.    Rajaratnam, J.M. and TRO knowingly, and purposefully, directly and indirectly aided and abetted, intentionally facilitated, and/or recklessly disregarded the intentional commission of suicide bombings and other murderous attacks by LTTE that resulted in the decedents' deaths and substantial emotional injuries to the personal injury plaintiffs, and their family members.

264.    Rajaratnam, J.M. and TRO intended or knew or should have known, that their conduct would lead to the killing of or injury to innocent persons and resulting severe emotional distress.  Rajaratnam, J.M. and TRO intended, knew, or should have known that the suicide bombings and other murderous attacks committed by LTTE would kill, maim, and/or permanently injure Plaintiffs and other innocent people, leaving devastated family members to grieve for their losses with ongoing physical, psychological and emotional injuries and ongoing post traumatic stress disorder.

265.    The actions of Rajaratnam, J.M. and TRO were unconscionable and done with an intentional, malicious, willful, and/or reckless disregard for the rights and lives of those murdered, those injured, and the surviving family members.

266.    As a direct and proximate cause of Rajaratnam, J.M. and TRO's intentional misconduct and/or reckless disregard for human life, Plaintiffs have suffered and will continue to suffer severe, debilitating, permanent emotional, physical and psychiatric disorders, ongoing

419848.1

emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counseling and long-term care, particularly for all minor Plaintiffs.

267.    Rajaratnam, J.M. and TRO, by engaging in this intentional, unlawful conduct, intentionally, grossly negligently, or negligently inflicted emotional distress upon the Plaintiffs.

268.    WHEREFORE, Plaintiffs demand judgment in their favor against Rajaratnam, J.M. and TRO and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Court deems appropriate to compensate the Plaintiffs and prevent Rajaratnam, J.M. and TRO from ever again engaging in the financing of terrorism in violation of the law of nations.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

**LITE DePALMA GREENBERG, LLC**

Dated: June 13, 2014          By:     /s/ *Joseph J. DePalma*
                                       Joseph J. DePalma, Esq.
                                       Jeffrey A. Shooman, Esq.
                                       Two Gateway Center, 12th Floor
                                       Newark, NJ 07102
                                       Tel: (973) 623-3000
                                       Email:  jdepalma@litedepalma.com
                                              jshooman@litedepalma.com

                                       **MOTLEY RICE LLC**
                                       Michael Elsner, Esq.
                                       John M. Eubanks, Esq.
                                       28 Bridgeside Boulevard
                                       P.O. Box 1792
                                       Mount Pleasant, South Carolina 29465
                                       Telephone: (843) 216-9000

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Plaintiffs by their attorneys, hereby certify that the matter in controversy is not the subject of any other action.

I hereby certify that the following statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: June 13, 2014

**LITE DePALMA GREENBERG, LLC**

By:     /s/ *Joseph J. DePalma*
Joseph J. DePalma, Esq.
Jeffrey A. Shooman, Esq.
Two Gateway Center, 12th Floor
Newark, NJ 07102
Tel: (973) 623-3000
Email:  jdepalma@litedepalma.com
            jshooman@litedepalma.com

**MOTLEY RICE LLC**
Michael Elsner, Esq.
John M. Eubanks, Esq.
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone: (843) 216-9000

419848.1