

MotleyRice® LLC
ATTORNEYS AT LAW
www.motleyrice.com

"I will stand for my client's rights.
I am a trial lawyer."
–Ron Motley (1944–2013)

28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
**o.** 843.216.9000   **f.** 843.216.9450

**Michael E. Elsner**
*Licensed in NY, SC, VA*
direct: 843.216.9250
melsner@motleyrice.com

June 7, 2017

**VIA ECF – UNDER SEAL**
The Honorable Joseph A. Dickson
United States Magistrate Judge
United States District Court
District of New Jersey
Martin Luther King Building – United States Courthouse
50 Walnut Street
Newark, New Jersey 07101

      Re:    *Krishanthi, et al. v. Rajaratnam, et al.*, No. 2:09-cv-05395-JLL-JAD

Dear Judge Dickson:

      We write on behalf of Plaintiffs in response to the Court's May 24, 2017 Order (ECF No. 301) instructing Plaintiffs to provide the Court with certain additional information in connection with Plaintiffs' request that, due to articulated safety concerns, the Court maintain under seal the identity of two confidential witnesses and private information about one of Plaintiffs' investigators. The Court has instructed that Plaintiffs:

> file a submission that identifies the type (i.e. 'Confidential' or 'Outside Attorneys' Eyes Only') and scope (i.e., name, former job affiliations, etc.) of the confidentiality designations that they seek to maintain <u>concerning each of the three individuals at issue</u>. For each piece of information that Plaintiffs seek to maintain as 'Confidential' and/or 'Outside Attorneys' Eyes Only', Plaintiffs shall provide a sufficiently detailed, non-conclusory explanation as to why that information is eligible for such protection under the terms of the Discovery Confidentiality Order, (ECF No. 203), and/or its amendment, (ECF No. 215)...Plaintiffs shall support their submission with affidavits and/or documents as necessary, as counsel's unsupported speculation as to factual matters will be insufficient.

ECF No. 301 at 5-6. The parties have conferred on the issues raised in the Court's Order in an effort to narrow their areas of disagreement, and Plaintiffs submit this letter memorandum and the Affidavits of Brian Mallon, ███████████████ Anonymous Witness 1 ███████ ██████ Rohan Gunaratna, John Allison and Jay Kanetkar in support of their submission to



Honorable Joseph A. Dickson
June 7, 2017
*Krishanthi, et al. v. Rajaratnam, et al.*, No. 2:09-cv-05395-JLL-JAD
Page 2

maintain certain information under seal with the Court under the "Confidential" and/or "Outside Attorneys' Eyes Only" designations.

The Discovery Confidentiality Order, as amended, in this case provides two levels of confidentiality: "Confidential" and "Outside Attorneys' Eyes Only." In pertinent part, the "Confidential" designation provides protection for "any information, document, or thing, or portion of any document or thing: (b) that contains private or confidential information, or (c) that contains information received in confidence from third parties, or (d) that the producing party otherwise believes in good faith to be entitled to protection under Rule 26(c)(1)(G) and Local Civil Rule 5.3" ECF No. 203 at ¶1. The "Outside Attorneys' Eyes Only" designation provides protection for "any information, document, or thing, or portion of any document or thing that contains highly sensitive confidential business or personal information, the disclosure of which is highly likely to cause significant harm to an individual or to the business of the designating party." ECF No. 215 at ¶15.

Plaintiffs seek to designate as "Outside Attorneys' Eyes Only" the names and identities of two fact witnesses, Anonymous Witness 1 ▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮ and the contact details of Brian Mallon—one of Plaintiffs' non-testifying expert witnesses.[1] We seek this designation because the public release of this information beyond those permitted to review it, under the "Outside Attorneys' Eyes Only" designation poses a significant risk of harm to the safety and security of these individuals.

## ARGUMENT

I.  **Disclosure of the identities and contact information for** ▮▮▮▮▮▮▮▮▮ **and Anonymous Witness 1 is highly likely to cause significant harm to them.**

As set forth in more detail in the Affidavits of ▮▮▮▮▮▮▮▮▮▮ dated June 6, 2017 (attached hereto as Exhibit 1) and February 5, 2010 (attached hereto as Exhibit 2), Mr. ▮▮▮▮▮▮ served as an undercover cooperating witness for the JTTF and the FBI from 1999 through 2006. Exhibit 1 at ¶2, Exhibit 2 at ¶6. His work with the FBI resulted in the successful conviction of 20 LTTE members and/or material supporters in U.S. courts. Exhibit 2 at ¶10. At no point did he reveal publicly his true name and contact details as a cooperating witness for the U.S. Government. Exhibit 1 at ¶4, 5. His true identity was only made known to Plaintiffs' counsel after he was approached by Plaintiffs' non-testifying investigators/expert consultants about whether he would be willing to voluntarily testify for the Plaintiffs in this case.

---

[1] Plaintiffs address the "Outside Attorneys' Eyes Only" designation of certain information concerning Brian Mallon in Section II.

Honorable Joseph A. Dickson
June 7, 2017
*Krishanthi, et al. v. Rajaratnam, et al.*, No. 2:09-cv-05395-JLL-JAD
Page 3


 using an alias and fictitious businesses, obtained evidence and surreptitiously recorded hundreds of wiretap conversations and events for the U.S. Government which led, in turn, to multiple criminal convictions for the provision of support to the LTTE. Exhibit 2 at ¶5, 10, 21. █████████████ role in infiltrating the LTTE in the United States and serving as a cooperating witness for the U.S. Government has placed him at risk of physical harm. Exhibit 1 at ¶6-9. █████████████ fears that he may suffer physical harm by LTTE supporters if he is identified publicly as the U.S. Government's cooperating witness in the LTTE prosecutions in the Eastern District of New York. Exhibit 1 at ¶6, 9.



has certified that "I am afraid that my family and I may be attacked if it becomes known that I cooperated with the Sri Lankan government and provided information in this case." *Id.* at ¶31. This risk is further supported by the Affidavit of Rohan Gunaratna (attached hereto as Exhibit 4), an LTTE expert, who is fully aware of the dangers posed in Sri Lanka to cooperating witnesses. Exhibit 4 at ¶5-7, 17-20.

Plaintiffs respectfully urge this Court to enter a protective order shielding the true name of these witnesses from public view, permitting them to offer testimony under a pseudonym at trial to protect their personal safety which will be put at risk if they were to testify in open court under their legal names. In *United States v. Fenech*, 943 F. Supp. 480, 488 (E.D. Pa. 1996), the Court noted that "[c]ourts have consistently allowed witnesses to withhold their name, address, or place of employment where revealing that information would place the witness in danger." The Court has discretion, upon "good cause shown," to enter a protective order to protect a party or person from "annoyance, embarrassment, oppression or undue burden or expense." Fed. R. Civ. P. Rule 26 (c) (1); *cf. Smith v. Illinois*, 390 U.S. 1219, 133 (Harlan, J., Dissenting) (recognizing that, in addition to questions that tend to harass, annoy, or humiliate a witness, inquiries that tend to endanger go beyond the bounds of proper cross-examination). The Court in its discretion may: (A) forbid the disclosure or discovery; (C) prescribe a discovery method; (D) forbid inquiry into

Honorable Joseph A. Dickson
June 7, 2017
*Krishanthi, et al. v. Rajaratnam, et al.*, No. 2:09-cv-05395-JLL-JAD
Page 4

certain matters, or limit the scope of disclosure or discovery to certain matters; or (F) require the deposition be sealed and opened only by court order. Fed R. Civ. P. Rule 26 (c) (1) (A)-(H).

It is within the Court's discretion to protect the true name of a third party witness and to permit the witness to testify publicly under a pseudonym when disclosure poses a threat to the safety and security of the witness. *U.S.* v. *Fuentes*, 988 F. Supp. 861, 862 (E.D. Pa. 1997). The Court in *Fuentes* required the government to disclose the true name of the witness to defense counsel, the party, and one investigator in order that they may prepare their defense. *Id.* Defendant challenged the Court's order preventing the disclosure of the witness's true name in trial. The Court held that revealing the true identity of the witness confidentially to the defendants permitted them to investigate the witness's background and "not permitting use of his true name at trial has in our view no constitutional significance." *Id.* At 865. The Court also determined that the Confrontation Clause did not prevent the Court from strictly limiting who may know the true identity of the witness. *Id.*

The decision of whether to protect the identity of a witness in a civil or criminal case depends upon a balancing of the public interest in securing information from a witness against an individual's right to adequately prepare their defense. *D'Orazio* v. *Washington Township, et al.*, 2008 WL 4307446, p. *3 (D. N.J. 2008). "Whether an informant's identity must be disclosed depends upon the particular facts of each case, taking into consideration the nature of the claim, the possible defenses, the significance of the informer's identity, and other relevant factors. Ultimately the decision boils down to fundamental fairness." *Id. (citing Roviaro v. U.S.*, 353 U.S. 53, 62 (1957)).

Defense counsel has had the true name of each of these witnesses for over a year. Moreover, ▮▮▮▮▮▮▮ and AW1 have each detailed the general nature of the testimony that they intend to offer at trial through affidavits that have been produced to the Defense. Each affidavit reveals evidence of the financial operations of the LTTE. *See* Exhibits 2-4, generally. This civil case concerns the financing of one of the most ruthless terrorist organizations in the world. The LTTE was responsible for the deaths of hundreds if not thousands of individuals through the use of suicide bombing attacks, traditional explosive devices and assassinations— including the assassinations of heavily guarded political and military figures. *See* Declaration of Kenneth McKune dated April 21, 1998, attached hereto as Exhibit 5. While certainly the potency of the LTTE has been diminished in recent years, LTTE members remain at large and pose a threat to the safety and security to those who have given evidence against the LTTE. Exhibit 4, at ¶¶17-21, Exhibit 1 at ¶7-8, Exhibit 3 at ¶31. These real and present risks are heightened in Sri Lanka where these witnesses reside. *Id.* 17-21. Each witness has articulated the significant dangers they face as a result of their cooperation and disclosure of information to government authorities. Exhibit 1 at ¶9, Exhibit 3 at ¶31.

Honorable Joseph A. Dickson
June 7, 2017
*Krishanthi, et al. v. Rajaratnam, et al.*, No. 2:09-cv-05395-JLL-JAD
Page 5

Once good cause for a protective order is shown, the burden shifts to the person seeking disclosure to establish the significance of the informant's identity and the specific need for disclosure. *D'Orazio* v. *Washington Township, Civil No. 07-5097 (RMB)*, 2008 WL 4307446, at *3 (citing *Pickel v. U.S.*, 746 F.2d 176, 181 (3d Cir. 1984); *U.S. v. Mertens*, Crim. Action No. 93-581 (JEI), 1994 WL 39115 (D.N.J. Feb. 2, 1994)). "Disclosure is not required if it is simply of some indirect, casual or remote benefit" and "mere speculation that identification may possibly be of some assistance" does not warrant disclosure. *D'Orazio*, 2008 WL 4307446, at *3 (citing *U.S. v. Zolp*, 659 F. Supp. 692, 705 (D.N.J. 1987)).

Defense counsel has articulated no significant need to publicly disclose the true identity of the witnesses. Nor has Defense counsel revealed how disclosing the true names would contribute in any way to their defense. Plaintiffs respectfully submit that there is simply no prejudice. They know the true identity of the witnesses, they have received all discovery in the case concerning the witnesses and have an affidavit signed by each witness outlining the substance of their testimony and they have been given an opportunity to depose each witness. Defense counsel has been freely able to investigate these witnesses through their investigations and disclosure of the true names of these witnesses publicly will not contribute to their defense in any meaningful way. *Cf. Fuentes*, 988 F. Supp. at 862 (withholding identifying information of a threatened witness from disclosure in open court where opposing counsel has had access to the witness's identity, does not impede the defendant's out-of-court investigation in any material way or foreclose possible avenues of in-court examination).

Defense counsel has already determined that they need not take the deposition of AW1. Therefore, as to his disclosure, there is no meaningful reason to do so. We respectfully submit that AW1 testify at trial using a pseudonym, and that ▮▮▮▮▮▮▮▮ should be deposed and testify at trial using a pseudonym.

In addition, pursuant to the protective order, Plaintiffs' request that the witnesses' contact details remain designated as "Outside Attorneys' Eyes Only." The fact that in criminal trials – not unlike civil trials – anonymity is permitted where disclosure of a witness' contact information would endanger the witness justifies maintaining the "Outside Attorneys' Eyes Only" designation as to ▮▮▮▮▮▮▮▮ and AW1's name and contact information. Furthermore, the Defendants have sufficient information – including affidavits from both ▮▮▮▮▮▮▮▮ and AW1 – to conduct their own independent investigation of the facts. Paragraph 15 of the Discovery Confidentiality Order, as amended, protects from disclosure information "highly likely to cause significant harm to an individual," permitting designation of information as "Outside Attorneys'

Honorable Joseph A. Dickson
June 7, 2017
*Krishanthi, et al. v. Rajaratnam, et al.*, No. 2:09-cv-05395-JLL-JAD
Page 6


Eyes Only." *See* ECF No. 215 at ¶15.[2]  Given the risk of danger to these individuals and the lack
of prejudice to Defense counsel who have known their identities for over a year, we submit this
Court should keep their identities confidential.

   Plaintiffs' counsel are willing, however, to enter a procedure whereby the parties and/or
the Court informs the U.S. Attorney's office in Newark, New Jersey and the Eastern District of
New York that ███████████ has agreed to voluntarily testify as a fact witness in this case and
that Defense counsel has sought his deposition.  This would permit the government to raise any
objections it may have and to articulate the basis of the objections.  The core issue for this Court
is whether a confidential witness in a criminal case may voluntarily testify in a subsequent civil
case.  Defendants here assert that, because the government was conducting some undisclosed
ongoing investigation into the LTTE, the Court should permit defense counsel to speak to the
government about the confidential witness.  Informing the government of the witness' testimony
should amply satisfy Defense counsels' concerns.

   Plaintiffs' counsel are also willing to permit Defense counsel to share the names of ███
███████████ and AW1 with the actual Defendant, Raj Rajaratnam, provided that the Defendants
are aware that they may not disclose the names to anyone else not covered under the "Outside
Attorneys' Eyes Only" protective order.  The personal contact details for the witnesses, however,
should remain shielded from the Defendants as there is no legitimate basis to disclose their contact
details.

## II.   The fact that the three JTTF investigators worked as non-testifying experts for Plaintiffs' counsel should be treated as "Confidential" under the protective order.

---

[2] Footnote 7 of the Court's May 24, 2017 Order states, "in a previous submission, Plaintiffs
represented that certain information concerning ███████████ (including his/her name and,
ostensibly, role) was previously revealed in public filings." ECF No. 301 at 7, n.7 (citing ECF No.
276 at 2).  Plaintiffs' December 20, 2016 submission indicated that, **had** ███████████ testified
as a cooperating witness in the criminal cases brought in the Eastern District of New York, then
his identity would have been disclosed.  This was stating the contrast between a cooperating
witness and a confidential human source. ███████████ true name has not been revealed in
public filings.  While the criminal defendants in the cases brought in the Eastern District of New
York may know who the cooperating witness was based on the disclosure of wiretaps of
conversations with those defendants, ███████████ was nevertheless utilizing a pseudonym
when he served as a cooperating witness and participated in the wiretaps.  To disclose his identity
now would be to disclose his real name and not the one by which he was known by the criminal
defendants.

Honorable Joseph A. Dickson
June 7, 2017
*Krishanthi, et al. v. Rajaratnam, et al.*, No. 2:09-cv-05395-JLL-JAD
Page 7


On November 14, 2016, Plaintiffs confidentially disclosed to Defense counsel the names and contact information for Plaintiffs' non-testifying investigators/expert consultants with the caveat that, "[b]y providing this disclosure, Plaintiffs do not waive their right to withhold communications with these agents pursuant to the attorney work-product doctrine or any other protections afforded these individuals as non-testifying experts under Rule 26." At no point have the Plaintiffs waived their argument that Plaintiffs' non-testifying investigators/expert consultants shall be confidentially maintained under Rule 26. Furthermore, the Court has never made a determination that the Defendants demonstrated "exceptional circumstances" to warrant their disclosure. The confidential disclosure which Plaintiffs undertook to try and close off the extended litigation has now consumed another six months of litigation and created a collateral discovery issue which has no bearing on Phase I liability discovery issues. While Defendants claim that this is solely because Plaintiffs have prevented them from sharing information with the U.S. Government about Plaintiffs' non-testifying investigators/expert consultants, the fact remains that the Defendants have never once met their burden for establishing their right to the identities of Plaintiffs' non-testifying investigators/expert consultants.

"The case law dealing with attorneys' investigators shows that they should generally be afforded the same protection as the attorneys for whom they work." *FTC v. Hope Now Modifications, LLC*, 2011 U.S. Dist. LEXIS 71921, at *15-*16 (D.N.J. July 5, 2011); *see also Alexander v. F.B.I.*, 192 F.R.D. 12, 18 (D.D.C. 2000), *see also United States v. District Council*, 90 Civ. 5722 (CSH), 1992 U.S. Dist. LEXIS 12307, at *26 (S.D.N.Y. Aug. 14, 1992) (citing *United States v. Nobles*, 422 U.S. 225, 238-39 (1975) (because attorneys often rely on investigators, attorney's investigator's information is protected work product)). It is also important to underscore that these investigators are non-testifying investigators/expert consultants. This differentiation is important when looking at the case law that the Defendants have repeatedly raised on these issues. Fed. R. Civ. P. 26(b)(4)(D) also limits information held by an expert employed only for trial preparation. The rule's limitation applies not only to facts and opinions, but also to the identity of non-testifying experts. *See LivePerson, Inc. v. 24/7 Customer, Inc.*, 2015 U.S. Dist. LEXIS 99782, at *4-5 (S.D.N.Y. July 30, 2015) (citing *Williams v. Bridgeport Music, Inc.*, 300 F.R.D. 120, 122 (S.D.N.Y. 2014) (Rule 26 precludes discovery of the identity of an informal consulting expert); *Dover v. British Airways, PLC (UK)*, 2014 U.S. Dist. LEXIS 114121, at *4 (E.D.N.Y. Aug. 15, 2014) (same); *Ager v. Jane C. Stormont Hospital and Training School for Nurses*, 622 F.3d 496, 500-01 (10th Cir. 1980) (same); *MacGillivray v. Consolidated Rail Corp.*, 1992 U.S. Dist. LEXIS 3244, at *3 (E.D. Pa. Mar. 17, 1992) (same)). *LivePerson* also held that "a non-testifying expert's identity is protected from discovery absent a showing of exceptional circumstances." 2015 U.S. Dist. LEXIS 99782, at *5. In other words, Rule 26 does not compel the disclosure of Plaintiffs' non-testifying investigators/expert consultants' identities, and the case law cited previously by the Defendants fails to overcome this hurdle as well.

Honorable Joseph A. Dickson
June 7, 2017
*Krishanthi, et al. v. Rajaratnam, et al.*, No. 2:09-cv-05395-JLL-JAD
Page 8

The leading case cited by Defendants actually states, "[b]y preventing the disclosure of the identity of a party's consultants, [Rule 26(b)(4)(b)] prevents a party from discovering his or her opponent's trial strategy." *Biovale Corp. Int'l v. Hoechst Aktiengesellschaft*, 1999 U.S. Dist. LEXIS 21621, at *20 (D.N.J. Nov. 12, 1999). In *Biovale*, Judge Barry held that the disclosure of the identities of a parties' investigators hinged upon a showing of <u>exceptional circumstances</u>. *See also Ager v. Jane C. Stormont Hospital & Training School for Nurses*, 622 F.2d 496, 503 (10th Cir. 1980) (holding that "the identity, and other collateral information concerning an expert who is retained or specially employed in anticipation of litigation, but not expected to be called as a witness at trial, is not discoverable except as 'provided in Rule 35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means'"); *Corley v. Google, Inc.*, 2016 U.S. Dist. LEXIS 81814, at *18 (N.D. Cal. June 22, 2016) (holding "the identities of non-testifying experts should not be disclosed without a showing of 'substantial need' because that information is 'central to lawyering strategy' and is therefore protected work product") (citing *In re Pizza Time Theatre Securities Litig.*, 113 F.R.D. 94, 98 (N.D. Cal. 1986)). At no point have the Defendants made any attempt to demonstrate exceptional circumstances mandating the disclosure of the investigators' identities in this case. The stated basis for the disclosure of the non-testifying experts was to determine the "motivations of this lawsuit." ECF No. 226 at 12. The Court recognized at the time that this was not an appropriate basis to seek the disclosure and that motivation failed to meet the "exceptional circumstances" test. An example of an "exceptional circumstance" was described in *Biovale*, a trade secrets case where there was a concern that the non-testifying investigators would reveal confidential and proprietary information to a pharmaceutical company's competitor. This would harm the pharmaceutical company whose information was being revealed. Defendants have not shown an exceptional circumstance here warranting disclosure.

The other oft-cited cases by the Defendants fare no better. In *Pettyjohn v. Goodyear Tire & Rubber Co.*, 1992 U.S. Dist. LEXIS 5314 (E.D. Pa. Apr. 20, 1992), the request at issue related to an accident that was allegedly caused by a defective tire. In that case, the Court permitted the disclosure of the identities of individuals who engaged in investigations of the accident itself. 192 U.S. Dist. LEXIS 5314, at *8. Here, Plaintiffs have retained investigators who are also experts on the LTTE and its funding apparatus or who have previously been engaged in investigating the LTTE's fundraising within the United States to assist in building their case. Plaintiffs submit that the identities of these non-testifying experts who have been retained by counsel would divulge Plaintiffs' theories of liability which *Pettyjohn* specifically states is non-discoverable information. *Id.* at *9 (holding that an interrogatory seeking the facts and theories uncovered by plaintiffs supporting their claims "would doubtless involve the legal theories and opinions of plaintiff's counsel and possibly other representatives" and therefore "seeks non-discoverable information"). Whereas the identities of Plaintiffs' non-testifying investigators/expert consultants were confidentially disclosed, Plaintiffs retained the right to challenge the use of this information pursuant to Rule 26 and any other appropriate privilege grounds. The identities were disclosed

Honorable Joseph A. Dickson
June 7, 2017
*Krishanthi, et al. v. Rajaratnam, et al.*, No. 2:09-cv-05395-JLL-JAD
Page 9

with the designation to protect Plaintiffs' arguments regarding any subsequent use of the information.

The last of the three cases previously cited by the Defendants stands for the position that "where the investigating witnesses at plaintiff's market would be expected to be called to testify" at trial, then the identity of these informers cannot be withheld. *Han v. Food & Nutrition Serv. of U.S. Dep't of Agric.*, 580 F. Supp. 1564, 1568-69 (D.N.J. 1984). In this case, Plaintiffs' non-testifying investigators/expert consultants are <u>non-testifying</u>. Therefore, *Han* has no application whatsoever to this case. Plaintiffs do not seek confidential protection for Mr. Rohan Gunaratna, because Mr. Gunaratna publicly holds himself out as an expert and he discloses his contact details publically. Mr. Gunaratna may also serve as a testifying expert.

Plaintiffs submit that neither Rule 26 nor the case law cited by the Defendants supports any further dissemination of the identities of Plaintiffs' non-testifying investigators/expert consultants. In fact, the disclosure at issue was undertaken by Plaintiffs without the Court deciding this issue in an attempt to short-circuit the very mini-trial that has ensued since Plaintiffs made their disclosures. But Plaintiffs' disclosure was limited and recited that they were not waiving their rights to protect the information under Rule 26 or any other privilege grounds available. As a result, Plaintiffs believe that the three non-testifying investigators/expert consultants' roles and identities should be considered "Confidential" under the protective order. The Discovery Confidentiality Order provides that information may be designated "Confidential" if any information, document, or thing "contains private or confidential information." The identity of non-testifying experts is specifically prohibited absent exceptional circumstances under Fed. R Civ. P. 26 and is therefore correctly designated as confidential.

Moreover, Defendants fail to explain the relevance or impact of introducing ███ ██████████ to its counsel in this civil case. Even assuming any of the outlandish allegations that Defense counsel have alleged concerning the former JTTF agents were true, they fail to show why that would have any bearing on this civil case. There is no equivalent in civil litigation to barring the introduction of evidence or testimony because of inappropriate police conduct – *i.e.*, fruit of poisonous tree doctrine. The only rational objective for Defendants' insistence is to interfere with Plaintiffs' counsel's witness testimony and Plaintiffs' counsel's reliance on non-testifying investigators/expert consultants. The Third Circuit has explicitly adopted the Second Circuit's determination that the fruit of the poisonous tree "doctrine is an evidentiary rule that operates in the context of criminal procedure and has generally been held to apply only in criminal trials." *Monaco v. City of Camden*, 366 Fed. Appx. 330, 332 n.2 (3d Cir. 2010) (*quoting Jenkins v. City of New York*, 478 F.3d 76, 91 n.16 (2d Cir. 2007) *and United States v. Calandra*, 414 U.S. 338, 348 (1974)). In fact, the Third Circuit determined that the argument that the fruit of the poisonous tree doctrine applies in the civil context "confuses the principles of civil and criminal proceedings." *Id.*

Honorable Joseph A. Dickson
June 7, 2017
*Krishanthi, et al. v. Rajaratnam, et al.*, No. 2:09-cv-05395-JLL-JAD
Page 10

For these reasons, Plaintiffs submit that their November 14, 2016 letter disclosing Plaintiffs' non-testifying investigators/expert consultants should remain designated as "Confidential."

**III.    In the alternative, disclosure of the identities of Plaintiffs' non-testifying investigators/expert consultants should not include disclosure of their personal identifying information, including mailing address, phone numbers, or e-mail addresses**

At the very least, the personal addresses, phone numbers and e-mail addresses of Plaintiffs' non-testifying investigators/expert consultants should be maintained under the "Confidential" designation as private or confidential information entitled to designation even if the Court determines that the identities of the investigators/expert consultants are not entitled to protection. *See* ECF No. 215 at ¶1(b). Each of these former FBI agents worked on sensitive and high profile anti-terrorism criminal cases. The investigators have not offered their services generally to the public and have not publicly disclosed their personal contact details. *See* Affidavit of John Allison attached hereto as Exhibit 6 at ¶6 and Affidavit of Jayat Kanetkar attached hereto as Exhibit 7 at ¶7. The public release of these personal contact details could pose a risk to their safety and security. Exhibit 6 at ¶8 and Exhibit 7 at ¶9-10. While there is no direct and identifiable threat to the safety of Mr. Kanetkar and Mr. Allison, there is no identifiable reason to release the information. Defense counsel has the contact information for each of these individuals and can share the information with their own investigators. There is no reason to place the witnesses at risk by public disclosure. While discussed in the context of FOIA exemptions from disclosure, the purpose behind protecting personal contact details of former law enforcement agents is instructive. Law enforcement personnel have a privacy interest in protecting their personal contact details because disclosure "could subject them to annoyance, embarrassment, and harassment in the conduct of their official and private lives." *Halpern v. FBI*, 181 F.3d 279, 296-297 (2nd Cir.1999). "These confidential interests are not waived through . . . passage of time." *Id.* at 297.

However, as set forth in the Affidavit of Brian Mallon (attached hereto as Exhibit 8), Mr. Mallon was involved in highly classified government contract work in Pakistan which resulted in the detention of multiple high-value Al Qaeda assets. Exhibit 8 at ¶2. As a result of the work he performed in Pakistan and elsewhere, Mr. Mallon has learned that a bounty was placed on his life. *Id.* at ¶ 5. To avoid any potential harm that might come to him as a result of his identity being disclosed, he is adamant that any contact information remain redacted under the "Outside Attorneys' Eyes Only" designation in order to maintain his safety given the information he has received regarding the threats to his life. With respect to Mr. Kanetkar and Mr. Allison, the "Confidential" designation should be sufficient. Mr. Gunaratna's contact details may be disclosed because they are otherwise publicly available.

Honorable Joseph A. Dickson
June 7, 2017
*Krishanthi, et al. v. Rajaratnam, et al.*, No. 2:09-cv-05395-JLL-JAD
Page 11

       In the event the Court orders disclosure of the non-testifying consultants/expert witnesses' roles in this civil lawsuit, procedures should be put in place to protect Plaintiffs' counsel work product from disclosure to Defense counsel.

## CONCLUSION

       As Plaintiffs set forth above, ███████ and AW1 face serious physical harm should their identities be disclosed. As a result, Plaintiffs seek a protective order permitting the witnesses to testify under a pseudonym and an order making their identities and contact details subject to the "Outside Attorneys' Eyes Only" designation. Therefore, Plaintiffs respectfully submit that the "Outside Attorneys' Eyes Only" designation applicable to ███████ and AW1 – for both their identities and their contact information – should remain in place to provide them with protection from physical harm for testifying against the LTTE and a number of its operatives. Plaintiffs also seek to designate as "Outside Attorneys' Eyes Only" Mr. Mallon's address, phone number and email address because he too faces significant danger to his well-being and safety.

       Plaintiffs further submit that the identifies of Plaintiffs' non-testifying investigators/expert consultants should be designated as confidential and Defense counsel should not be permitted to engage in any further dissemination of this information beyond the confines of the Court's April 24, 2017 Letter Order. To the extent that the Court disagrees with Plaintiffs' position, they respectfully submit that the contact information for Mr. Kanetkar and Mr. Allison should be maintained under a "Confidential" designation and that a procedure be developed shielding Defense counsel from Plaintiffs counsel's work product.

       For the Court's convenience, Plaintiffs' counsel has attached to this brief as Exhibit 9, an example of a proposed designation from our initial disclosure letter.

                                  Respectfully submitted,

                                  Michael E. Elsner

Cc:    All counsel of record (via e-mail)

# EXHIBIT
# 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARUNAMUNIGE CHAMILA KRISHANTHI, *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>RAJAKUMARA RAJARATNAM, *et al.*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 2:09-CV-05395 DMC-MF |

## AFFIDAVIT OF ███████████████

I affirm the following:

1. I, ██████████████████████████

2. I worked undercover with Special Agents of the Joint Terrorism Task Force (**"JTTF"**) of the Federal Bureau of Investigation ("**FBI**"), Newark, NJ from 1999 through August of 2006, and agreed to cooperate with the **FBI** in an ongoing investigation of the **LTTE**.

3. I was a confidential witness who covertly recorded conversations and videos documenting support of the **LTTE**.

4. I have not publicly disclosed my name in association with any work I have performed with the **FBI**, nor was my true name publically released concerning my work as a confidential witness.

5. I have attempted to maintain anonymity while working with the **FBI** by using aliases or masking my identity as an **FBI** confidential witness.

6. I have been informed by members of the **FBI** and the government of Sri Lanka that disclosing my identity as a confidential witness could risk my safety.

1

7.  My risk is heightened by the fact that I currently live in Sri Lanka where the **LTTE** operated.

8.  Even though the **LTTE** is no longer as active as it was historically, the threat to my safety remains from **LTTE** members and sympathizers.

9.  Because of my work as a confidential witness with the **FBI**, revealing my true name, home address, home telephone number, cell phone number or any other identifying information poses a potential risk to my safety and the safety of my family members.

10. While I am willing to testify, it is my preference to do so keeping my true name and contact information shielded from the public.

FURTHER THE AFFIANT SAYETH NOT.

Executed on _____6th_____ of ___JuNE___, 2017.

# EXHIBIT
2

Joseph J. DePalma
Jason E. Macias
LITE DEPALMA GREENBERG, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Phone: (973) 623-3000
Fax:     (973) 877-3845

Michael E. Elsner (admitted *pro hac vice*)
John M. Eubanks  (admitted *pro hac vice*)
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
Phone: (843) 216-9000
Fax:     (843) 216-9450

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARUNAMUNIGE CHAMILA KRISHANTHI, *et al.*, | Civil Action No. 2:09-CV-05395 DMC-MF |
| Plaintiffs, | |
| v. | |
| RAJAKUMARA RAJARATNAM, *et al.* | |
| Defendants. | |

## AFFIDAVIT OF ████████████

PERSONALLY APPEARED BEFORE ME, ██████████████ being duly sworn, who hereby states and affirms the following:

1. I, ██████████████ am a citizen of Sri Lanka and have resided in the United States since 1985.

2. I was born on ██████ in ████████ and ██████████████ by education.

MR-LTTE-00052678

3. I was a staunch supporter of the Liberation Tigers of Tamil Eelam (LTTE) from 1983 to 1994 in India and the United States as a member of the Student Organization of Liberation Tigers (SOLT).

4. ████████████████████████████████████████████████████████████████

5. ████████████████████████████████████████████████████████████████

6. In the course of my deportation process, I met with Special Agents of the Joint Terrorism Task Force ("JTTF") of the Federal Bureau of Investigation ("FBI"), Newark, NJ in 1999, and agreed to cooperate with the FBI in an ongoing investigation of the LTTE.

7. In return for my cooperation with the FBI, I was not deported from the United States.

8. The FBI has paid for my expenses over the past ten years, and I have been compensated with approximately $500,000 in total monies from the FBI for my work.

9. I am currently paying the IRS approximately $6,000 owed in back taxes on a monthly payment plan to repay this amount.

10. My work with the FBI has resulted in the successful conviction of 20 LTTE members or supporters in US criminal courts.

11. I have never received money from Motley Rice LLC and I have never received a promise of payment from Motley Rice LLC.

12. During my period of cooperation with the FBI, I attended numerous LTTE events in New York, New Jersey, England, Sri Lanka, and Canada. I met with senior LTTE officials in the United States, Canada, and Sri Lanka; I met with LTTE financial contributors; and I used audio devices to record conversations with these LTTE officials and donors.

13. At the request of the FBI, I attended and tape recorded a number of LTTE fundraisers in the United States, including an Ilankai Tamil Sangam America ("ITSA"), TRO, WTCC, and IMHO fundraising events held in various locations in New York and New Jersey.

MR-LTTE-00052679

14. ITSA's leadership was taken over by an LTTE member on or about 1995 or 1996, and it was commonly known that ITSA was a LTTE front since 1995 or 1996 to the present.

15. Raj Rajaratnam ("Raj") was the guest speaker at the November 2002 ITSA fundraising event and he was introduced to the fundraiser attendees by an anesthesiologist, Dr. Siva.

16. At this event, Raj spoke about the struggle in Sri Lanka. He asked those in attendance "to support this struggle." From his remarks, those in attendance understood that he was asking them to support the LTTE in its terror campaign against the Sri Lankan people and government.

17. An LTTE flag and informational brochures concerning the LTTE were placed on a table in the conference hall.

18. It was commonly understood among LTTE members that Raj was a large financial supporter of the LTTE since at least 2000.

19. It was also common knowledge within the Tamil community that Raj, for the purpose of helping LTTE's terror campaign, gave significant amounts of money to the LTTE after the LTTE's "Elephant Pass" attack in 2000.

20. I further became aware of Raj's financial support of the LTTE through conversations with a known LTTE official in the US, Vijayshanthar Patpanathan (also known as "Chandru"), and Father Gasper Raj.

21. I obtained over two hundred (200) covertly recorded conversations with Chandru, many of which detailed Raj's support of the LTTE.  In total I obtained approximately eight hundred (800) recordings.

22. I am also aware that Raj's father, J.M. Rajaratnam ("J.M."), is a supporter of the LTTE and is a past-president of ITSA.

23. I have met with Raj's father, J.M., approximately twelve (12) times, and have had one private meeting with him in 2004 at his home on Lakeview Drive in New Jersey. Father Gaspar Raj ("Gaspar Raj") accompanied me to the meeting.

24. I was able to meet with J.M. because of my association with Gaspar Raj, whom I first became acquainted with while in attendance at a Tamil Rehabilitation Organization ("TRO") fundraiser held at the Gujarat Samaj, Queens, New York in March 2002.

3

MR-LTTE-00052680

Although the benefit was for the TRO, the World Tamil Coordinating Council ("WTCC") organized the event. The secretary of the WTCC, Vijayshanthar Patpanathan ("Chandru") organized Gaspar Raj's itinerary while in the United States. J.M. spoke at this event and asked the audience to contribute money to the LTTE.

25. J.M. was also a frequent attendee of fundraisers sponsored by LTTE charitable groups. Like the November 2002 ITSA fundraiser described above, in most if not all of these events, the flag of the Tamil Tigers was prominently displayed before those in attendance. During these fundraisers, J.M. knowingly and purposefully solicited donations and encouraged those in attendance to support the LTTE and its terror campaign.

26. Through my work with the FBI and INS, I was able to assist with Gaspar Raj's entry into the United States on multiple occasions.

27. On April 24, 2004 I received a phone call from Chandru, the Secretary of the WTCC, with news that Gaspar Raj was being detained by airport authorities at Newark Liberty International Airport in Newark, New Jersey.  I notified my contacts within the US government about Gaspar Raj and he was subsequently released.

28. Gaspar Raj ate dinner at my house and stayed overnight.  The next day Socrates Nachimuthu and I drove Gasper Raj to Newark airport where Gasper Raj flew to England.  Socrates is a convicted supporter of the LTTE.

29. Assisting in Gaspar Raj's release from detention at the airport enhanced my standing within the LTTE.

30. Due to my involvement in the FBI's investigation of the LTTE, I was able to offer Gaspar Raj further assistance with his entry into the United States on June 29th, 2004, and July 2005.

31. In the course of my conversations with Gaspar Raj, I noted that I might be able to help broker an arms deal for the LTTE. Gaspar Raj indicated that he would have to discuss this matter with others in the LTTE before proceeding.

32. During this trip, Gaspar Raj stayed as a guest at my home in Staten Island, wherein he confided to me that the LTTE would fund up to one million dollars to have the United States terrorist ban lifted. Gaspar Raj asked if I, with the help of my government contacts, would be able to assist him in this matter.

4

33. He further explained that J. M. would give money to help fund that attempt to bribe U.S. Government officials to remove LTTE from the U.S. list of designated Foreign Terrorist Organizations.

34. A meeting was arranged by Gaspar Raj with J.M. at J.M.'s home in New Jersey to make J.M. aware of my capabilities and the different kinds of assistance I could provide to the LTTE.

35. At this time, I knew that J.M. was the father of Raj. I was also aware that J.M. spoke directly with senior LTTE leadership in Sri Lanka, including its then leader, Vellupillai Prabhakaran, and gave money to the LTTE for the purpose of supporting LTTE's terror campaign.  I am also aware that in 2002 J.M. travelled to Vanni, Sri Lanka and met with Prabhakaran and other senior LTTE leadership.  Upon departing Sri Lanka, J.M. attempted to enter India, but was denied entry because of his relationship with the LTTE.  I was aware that J.M. was one of a very select group of people that could call Prabhakaran directly from the United States.

36. J.M.'s address was 18 Lakeview Drive, Westwood, New Jersey.  When I arrived with Gaspar Raj, J.M. and his wife were already at the house.

37. At this meeting, Gaspar Raj told J.M. about my connections with United States government officials.

38. In the course of this introductory conversation, which was recorded with an FBI-provided device, J.M. went as far as to comment that I must be connected to the "mafia" to have such big connections within the US Government.

39. Gaspar Raj and J.M. then went into the dining room for a private conversation. When they returned, Gaspar Raj indicated that they wanted me to become the U.S. leader of the LTTE. I thanked them for their offer but declined the position.  Driving away from J.M.'s house to New York, Gaspar Raj told me that Raj Rajaratnam gave ten million dollars ($10,000,000.00) to the LTTE after the Elephant Pass attack.  He also stated that J.M. would definitely fund the bribery scheme proposed by the LTTE. The entire conversation was recorded on an FBI supplied recording device.

40. I then took Gaspar Raj to the train station so he could travel to Maryland to meet with TRO officials.  The next day, he returned from Maryland.

MR-LTTE-00052682

41.  J.M.'s address was 18 Lakeview Drive, Westwood, New Jersey.  When I arrived with Gaspar Raj, J.M. and his wife were already at the house.

42. Gaspar Raj and J.M. then went into the dining room for a private conversation. When they returned, Gaspar Raj indicated that they wanted me to become the U.S. leader of the LTTE. I thanked them for their offer but declined the position.  Driving away from J.M.'s house to New York, Gaspar Raj told me that Raj Rajaratnam gave ten million dollars ($10,000,000.00) to the LTTE after the Elephant Pass attack.  He also stated that J.M. would definitely fund the bribery scheme proposed by the LTTE. The entire conversation was recorded on an FBI supplied recording device.

43. Between 2004 and 2006, I had weekly telephone conversations with Gaspar Raj. Approximately 100 of these conversations were recorded at the direction of the FBI. During some of these conversations Gaspar Raj revealed how he assisted the LTTE and spoke about his strong relationship with the LTTE leadership.  Gasper Raj also stated that he raised over one million dollars ($1,000,000.00) for the LTTE thru the TRO in the United States.  Gasper Raj stated to me that the TRO was the same organization as the LTTE.

44. Based on my personal knowledge and belief, I will testify that Raj Rajaratnam and J.M. Rajaratnam were both involved in providing financial support to the LTTE for the purpose of helping LTTE's terror campaign on the Sri Lankan people.

45. I further contend that it was common knowledge among LTTE leaders and members that Raj made significant financial contributions to the LTTE including a large contribution in support of the 2000 Elephant Pass attack.

46. Based on my encounters with J.M. Rajaratnam, I believe that he knowingly supported the LTTE financially through front charities such as the TRO and WTCC for the purpose of helping LTTE's terror campaign.

6

MR-LTTE-00052683

FURTHER THE AFFIANT SAYETH NOT.

SWORN TO AND SUBSCRIBED
before me this 5⁷ᵗʰ day of February, 2010.

_Kathleen Kornfeld Levenson_
Notary Public

KATHLEEN KORNFELD LEVENSON
A Notary Public of New Jersey
My Commission Expires Sept. 28, 2014

7

MR-LTTE-00052684

# EXHIBIT
# 3

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARUNAMUNIGE CHAMILA KRISHANTHI, *et al.,* | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )   Civil Action No. 2:09-CV-05395 JLL-JAD |
| | ) |
| RAJAKUMARA RAJARATNAM, *et al.* | ) ) ) |
| Defendants. | ) ) ) ) |

**AFFIDAVIT OF** ██████████

I, ████████ , do hereby state and declare as follows:

1. I was born in ████████████████ .

2. I completed my ██████████████████████████
████████████████████████████████████████
████████████████████████████

3. This affidavit is based upon my personal knowledge and to the best of my knowledge, the facts contained herein are true and accurate.

4. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

████████

5.

6.

7.

8.

9.

10.

11.



HIGHLY CONFIDENTIAL- ATTORNEYS' EYES ONLY-
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER



HIGHLY CONFIDENTIAL- ATTORNEYS' EYES ONLY-
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

MR-LTTE-00052720



**HIGHLY CONFIDENTIAL- ATTORNEYS' EYES ONLY-**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**



HIGHLY CONFIDENTIAL- ATTORNEYS' EYES ONLY-
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER



**HIGHLY CONFIDENTIAL- ATTORNEYS' EYES ONLY-**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**

28
29
30
31



I certify under penalty of perjury that the foregoing is true and correct.



I am experienced in translating from Tamil to English and English to Tamil. I assisted

the witness with a translation of this affidavit. I translated every word of the affidavit

from English to Tamil for the witness multiple times and verified that the witness

understood and agreed with every word of the affidavit.

I certify under penalty of perjury that I accurately and completely translated this affidavit

for the witness and verified that the witness understood and agreed with each word

written in the affidavit.



**HIGHLY CONFIDENTIAL- ATTORNEYS' EYES ONLY-**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**

MR-LTTE-00052725

EXHIBIT 1

MR-LTTE-00052726

VEHICLES SUPPLII FOR LTTE

| Item | ENG NO | CH ENO |
|---|---|---|
| Land cruiser | IHZ-0477968 | JTERB71570 - 0026494 |
| Land cruiser | IHZ- 0477957 | JTGRB71J30 - 0026492 |
| Land cruiser | IHZ - 0477991 | JTECB09J00 - 3021766 |
| Land cruise | IHZ - 0477949 | JTGRB71JX0 - 0026490 |
| Land cruise | IHZ - 0332773 | JJ7HP5A5 - 07017807 |
| TOYOTA Bus | 5L-5580149 | JTFSK22820- 0001084 |
| TOYOTA Bus | 5L-5578747 | JTFSK22860- 0001069 |
| HILUX VAN | 3L-5579381 | JTPDE62690 - 0145534 |
| HILUX VAN | -5580047 - | JTPDE62610 - 0145692 |
| HILUX VAN | - 5580267 - | JTPDE62660 - 0145705 |
| HILUX VAN | - 5580235 - | JTPDE62690- 0145751 |
| HILUX VAN | - 5580308 - | JTRDE62670- 01455745 |

} 3 VEHICLES
LTTE SUPPLI
03 USED
by TRO

total vehicles 10
total payment - 1100 milion RS

03/2010

MR-LTTE-00050839

INWARD REMITTANCE 2006                    207   65

USD TRO                              92,782,799.68
RELIEF FOUNDATION TRO                20,422,871. -
TSUNAMI RELIER                      102,197,284.60
ILANKAI THAMIL SANGAM-USA            44,991,477. -
CANADIAN FOUNDATION (CFRTRR)         39,511,000 -
SOUTH AFRICA                          6,378,110 -
SWISS TRO                            28,036,459 - 83
GERMANY TRO                          19,229,538.80
ITALY TRO                               983,807.43
FRANCE TRO                            3,447,252. -
CANADA TRO                            8,897,912 -
HOLAND TRO                            1,941,800. -
AUSTRALIA TRO                        15,168,500 -
SWEDEN TRO                              528,000 -
NORWAY TRO                            4,496,500 -
DENMARK TRO                           9,587,930 -
                                   _____
                                    3,986,012,242.34


BANK income 2006

Seylan Bank ____                    3,364,347,81.51
commercial Bank ____                  10,457,895. -
Hatton National Bank ____          8,865,444.28
panasia Bank      ____               39,511,000.
Bank or ceylon    ____              3,235,209.55
By hand cheque                          96,912.
                                    _____
                                    3,986,012,242.34

                                         √ 2010

MR-LTTE-00050840

INWARD REMITTANCE 2005

WHITE PIGEON — 132,056,399·12
HOMSA-UK — 14,559,372·60
JHC OBA-UK — 702,066·-
SHRI KANAGATHURGAI 1,444,674·-
BOROUGH OF WALTHAM —(£1294·53)
— 112,101,146·47
SWISS TRC — 149,009,392·33
GERMANY TRC — 72,857,785·-
NORWAY TRC — 83,547,154·50
FRANCE TRC — 6,409,866·99
ITALY TRC — 91,763,450·60
DENMARK TRC — 4,985,351·11
SWEDEN TRC — 19,002,090·-
NEWZEALAND TRC — 17,135,056·-
HOLAD TRC — 101,713,566·-
CANADA TRC — 2,412,400·-
HINDU SOCIETY CANADA — 238,805·-
HETZERATH — 178,702,500·-
USA TRC — 4,945,000·-
TAMIL FOUNDATION — 10,779,143·70
USA TRC Emergncy — 247,761,821·74
RAJARATNAM USA — 2,006,019·21
BOTSWANA TRC — 85,473,280·62
AUSTRLIA TRC — 233,384,058·74
NERWAY — 1,360,000·-
HBL CROW — 27,137,578·60
CANADA TAMIL — 7,239,293·25
HINDU TEMPLE canada — 6,498,431·24
HINDU MISSION canada

CAPFTDR — 13,380,750·-
BERLIN TRC — 2,906,582·-
MALAYSIA — 6,489,978·64
WELLINGTON — 15,298,805·42
PRINCESSTOWN — 617,533·-
WINCHESTER USA — 5,889,000·-
TRC MALTESER — 17,171,261·25
TRC-OPERATION USA — 49,849,500·-
BQSEP — 7,534,500·-
SJAMO Account — 4,420,523·74
EISS Accout — 1,808,314·88
PBC FOUNDATION — 11,668,763·50
GEORG BECK — 1,347,256·-
EMERGIECY ITALY — 18,574,875·-
Room To READ — 991,980·-
1,770,769,326·17

BANK - income
Standard charter BANK — 882,851,960·99
Seylan Bank — 316,461,467·49
panasia Bank — 259,148,609·94
commercial Bank — 73,744,315·-
Hatton national Bank — 66,274,910·09
Bank of celeyon — 23,007,008·12
Peoples BANK — 5,155,555·-
Grave to malaysia — 63,500,000·-
sakthy Grobal — 10,833,500·-
Greods purchesed — 68,672,000·-
Thilagar — 1,120,000·-
1,770,769,326·17

3/2010

MR-LTTE-00050841



MR-LTTE-00050842

| | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| income | 44498644875.04 | 6289450719.06 | 251840937.63 | 339115464.50 |
| Tsunami Refund | — | — | 19202066.94 | 53630.14 |
| TPL Foreign interest | — | — | 15784583888.54 | 594485833.50 |
| TPL procedure | 44498044975.04 | 6298950719.06 | 17708613933.17 | 39865487249.48 |
| | 14498044975.04 | 10395507419.06 | 11579869324.17 | 177859124923.34 |
| LTT repayment | 330,000,000. | 52,000,000,000 | 611500000000. | 220750000. |
| | (0.) | (0.) | (0.) | (0.) |

MR-LTTE-00050843

44-03. 50  6800

GV/A -193. LTTE

GV/B 336  PRO - LTTE

KK 4848 - LTTE

KK 4868 - LTTE DOCTOR Murali

KK 4935 - LTTE ශ්‍රී ලංකාවේ තුන්වන ජාතික

NK/A 491 - LTTE

NK/B 1204 - LTTE

NK/B 1065 - LTTE

NK/B 1129 - LTTE - ඡන්ද හිමිනාමි, අශෝකාවත්ත සහෝ - (?)

NK/B 1151 - LTTE. සහෝ

O/U - 4778 - LTTE BIG LEADER සහෝ

O/U - 4785 - LTTE

O/U - 4798 - LTTE

O/U - 5040 - LTTE

O/U - 5047 - LTTE - Anjavan

O/U - 5061 - LTTE

O/U - 5169 - LTTE - PunKundran (Auspra. TRO Details)

O/U - 5178 - LTTE - PunKundran (Auspra. TRO Details)

O/U - 5253 - LTTE

O/U - 5675 - LTTE

O/U - 5686 - LTTE

O/U - 5706 - LTTE - Kesavan TRO

O/U - 5719 - LTTE

O/U - 6001 - LTTE - forest officer - PU-6716 Australia

O/U - 7419 - LTTE - forest officer - PU-6716 Australia

O/U - 5730 - LTTE

O/U - 5732 - LTTE

O/U - 5232 - LTTE

O/U - 5862 - LTTE

PM/N - 66 - LTTE

PM/N - 882 - LTTE - weera. ...

P/C/A - 05 - LTTE

PU 17057 - TRO - widebijen

MR-LTTE-00050844

```
PV - 7751    - LTTE
PV - 7720    - LTTE
DV - 7727    - LTTE
PV - 7783    - LTTE
PV - 14 A    - LTTE
RK - 2906    - LTTE
SK - 2376    - LTTE
SK - 2620    - LTTE
     3452    - LTTE

VK  3715    - LTTE
```

1621031 - ශ්‍රීලංකා ග්‍රාමසේවක  Jaffna Director
1868824 - ලංකාංකිත          ෆෝන්නම්බර V
          සංවිධානය           778493725

630751870 V
762394758 V

MR-LTTE-00050845

income DETAILS

2003 Separation Family income —   474 980 475 · 04

2004 Foreign income   628 950 719 · 06

2005 Foreign income   1,770,769,326 · 17

2006 Foreign income (2006 June)   39 860 242 · 34
—————————
3273 301 762 · 61

PAYMENT FOR SPECIAL (LTTE)

2003 SPECIAL PAYMENT —   330,000,000 ·

2004 SPECIAL PAYMENT —   410,000,000 ·
OTHER LTTE PAYMENT —   115 000 000 ,

2005 SPECIAL PAYMENT —   611 500 000 ·

2006 SPECIAL PAYMENT —   220 750 000     1687 250 000 · —
—————————
1586 051 762 · 61

Foreign income   -   3273,301,762 · 61

SPECIAL PAYMENT (LTTE) £ 1687 250 000

TRO expenditure   1586 051 762 · 61
—————————
3273 301,762 · 61     3273 301,762 · 61

2010

MR-LTTE-00050846

PAYMENT FOR SPECIAL (LTTE)                    53

| | | | |
|---|---|---|---|
| 2003. | Shenthan — . | | 330,000,000 |
| 2004 | Shenthan - | 410,000,000 | |
| | OTHER PAYMENT | 115,000,000 | 525,000,000 |
| 2005 | Shenthan - | 570,000,000 | |
| | Vasantham - | 21,500,000 | |
| | Batticalow (Banu) | 10,000,000 | |
| | Trinco (Sornan) | 10,000,000 | 611,500,000 |
| 2006 June | Shenthan | 198,000,000 | |
| | Vasantham . | 19,750,000 | |
| | Arivumani | 3,000,000 | 220,750,000 |
| Total LTTE PAYMENT | | | 1,687,250,000 |

MR-LTTE-00050847

BANK ACCOUNT SUMMARY                    305  50

| | |
|---|---|
| WHITE PIGEON — | 180595880112 |
| The swiss village program | 01607837029 |
| The strenght room each | 01607837010 |
| The Light of Hope | 01607837009 |
| The Back to work | 01607837008 |
| The save the children | 01607837007 |
| The Giaory beek Account | 01607837028 |
| The ciss coperazine | 01607837026 |
| The Norwegion Refugee | 01607837015 |
| The ABC Foundation | 01607837027 |
| The AGISEP pvi Account | 01607837021 |
| The operatiousA | 01607837020 |
| The Noraay Grovement | 01607837011 |
| The STAMO Account | 01607837025 |
| The Room to read | 01607837034 |
| The SOUNDAEBORGI D.K | 01607837030 |
| The Emergency Italy | 01607837031 |
| The Action Aid Acecut | 01607837023 |
| Standard chastered Bank | 01607837001 |
| comm—Greneral Acccut | 1120016250 |
| comm—Light of Hope | 1120016251 |
| comm—Back to work | 1120016252 |
| comm—strengtening each | 1120016253 |
| comm—International | 1120016254 |
| SEYLAN Back to work | 0720-01726548-003 |
| SEYLAN FISHERIES | 0720-01726548-007 |
| SEYLAN LIGHT OF HOPE | 0720-1726548-004 |
| SEYLAN Fisheries and Aquatic | 7200161730600 |

STRENGHT RDOM EDCA — C726-C726548-005
soyun Tamils Rehabilitation organisation 130679 8003
HNB Tamil Rehabilitation organish. 90430238
Pan Asia Bank. TRO — 18C58C650112
ceylan Tsunami Relief Fand — 720016673070 01
BANK OR Ceylon kilinochi — 4534C
Bank of ceylon kilinochi — 4522C
Bank of ceylon kilinochi — 4156C
COMMERCIAL BANK TRO — 1120016984

MR-LTTE-00050849

# EXHIBIT
4

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARUNAMUNIGE CHAMILA KRISHANTHI, *et al.,* )<br><br>Plaintiffs, )<br><br>v. )<br><br>RAJAKUMARA RAJARATNAM, *et al*. )<br><br>Defendants. ) | Civil Action No. 2:09-CV-05395 DMC-MF |

## AFFIDAVIT OF ROHAN GUNARATNA

I, Rohan Gunaratna, do hereby state and declare the following:

1. I am a Professor of Security Studies at the S. Rajaratnam School of International Studies at the Nanyang Technology University and the director of the International Centre for Political Violence and Terrorism Research ("ICPVTR") in Singapore.

2. ICPVTR is the largest academic counterterrorism center outside the U.S. and Europe.

3. I have over 30 years of academic, policy, and operational experience in counterterrorism, and I am a specialist in the global threat posed by terrorist groups in the Middle East, Africa, and Asia.

4. In addition to serving as the editor of the Insurgency and Terrorism series of the Imperial College Press in the United Kingdom (until recently), I am the author and editor of 20 books related to insurgency and terrorist groups. I was also a Senior Fellow at the Fletcher School for Law and Diplomacy at Tufts University, at the Memorial Institute for the

Prevention of Terrorism in Oklahoma, and at the United States Military Academy's Combating Terrorism Centre at West Point.

5. I have advised, assisted, and conducted specialist training on terrorist groups and counterterrorism for government militaries, law enforcement, and national security agencies including the United States and Sri Lanka.

6. I have a particular interest in security issues as well as knowledge of security risks of Sri Lanka as I was born there and have travelled to Sri Lanka on an annual basis since leaving the country.

7. I am the author of one of the first publications to discuss the impact of the Liberation Tigers of Tamil Eelam ("LTTE") in Sri Lanka. International & Regional Security Implications of the Sri Lankan Tamil Insurgency was published in 1997. The book reviews the manner in which the LTTE receives or derives sanctuary, finance, weapons, and training from a vast international support base.

8. It is through the research of the history, structure and financing of the LTTE that I met ████████████

9. ██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

10. I have known ███████████ for approximately three years

11. ██████████████████████████████████████████

██████████████████████████████████

12. █████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████.

13. The TRO was the charitable arm of the LTTE.

14. Both the LTTE and the TRO are globally designated terrorist groups.

15. ████████████ had direct access to LTTE bank accounts and knowledge of the people in the international diaspora that financially supported the LTTE.

16. █████████████████████████████████████████

████████████████████████████

17. ██████████████████████████████████████

18. Even though the LTTE has been dismantled, there are still supporters of the group living in the area.

19. In fact, a number of people have been killed in Sri Lanka by LTTE members because they have shared information with the Sri Lankan government.  Moreover, I have been informed by the Sri Lankan government that ███████████ may be in danger of retribution by LTTE members or sympathizers.

20. Furthermore, I am personally privy to the security concerns ████████████ may face if ████ information is disclosed to the public as there are have been several security threats and attempts by the LTTE to physically harm me, my family and friends.

21. Public disclosure of ██████████ name, image, or any contact information in relation to this case poses a significant risk to ████ life and poses a potential risk of retribution towards ████ family.

FURTHER THE AFFIANT SAYETH NOT.

Executed on 6th of June, 2017.

_____
                    Rohan Gunaratna

# EXHIBIT
# 8

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KARUNAMUNIGE CHAMILA
KRISHANTHI, *et al.*,

        Plaintiffs,

     v.

RAJAKUMARA
RAJARATNAM, *et al*.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 2:09-CV-05395 DMC-MF

## AFFIDAVIT BRIAN MALLON

I, Brian P. Mallon, state and affirm the following:

1. I am a former Senior Special Agent with the Joint Terrorism Task Force ("JTTF") in Newark, New Jersey. The JTTF is composed of agents from various local and federal agencies including the New York/New Jersey Port Authority, Federal Bureau of Investigation ("FBI"), U.S. Secret Service and Bureau of Alcohol, Tobacco and Firearms, among others.

2. After retirement from the Joint Terrorism Task Force in 2002, I worked as the Director of Security for Afghan Wireless in Kabul, followed by private contract work, including private contract work for the US Government.



8. I currently engage in private contracting work for a discreet subset of clients; however, I do not advertise my services publicly and am contracted based on word of mouth rather than on any public advertising.

1

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on _____/ST_____ of _____JUNE_____, 2017.

BRIAN P. MALLON